1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SONIA JOSEPH, individually and as Special
Administrator of the ESTATE OF GIOVONN
JOSEPH-MCDADE, and GIOVANNI
MCDADE, individually,

               Plaintiffs,

     v.

CITY OF KENT, a Washington Municipality;
CITY OF KENT POLICE DEPARTMENT;
WILLIAM DAVIS; MATTHEW RAUSCH;
and JOHN DOES 1-10

               Defendants.

Case No. 2:20-cv-00771-BJR

PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J.
(No. 2:20-cv-00771-BJR)

## I.    INTRODUCTION

On June 24, 2017, Defendant Kent Police Officer William Davis fatally shot Giovonn Joseph-McDade—a 20-year-old unarmed Black man—within approximately two minutes of joining a vehicle pursuit that evolved out of a pretextual traffic stop for expired license plates. During the brief, relatively low-speed pursuit that preceded his death, Mr. Joseph-McDade maintained control of his vehicle, using his turn signal and turn lanes to maneuver safely, even as Defendant Kent Police Officer Matthew Rausch repeatedly rammed his patrol car into the Honda Accord Mr. Joseph-McDade was driving. At the time he fatally shot Mr. Joseph-McDade, Officer Davis had no information whatsoever that occupants of the vehicle were involved in criminal activity or that there was a weapon inside the vehicle.

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so…A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985). This pronouncement of the Supreme Court some 35 years ago put "beyond debate" the question presented in this case of whether a reasonable officer would have known it was unlawful to fatally shoot an unarmed, nonviolent suspect to thwart his escape. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Later case law has further delineated the contours of the clearly established right to be free from the use of lethal force in the context of low-risk, low-speed vehicular chases. *Adams v. Speers*, 473 F.3d 989, 994 (9th Cir. 2007); *Acosta v. City & Cty. of San Francisco*, 83 F.3d 1143, 1147 (9th Cir. 1996), as amended (June 18, 1996); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003). This precedent confirms that a reasonable officer would know it is unlawful to fatally shoot a fleeing driver absent danger to the public or officers, as is the case when pursuing officers have no basis to believe the suspect committed a dangerous criminal offense and otherwise has not behaved dangerously while

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

eluding capture. Plaintiffs dispute Defendants' contention that there was *any* threat to the police or public at the time Kent Officers deployed lethal force against Giovonn-Joseph-McDade to prevent his escape. The expert opinion, documentary, and physical evidence presented herein demonstrates a factual dispute on this issue, dispositive of Defendants' Motion.

## II.    FACTUAL SUMMARY.[1]

In early January 2016, Kent Police Department Officers knocked on the door of Giovonn Joseph-McDade's condominium.[2] They had come to his home because they felt—although he was taller—he "seemed to match the general description" of a driver involved in a collision earlier that evening.[3] A witness to the collision subsequently confirmed Mr. Joseph-McDade was not, in fact, the driver.[4] In the course of his questioning by Kent Officers, Mr. Joseph-McDade protested "that he was 'always' being harassed by the police."[5] This was not the first time Kent Police Officers had contacted Mr. Joseph-McDade, and he was again quoted in a report of this incident remarking to the Kent Police Officers: "You're just harassing me."[6]

Approximately a year and a half later, on June 24, 2017, Kent Police Department Officer Matthew Rausch was on routine patrol.[7] Just after midnight, at about **12:05 am**, he drove up to the ARCO AM/PM gas station parking lot located at 10402 SE 256th St. in Kent where he had spotted a tan Honda Accord car parked near the gas pumps, under the lights.[8] Officer Rausch was able to

---

[1]    Dkt. #21 at p.2, n.1, states that "Defendants agree there is no dispute with regard to basic facts based on the physical evidence, officer and eyewitness testimony, and video evidence." Defendants' position in this regard is a striking departure from their discovery responses. *E.g.,* Wright Decl., Ex. 1, Plaintiffs' First Set of Requests for Admissions to Defendants (Response Nos. 14-18, 20, 22, 24-25, 28-36).

[2]    Wright Decl., Ex. 2, Kent Police Department Report of Officer Thompson, JJ, dated 1/3/16, Supp. No. 0002, at PL_Estate_DoPrdn_000021.

[3]    *Id.*

[4]    *Id.* at PL_Estate_DoPrdn_000022.

[5]    *Id.*

[6]    *Id.*

[7]    Wright Decl., Ex. 3, Compelled Statement of Matthew Rausch at Joseph-McDade_I 0021.

[8]    *Id.*

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J. (No. 2:20-cv-00771-BJR) ~ PAGE 2

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

see that there were two occupants in the Honda, and that a third person was approaching the car "smiling and laughing."[9] The occupants of the Honda were later identified as Giovonn Joseph-McDade, the driver, and Devonte Cheeks, who is also non-Caucasian, the passenger seated in the front of the car.[10] According to Officer Rausch, the third individual approaching the car opened the rear passenger door and was apparently about to get inside, until he saw Officer Rausch pulling into the lot in his police vehicle.[11] Upon seeing the patrol car, Officer Rausch reported that the third male "stopped for a moment and then had a scared look on his face."[12] He then got into the Accord "slowly," per Officer Rausch, "as if not to draw attention to himself."[13]

This third individual has since been identified as Giovanni Fashaw, a childhood friend of Mr. Joseph-McDade's who was also 20 years-old in June of 2017.[14] Like Mr. Joseph-McDade, Mr. Fashaw is African American.[15] Mr. Fashaw suffered from mental health challenges, including psychosis and paranoid schizophrenia.[16] At the time of Giovonn Joseph-McDade's death, Mr. Fashaw had been experiencing psychotic episodes and was unmedicated.[17]

After watching Mr. Fashaw get into the car, Officer Rausch ran a WACIC/DOL inquiry, which returned information that the 1994 Honda Accord had expired and cancelled registration.[18] Additional information accessible to Officer Rausch in running this inquiry confirmed that,

---

[9]   *Id.*
[10]  Wright Decl., Ex. 4, Des Moines Police Department Follow Up Continuation, Officer Reporting: F. Gendreau, July 21, 2017, at p.2.
[11]  Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0021.
[12]  *Id.*
[13]  *Id.*
[14]  Wright Decl., Ex. 5, Aff. of Bianca Fashaw, ¶¶4-6.
[15]  *Id.* at ¶4.
[16]  *Id.* at ¶5.
[17]  *Id.*
[18]  Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0022.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1    although the displayed license plate was expired and cancelled, Giovonn Joseph-McDade was the

2    registrant with a valid, unexpired license plate registration appearing in his name.[19]

3             Officer Rausch proceeded to watch the occupants of the vehicle from across the parking

4    lot for several minutes.[20] In addition to reporting that Mr. Fashaw "had a scared look on his

5    face,"[21] Officer Rausch also subsequently noted that he believed the driver's behavior was

6    "odd," and that the driver "appeared as if he was trying to avoid being stopped or confronted by

7    me."[22]

8

9             Officer Rausch did not provide a statement regarding the incident that transpired on June

10   24, 2017, until five days later[23]—after the law firm of counsel representing all Defendants in the

11   instant action rendered over four and a half hours of legal services on the day of Mr. Joseph-

12   McDade's shooting death, and nearly 40 hours from the date of the incident up to the date of the

13   authoring of Officer Rausch's compelled statement.[24] Officer Rausch's compelled statement

14   provides a retrospective explanation for why his surveillance of the Honda Accord led him to

15   believe drug-related criminal activity might be afoot, after he had run the car's plates:

16             The driver then pulled away from the gas pumps and towards the 104th Ave SE
               entrance/exit. I followed in my vehicle. As we were slowly driving through the lot
17           the driver turned his head all the way around and was watching me as if he was
               trying to see what I was going to do. In this light, he appeared to be a white male,
18           possibly Hispanic. He saw I was headed the same direction and he quickly turned
               back around in the lot and pulled back up to a gas pump. The driver's behavior was
19           very odd and it appeared as if he was trying to avoid being stopped or confronted
               by me. I then drove around all of the gas pumps and saw that the driver had exited
20           the Honda, leaving his door wide open. I was unsure of where he went. The two
               other occupants of the vehicle were now watching me as I proceeded through the
21           lot…

22

---

[19]   Harmening Decl., ¶12. *See also* Wright Decl., Ex. 4, Des Moines Police Department Follow Up Continuation,
23      Officer Reporting: F. Gendreau, July 21, 2017, at p.2.

[20]   *See* Wright Decl., Ex. 2, Rausch Statement at Joseph-McDade_I 0021-22.

24 [21]   *Id.*

[22]   *Id.* at Joseph-McDade_I 0022.

25 [23]   *Id.* at Joseph-McDade_I 0020 (dated June 29, 2017).

[24]   Wright Decl., Ex. 6, Fee Billing Records of Keating, Bucklin & McCormack, Inc., P.S. at
26      PL_Estate_DocPrdn_007176-78.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J.
(No. 2:20-cv-00771-BJR) ~ PAGE 4

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

> The occupants of the Honda were behaving very strangely and I believed that possible criminal activity was occurring. I watched for a few moments and I saw the rear passenger step out of the vehicle and look around the ARCO lot. It appeared to me that he was looking for my police vehicle. The male then slowly walked away from the vehicle towards 104th Ave SE. I then saw the driver get back into the driver's seat of the Honda. The vehicle then pulled away from the pumps and back towards 104th Ave SE.[25]

Photographic evidence of the AM/PM parking lot at the time Officer Rausch ran the plates of Mr. Joseph-McDade's car confirms that there were other vehicles in the vicinity for which Officer Rausch did not run a "routine" license inquiry.[26] Officer Rausch did report in his prepared statement that he ran the plates because Honda sedans of "late" 1990s vintage are "commonly stolen vehicles,"[27] but the information Officer Rausch would have seen in running the car's plates confirmed that the car's owner, Giovonn Joseph-McDade, had valid registration for the vehicle, negating any suspicion the car was stolen.[28] Indeed, in his communications via Computer Aided Dispatch (CAD) throughout the incident, Officer Rausch exclusively referenced the Honda Accord as being involved in a *traffic violation*—any indications of suspicion of vehicle theft or drug-related activity are absent from the transcript of the Kent Police Department CAD related to the incident.[29] At no point during the events of the early morning hours of June 24, 2017, before Mr. Joseph-McDade's shooting death, did Officer Rausch verbalize or relay a suspicion of drug activity to other police officers. No evidence has been offered to corroborate Officer Rausch's representation that the vicinity of the AM/PM is associated with high drug-related crime.

Equipped with information that the Honda was registered to Giovonn Joseph-McDade, but without any probable cause to arrest or other legal authority to stop him and inquire further, Officer

---

[25] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0022.

[26] Wright Decl., Ex. 7, Photograph of AM/PM depicting truck with Caucasian driver visible.

[27] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0021. The Honda was a 1994 model.

[28] *See* Harmening Decl., ¶12.

[29] Wright Decl., Ex. 8, CAD Transcript: Detailed History for Police Incident #KP170044526 As of 07/12/2017 09:53:49, Joseph-McDade_I 0009-15.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

Rausch lay in wait until the car exited the AM/PM parking lot and entered the public roadway to initiate a traffic stop.[30] Officer Rausch testified later at the inquest that, after watching the Honda Accord for a "few minutes" before it pulled away and to another set of gas pumps, he "continued to watch it for maybe five-ten minutes" more.[31] Allegedly activating his lights and sirens, Officer Rausch stopped the Honda Accord.[32] The driver, Mr. Joseph-McDade, complied and exited the vehicle, but Officer Rausch ordered him to get back inside.[33] Officer Rausch gave no other order than to get back in the car, and there is no evidence of any further communication between the Officer and Mr. Joseph-McDade. As Officer Rausch used his radio to advise dispatch of the Honda Accord's license plate and request backup, the car drove away.[34]

The parties dispute the speed at which Mr. Joseph-McDade drove away, as Defendants indicate he "punched the gas" and drove off,[35] while the CAD record indicates he drove off slowly, at speeds between 20-30 miles-per-hour.[36] The CAD record also reflects that Officer Rausch's request for assistance was identified as a "Kent Police Priority 2."[37] Kent Police Department policy establishes that a "Priority 2" call "represents a minimal hazard" with "considerably less potential for life and/or property loss" than a confirmed or potential emergency call.[38] Department policy further defines a "Priority 2" call as representing "minimal risk to officers."[39] As the Honda accelerated away from him, Officer Rausch immediately engaged in pursuit.[40]

---

[30]  *See* Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0022.

[31]  Wright Decl., Ex. 9, Transcript of Inquest Proceedings, Vol. II, Dec. 12, 2017, at 8:8-16.

[32]  Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0022.

[33]  *Id.* at Joseph-McDade_I 0023.

[34]  *Id.*

[35]  Dkt. #21 at p.3.

[36]  Wright Decl., Ex. 8, CAD Transcript at Joseph-McDade_I 0009 (at 17:03, "IN PURSUIT – TRAF VIOL…NO TRFC, speeds 20, SLOWING DOWN" and at 17:12, "SPEEDS 30, trying to find place to bail.").

[37]  *Id.*

[38]  Wright Decl., Ex. 10, City of Kent Police Department Annual Report 2017 at p. 8.

[39]  *Id.*

[40]  Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0023.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

1

2    At **12:16 a.m.** on June 24, 2017, Defendant Kent Officer William Davis confirmed via

3    CAD he was driving to the Applebee's parking lot adjacent to the AM/PM to provide assistance

4    to Officer Rausch.[41] With Officer Davis in his patrol car was a ride-along passenger, AnnaMaria

5    Decker,[42] a non-officer Kent Police employee.[43] When Officer Davis and his ride-along were

6    enroute to the Applebee's, the only information known to them was that Officer Rausch had

7    stopped the Honda for a traffic violation.[44] In a statement given a few hours after the incident, Ms.

8    Decker confirmed she had no other information about why the Honda Accord was initially stopped

9    other than that it was a traffic stop.[45]

10    Likewise, Officer Davis received no information that there was any suspicion of criminal

11    activity beyond a traffic violation, nor did he have any information to suggest any occupant of the

12    Honda Accord was in possession of a weapon. He testified at the inquest proceedings as follows:

13        Q:    Well did you also hear testimony earlier from Office Rausch regarding his
           observation at the AM-PM?

14        A:    I did, yes.
    Q:    And at this time that you heard call out for a second unit did you have any

15               of that information?
    A:    No, ma'am I did not.

16        Q:    And did you have any of that information during the life of this incident?
    A:    No.

17        Q:    So when he made that call you had your understanding, based on your prior
           experience with Officer Rausch. But what was the specific nature of the

18               stop?

19        A:    It was a traffic stop.[46]

20    During the pursuit[47]—which lasted less than three minutes—Officer Rausch confirmed

21    there was no other traffic on the road, and alleges the speeds of travel ranged between 20-60 miles-

22

23    _____

    41   Wright Decl., Ex. 11, Compelled Statement of William Davis (Davis Statement) at Joseph-McDade_I 0028.

24        42   *Id.*
    43   Wright Decl., Ex. 12, Statement of AnnaMaria K. Decker, at Joseph-McDade_I 0280-81.

25        44   *Id.* at Joseph-McDade_I 0282.
    45   *Id.*

26        46   Wright Decl., Ex. 13, Transcript of Inquest Proceedings, Vol. III, Dec. 13, 2017, at 47:19-48:6.
    47   A map of the pursuit route is provided as Wright Decl., Ex. 14.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J.
(No. 2:20-cv-00771-BJR) ~ PAGE 7

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

per-hour on the main thoroughfares.[48] The speeds decreased to less than 20 miles-per-hour when

driving in residential neighborhood areas.[49] There is evidence that Mr. Joseph-McDade used his

turn signal during the pursuit.[50] He utilized a left-hand turn lane when turning off the main

thoroughfare into a residential area.[51] There were zero uninvolved vehicles or pedestrians

identified as being present on the road during the pursuit.[52] There is no evidence confirming a Kent

Police Department-commissioned supervisor actively monitored and provided directives to

Officers Rausch or Davis during the pursuit. Defendants have offered no evidence that Officer

Rausch's supervising officer, Sargent Thomas Clark, was involved in supervising the pursuit as

required by policy.[53]

At approximately **12:17 a.m.**, Officer Rausch first attempted to use force on the driver of

the Honda when he tried to ram his police vehicle into the car on the driver's side via a Pursuit

Intervention Technique (PIT).[54] This PIT was unsuccessful and did not make contact with the

Honda.[55] At 12:18 a.m., the Honda drove westbound on 244th St and 100th Ave.[56] When the Honda

reached a roundabout in the road, Officer Davis strategically positioned his police vehicle in a way

that forced the Honda to enter the cul-de-sac at the 9900 block of SE 244th.[57] In order to avoid

collision, the driver of the Honda entered the cul-de-sac at a speed of approximately ten miles-per-

---

[48]   Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0023; *see also* Ex. 9, Davis Statement at Joseph-McDade_I 0028. Defendants have yet to produce the "black box" from Officer Rausch's car to confirm the speeds.
[49]   *Id.*
[50]   *E.g.*, Wright Decl., Ex. 12, Statement of AnnaMaria K. Decker, at Joseph-McDade_I 0283 ("We'd seen it [the Honda Accord] had its blinker on…").
[51]   Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0023; Ex. 9, Inquest Transcript, Vol. II, at 17:19-24.
[52]   *See* Wright Decl., Ex. 8, CAD Transcript at Joseph-McDade_I 0009-15.
[53]   *See* Wright Decl., Ex. 15, Kent PD Policy #15.50 "Motor Vehicle Pursuits," p.3-4. Defendants did not call Sargent Thomas as a witness during the inquest, nor have they produced any report of Sargent Thomas's during discovery.
[54]   Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0023.
[55]   *Id.*
[56]   *Id.* at Joseph-McDade_I 0028.
[57]   *Id.* at Joseph-McDade_I 0028-29.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

hour.[58] After clarifying that "[s]triking the driver's side door is considered lethal force," Officer Davis stated he "did not believe that the suspect's actions had risen to [justify] that level of force" at the time the pursuit entered the roundabout.[59]

Shortly before **12:18 a.m.**, without any real or perceived threat whatsoever to either officer, Officer Rausch used lethal force via another PIT-like maneuver directed at the driver of the Honda, near the center of the car.[60] He did not issue any verbal warning prior to deploying lethal force. Officer Rausch was successful this time in striking the center of the car on the driver's side, causing extensive damage to the occupied center of the car at the very location where the reclined driver's seat headrest was located.[61] Despite the severe damage, the Honda was able to drive on.[62] Officers Rausch and Davis then attempted to prevent the Honda Accord's exit from the end of the cul-de-sac by strategically positioning their police vehicles to box-in the Honda Accord.[63]

In the cul-de-sac, Officer Davis got out of his police vehicle and approached the Honda with his gun drawn, and used it to strike and shatter the driver's side window.[64] While Officer Davis had his gun drawn, he was able to see both a driver and passenger in the car,[65] and therefore was able to visually confirm that no person inside the Honda Accord possessed any weapons. Officer Davis was also able to see that the driver had his hands up and crossed in front of his face.[66] Both Officer Davis and Rausch's statements describe Officer Davis's positioning shortly before

---

[58]   *Id.* at Joseph-McDade_I 0029.

[59]   *Id.*

[60]   Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0023.

[61]   Wright Decl., Ex. 16, Photo of Honda with impact right at head rest.

[62]   Wright Decl., Ex. 2, Rausch Statement at Joseph-McDade_I 0023.

[63]   *Id.*

[64]   *See* Wright Decl., Ex. 11, Davis Statement at Joseph-McDade_I 0030; Harmening Decl., ¶15; Ex. 16, Photo of Shattered Driver's Side Window.

[65]   Wright Decl., Ex. 11, Davis Statement at Joseph-McDade_I 0030.

[66]   *Id.* ("I clearly saw the driver raise his hands above his head. He crossed his arms in front of his face.").

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

the shooting as being behind his own patrol car.[67] A few moments later, the Honda Accord driver placed the car in reverse, then forward, in an attempt to drive the car through the space between the two police vehicles.[68] The passenger in the Honda, Devonte Cheeks, confirmed that when Mr. Joseph-McDade attempted to drive out of the cul-de-sac, the car was "going pretty slow" and Mr. Joseph-McDade was "trying to find an opening."[69] "He was looking to escape" and "trying to go around him [Officer Davis]."[70] Likewise, a resident of one of the homes located at the cul-de-sac, Hong Pham, testified at the inquest that he did not know whether the Honda accelerated toward the officer or not.[71]

At **12:18 a.m.**, Officer Rausch delivered his third attempted lethal force maneuver against the Honda Accord by driving his police SUV at the occupied driver's side.[72] In his compelled statement, Officer Rausch explained that he "pushed the accelerator in my vehicle to the floor, attempting to force the vehicle to stop or change directions," but "I was unable to get in front of the Honda and my vehicle struck the Honda somewhere on the driver's side."[73] The force of the impact severely damaged Officer Rausch's patrol vehicle's front bumper and push bar,[74] causing the push bar to bend up at an angle from right to left and detatching a portion of the push-bumper

---

[67] *Id.* ("The driver suddenly put the car in reverse and backed up quickly. When he started moving backwards I moved to the rear driver's side of my patrol vehicle. I was approximately 3 yards behind my rear bumper and off to the side."); Ex. 3, Rausch Statement at Joseph-McDade_I 0024 ("Officer Davis was now directly behind his patrol vehicle and still yelling at the driver of the Honda. His duty pistol was still out and pointed at the Honda…I lost sight of Officer Davis for a moment and feared that he had been struck. I then saw that he somehow wasn't hit or was still standing after being hit by the Honda and he was standing near the back of his patrol vehicle").

[68] *E.g.*, Wright Decl., Ex. 12, Statement of AnnaMaria K. Decker, at Joseph-McDade_I 0281, Joseph-McDade_I 0291.

[69] Wright Decl., Ex. 17, Reenactment Video with Devonte Cheeks at 6:59, 7:19, 14:43.

[70] *Id.* at 8:22, 12:04.

[71] Wright Decl., Ex. 18, Inquest Transcript, Vol. I, at 62:21-24.

[72] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0024 ("I pushed the accelerator in my vehicle to the floor…my vehicle struck the Honda somewhere on the driver's side…I later observed significant damage to the front of my vehicle") *and* Ex. 11, Davis Statement at Joseph-McDade_I 0029 (a PIT maneuver "[s]triking the driver's side door is considered lethal force").

[73] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0024.

[74] *E.g.*, Harmening Decl., ¶24; Wright Decl., Ex. 19, Photo of vehicle with detached pushbar.

---

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

on the right side.[75] "At about the same time" Officer Rausch crashed into the Honda, Officer Davis fired his gun twice at the driver.[76] Officer Rausch did not provide any verbal warning prior to ramming the Honda. Nor did Officer Davis verbally warn the driver that he was going to shoot.[77]

Although Officer Rausch's compelled statement clearly describes his intentional striking of the Honda with his own patrol vehicle almost simultaneously with Officer Davis's firing at Mr. Joseph-McDade,[78] Officer Rausch's inquest testimony blames Mr. Joseph-McDade for causing the impact he previously testified he had inflicted.[79]

Trajectory analysis confirms that Officer Davis fired his first shot from outside the front passenger side of the Honda, through the windshield.[80] This analysis confirms that Officer Davis's location relative to the Honda Accord at the time he first fired at the driver was decidedly not in the vehicle's forward path.[81] The bullet defects confirm Officer Davis had taken cover the moment Mr. Joseph-McDade placed his vehicle in reverse.[82] Additionally, the trajectory evidence shows that Officer Davis moved forward to fire his second shot, *after* the front of the Honda was already past him.[83] The bullets discharged by Officer Davis's firearm entered the windshield of the Honda Accord at an angle, travelling through the car to hit Mr. Joseph-McDade once in the side of his chest, grazing his arm, and once in the heart and lung.[84] Plaintiffs' expert William Harmening opines that neither Officer Davis nor Rausch, nor Ms. Decker were in danger of being struck by Mr. Joseph-McDade's vehicle, nor would a reasonable officer in their position have reasonably

---

[75] *Id.*

[76] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0024 ('At about the same time as I struck the Honda, Officer Davis discharged his pistol through the front windshield of the Honda").

[77] *See* Wright Decl., Ex. 11, Davis Statement at Joseph-McDade_I 0030 ("I yelled 'Police Stop.'…").

[78] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0024.

[79] *Cf. id. and* Wright Decl., Ex. 18, Transcript of Inquest Proceedings, Vol. I, Dec. 11, 2017, at 62:3-63:5.

[80] Harmening Decl., ¶16.

[81] *Id.*, ¶¶15, 18.

[82] *Id.*, ¶¶16, 18.

[83] *Id.*, ¶18.

[84] *Id.*, ¶10; Ex. 20, Autopsy Report, King County Medical Examiner, Dr. Timothy Williams, at p. 1.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J. (No. 2:20-cv-00771-BJR) ~ PAGE 11

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

perceived they were in danger of being struck by the Honda, given Officer Davis's positioning at the time he fired his gun.[85]

Moments before **12:19 a.m.**, just over two minutes after Officer Davis agreed to provide assistance for a traffic violation of cancelled registration, he fatally shot and killed the driver of the Honda, Giovonn Joseph-McDade. After Mr. Joseph-McDade was shot, his car moved past the two police vehicles and into a nearby park where it came to rest.[86] Mr. Joseph-McDade was pronounced dead at the scene; Associate King County Medical Examiner, Dr. Timothy L. Williams, concluded that Mr. Joseph-McDade died of multiple gunshot wounds, and identified the manner of death homicide.[87]

## III.    AUTHORITY AND ARGUMENT

Summary judgment is only appropriate if the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). Once the moving party has carried its burden to assert no genuine issue of material fact exists, its opponent can prevail by designating specific facts establishing a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 324-25 (1986). A district court ruling on summary judgement "must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001). If there is "any evidence from the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgement is improper." *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir.1997).[88]

---

[85] Harmening Decl., ¶19.

[86] Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0025. The fact that the car, driven by a fatally wounded, if not already dead, driver cleared the vehicles and Officer Davis without difficulty itself gives rise to the inference that Mr. Joseph-McDade never intended to hit Officer Davis, who was behind his vehicle.

[87] Wright Decl., Ex. 20, Autopsy Report at p. 1.

[88] Plaintiffs do not oppose dismissal of their claims against the Kent Police Department or their prayer for injunctive relief. Plaintiffs further agree that Sonia Joseph, the decedent's mother, in her representative capacity as Special Administrator, has standing under Wash. Rev. Code § 4.20.046 to pursue Fourth and Fourteenth Amendment

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J. (No. 2:20-cv-00771-BJR) ~ PAGE 12

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

**A. Defendants Violated Mr. Joseph-McDade's Fourth Amendment Rights by Using Objectively Unreasonable Force.**

Plaintiffs bring claims under 42 U.S.C. § 1983, which creates a cause of action against any person or municipality that abridges rights established by the Constitution. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002). In this case, Plaintiffs allege Defendants violated Giovonn Joseph-McDade's Fourth Amendment right to be free from unreasonable seizure of the person by using excessive force. The use of force violates the Fourth Amendment when it is "objectively unreasonable." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). *See also County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017). Courts analyze the use of force "from the perspective of a reasonable officer on the scene," considering the circumstances known to the officer on the scene. *Graham*, 490 U.S. at 396. *See also* Ninth Circuit Comm. on Model Civil Jury Instructions, Manual of Model Civil Jury Instruction for the District Courts of the Ninth Circuit, 2017 ed. (2019) 9.25. Whether deadly force is reasonable is a highly fact-specific inquiry, which should be left to the jury except in the most extreme cases. *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010); *Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002).

The "settled and exclusive framework" for determining the reasonableness of force is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Mendez*, 137 S. Ct. at 1546. Trial courts must balance "the type and amount of force inflicted" against "the importance of the government interests at stake." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). As outlined in *Graham*, when analyzing the governmental interest, trial courts must consider "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest." *Id.* at 964. The *Graham* factors are not exclusive, however. *Mattos v. Agarano*, 661 F.3d 433, 441

---

claims, both of which are analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

(9th Cir. 2011)). Trial courts in the Ninth Circuit must examine the totality of the circumstances by also considering "whatever specific factors may be appropriate in a particular case." *Id.*, *citing Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). This encompasses (4) "whether officers gave a warning before employing the force," (5) "whether there were less intrusive means" the officers may have used, *Glenn v. Washington Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011), and (6) "whether the officers engaged in 'unreasonable conduct prior to the use of force that foreseeably created the need to use it.'" *Maddox v. City of Sandpoint*, 2017 WL 4343031, at *3 (D. Idaho Sept. 29, 2017) (*quoting Mendez*, 137 S. Ct. at 1547, n.1). *See also Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). The Ninth Circuit pattern jury instruction for excessive force enumerates twelve non-exhaustive factors for the jury's consideration, including "the number of lives at risk (motorists, pedestrians, police officers) and the parties' relative culpability; *i.e.,* which party created the dangerous situation, and which party is more innocent." *Supra,* 9th Cir. Model Instr. 9.25.

### 1. The Record Evidence as to the Totality of Circumstances Attending the Officers' Use of Force Precludes Summary Judgment.

Defendants deployed unreasonable force against Giovonn Joseph-McDade through use of PIT maneuvers/intentional ramming of his car as well as firing the gunshots that ultimately killed him. Plaintiffs' expert William Harmening specifically confirms that Officer Rausch's use of deadly force in intentionally ramming Mr. Joseph-McDade's vehicle was unreasonable, a violation of Kent Police Department policy, and an action that a reasonable officer under the circumstances would know was unlawful;[89] indeed, Officer Davis's compelled statement supports the same conclusion.[90] Mr. Harmening further opines that Officer Davis's use of deadly force in shooting

---

[89]  Harmening Decl., ¶¶13, 14.

[90]  Wright Decl., Ex. 3, Rausch Statement at Joseph-McDade_I 0024 ("I pushed the accelerator in my vehicle to the floor…my vehicle struck the Honda somewhere on the driver's side…I later observed significant damage to the

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

Mr. Joseph-McDade was unreasonable, a violation of Kent Police Department policy, and that a reasonable officer, under the same or similar circumstances and with the same level of information, would have known shooting into at the moving vehicle was unlawful.[91]

Consistent with the expert opinion evidence, applying the totality of circumstances lens, nearly every factor for consideration illustrates the objective unreasonableness of the Defendants' use of force. First, the severity of the crime at issue was a traffic violation for cancelled license plates, where the Officer had ruled out the possibility that the car was stolen. Thus, at the time the pursuit was initiated, the government's only interest was in enforcing a non-moving traffic violation. It is difficult to imagine a less severe offense. Consistently, when backup was requested, the interaction with the suspect was characterized as a low risk/low priority situation.[92] Officer Davis conceded at the inquest that, during the incident, he only knew the pursuit grew out of a traffic violation and he had no other information about any suspicion of criminal activity. Engaging in vehicle pursuits for minor infractions and using aggressive and dangerous tactics such as PIT maneuvers absent a need for immediate apprehension are considered unreasonable by modern policing standards, including the Defendant City of Kent's own policies.[93] Such policies recognize that it is unreasonable to put the lives of officers, suspects, and the public at risk to apprehend non-dangerous offenders. *Accord Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury, even where non-lethal).

---

front of my vehicle") *and* Ex. 11, Davis Statement at Joseph-McDade_I 0029 (a PIT maneuver "[s]triking the driver's side door is considered lethal force").

[91] *E.g.,* Harmening Decl., ¶¶19, 20, 22, 23, 26, 28.

[92] Wright Decl., Ex. 10 at p.8 and Ex. 8.

[93] Wright Decl., Ex. 15, Kent PD Policy #15.50 "Motor Vehicle Pursuits," ("Vehicle Pursuits will be terminated when: "The suspect is identified, immediate custody is not necessary to protect officers or the public, and apprehension at a later time is reasonably certain," or "The danger of continuing the pursuit outweighs the immediate necessity of arresting the suspect.".) *See also* Ex. 21, Kent PD Policy #15.130 "Forcible Stopping" ("the officer should consider the risk of bodily injury presented to the fleeing suspect by use of the forcible stopping technique in light of the threat to the officer or the public presented by the fleeing suspect's actions.").

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

1

2        Second, the record reveals no evidence that the suspect posed an immediate risk of harm

3   to officers or others during the pursuit. At the time of the initial traffic stop and throughout the

4   subsequent pursuit, there was no reason for either Officer to reasonably believe Mr. Joseph-

5   McDade was armed with a weapon and, in fact, he was unarmed. Officer Rausch had the

6   opportunity to observe the occupants of the Honda for several minutes during which time he never

7   saw any indication either Mr. Joseph-McDade or Mr. Cheeks were in possession of a weapon. Just

8   prior to the shooting, Officer Davis was able to see inside the car to visually confirm no weapons

9   were inside. There is no indication that Mr. Joseph-McDade behaved in a threatening way prior to

10  or during the relatively low-speed pursuit, which occurred in the absence of pedestrian or vehicle

11  traffic. Beside potentially exceeding the posted speed limit, Mr. Joseph-McDade drove safely and

12  obeyed traffic laws during the pursuit, using his turn signal and slowing to make turns safely.[94]

13  Most importantly, Officer Rausch deployed lethal force via his intentional ramming of the center

14  occupied driver's side of the Honda *before there was any conceivable threat to officer safety.*

15       Once inside the cul-de-sac, Plaintiffs challenge whether Officers reasonably perceived any

16  threat of immediate danger to themselves. While Defendants offer their own self-serving

17  statements—crafted after the retention of their current defense counsel—to argue the suspect posed

18  a threat to officer safety when he drove toward Officer Davis, the Ninth Circuit has instructed that

19  trial courts are not to "simply accept what may be a self-serving account by the police officer."

20  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("The judge must carefully examine all the

21  evidence in the record…as well as any expert testimony proffered by the plaintiff, to determine

22  whether the officer's story is internally consistent and consistent with other known facts.").[95]

23

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [94] *E.g.*, Wright Decl., Ex. 9, Transcript of Inquest Proceedings, Vol. II, Dec. 12, 2017, at 17:19-24.

25  [95] *See also Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016) (same); *Makarowsky v. Lobdell*, No. 10-5423, 2011 WL 2491613, at *5 (W.D. Wash. June 22, 2011) ("[T]he court is not bound to and should not simply accept the potentially self-serving account by the shooting officer, where the only other witness is dead.");

26  *Pineda v. City of Houston*, 124 F. Supp. 2d 1037, 1055 (S.D. Tex. 1999) (denying summary judgment where the

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

Plaintiffs have offered evidence contradicting the Officers' statements regarding their appreciation of a threat to their own safety when the chase culminated in the cul-de-sac. Specifically, the physical evidence, trajectory analysis, and expert opinion refutes Defendants' contention that Officer Davis could reasonably have believed he was in harm's way at the time he fired on the Honda Accord's driver.[96] The expert testimony of William Harmening establishes that Officer Davis was in a position of cover when he fired the first shot at Mr. Joseph-McDade, and actually *moved forward,* toward the vehicle as it moved past him, as he fired his second shot.[97]

Third, with respect to the suspect's behavior in resisting arrest, when initially stopped by Officer Rausch, Mr. Joseph-McDade was compliant, stopping his vehicle, getting out to speak to Officer Rausch, and getting back inside the car when instructed to do so.

Fourth, no verbal warnings relating to the use of force were given by either Officer Rausch or Davis prior to deploying lethal force via PIT/intentional striking maneuvers or firing shots; rather, the record reflects that there was only the implication of an order to stop by way of the pursuit, in addition to Officer Davis's admonition simply to "stop."

Fifth, there was an obvious, less-intrusive means of thwarting the suspect's escape through simply blocking the roundabout exit to the cul-de-sac where the Officers had chased Mr. Joseph-McDade.

Sixth, Officer Rausch engaged in unreasonable conduct that set in motion the series of events leading to his and Officer Davis's use of excessive force when he conducted a pretextual traffic stop of the Honda and initiated a pursuit. *See infra,* § B.

---

only evidence that a gun was pointed at an officer consisted of the involved officer's "self-serving testimony"); *Tomazic v. City of Cleveland,* No. 04-2252, 2006 WL 2661424, at *5 (N.D. Ohio Sept. 14, 2006) (same).

[96] *E.g.,* Harmening Decl., ¶¶20, 24.

[97] *Id.,* ¶18.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

Finally, zero lives were at risk if Mr. Joseph-McDade escaped the cul-de-sac; in contrast, Officer Davis placed five lives at risk by shooting into the moving vehicle (Giovonn Joseph-McDade, Devonte Cheeks, Ms. Decker, Officer Rausch, and himself)—in addition to occupants of the homes surrounding the scene of the shooting. No reasonable officer would believe he can stop a car that is only feet away from him by shooting the driver. The Officers' appraisal of the situation ignored the danger to uninvolved passengers in both Mr. Joseph-McDade's vehicle as well as the non-officer ride-along in Officer Davis's patrol vehicle. Under the fact-intensive totality of circumstances rubric, there is ample evidence from which a jury could find the Officers' use of force was objectively unreasonable.

### 2. Deadly Force is Not Authorized to Prevent Flight of a Non-Dangerous Suspect.

"Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. at 9. "[A]n officer's decision to use deadly force is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Cowan*, 352 F.3d at 762, *quoting O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003). "The reasonableness of the officer's decision 'depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force.'" *Cowan*, 331 F. 3d at 762, *quoting Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996).

Lethal force is unreasonable and unconstitutional in the context of low-risk vehicular chases where there is no danger to the public or officers posed by the fleeing suspect, including cases where the pursued driver has not committed any dangerous felony or otherwise behaved dangerously while eluding. *See, e.g., Adams v. Speers*, 473 F.3d at 994 (chase of suspect who drove "nonchalantly," largely within the speed limit, stopping at some stop signs and rolling

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOT. FOR SUMMARY J. (No. 2:20-cv-00771-BJR) ~ PAGE 18

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

through others, fell "within the obvious: the absence of warning and the lack of danger to the shooter or others distinguish the case from *Cole*, *Smith*, and *Brosseau*"); *Acosta v. City & Cty. of San Francisco*, 83 F.3d at 1147 ("district court erred in concluding that a reasonable officer in Yawczak's position could have reasonably believed that shooting at the driver of a slow-moving car was lawful."); *Cowan v. Breen*, 352 F.3d at 763 (officer not entitled to judgment as a matter of law as to whether a Fourth Amendment violation occurred when disputed facts suggested officer was not in danger of "death or even physical harm when he fired the fatal shots"); *McCaslin v. Wilkins,* 183 F.3d 775 (8th Cir. 1999) (deadly force may be used only if a suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm).

In *Cowan v. Breen*, the court held that, whether an officer was in imminent fear for his life, or the lives of fellow officers, was a question of fact that must be decided by the jury. 352 F.3d at 762-63. Much like this case, *Cowan* arose out of an encounter starting with an officer running the license plates on a vehicle whose occupants "aroused his suspicion" while parked in a store parking lot." *Id.* at 758. In *Cowan*, the officer claimed he feared for his life as the suspect drove his vehicle towards him, but the plaintiff presented evidence that the shooting officer "was not in danger of death or even physical harm when he fired the fatal shot," including evidence that the suspect's vehicle was traveling slowly; that the shooting officer was not in front of the vehicle but substantially off to its side when he fired the second, fatal shot; and that the vehicle made no sudden turns as it traveled along the roadway. *Id.* at 762-63. The court also relied upon "expert witness evidence cast[ing] doubt on whether the decision to shoot under such circumstances was an objectively reasonable one," particularly where proper police procedure when faced with an on-coming vehicle is to get out of the way rather than shoot."[98] *Id.* at 763. Here, there is expert opinion

---

[98]     *Compare* Harmening Decl., ¶¶22, 23.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

that Mr. Joseph-McDade was decidedly not using his vehicle as a weapon to run down one or both officers.[99] There is also testimonial evidence from two eyewitnesses—the passenger in Mr. Joseph-McDade's car, Mr. Cheeks,[100] and a homeowner in the cul-de-sac, Mr. Pham—who both dispute that Mr. Joseph-McDade drove his car at Officer Davis, or was instead simply trying to escape.[101]

The cases cited by Defendants for the proposition that an officer may constitutionally shoot a fleeing suspect so long as the officer is in the "general direction" of the path of the suspect's moving vehicle are readily distinguishable on the basis that each of the cited cases involved more serious felony offenses that gave rise to the vehicular pursuit as well as much more dangerous, erratic driving by the suspect during the chase—or an unrefuted record as to the officer's fear of being hit. Defendants rely heavily on both *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), and *Arnold v. City of Lakewood*, No. 3:10-CV-05907 RBL, 2012 WL 90472 (W.D. Wash. Jan. 11, 2012). In *Arnold*, the suspect engaged in a dangerous pursuit, putting police and the public at risk of serious injury. *Id.* at *1-3. The suspect collided with three separate police cars, held an object that appeared to be a weapon, and rocked his vehicle back and forth with officers in front of and behind him. *Id.* at *2-3. The officers presented unrebutted evidence and witness testimony that Mr. Arnold posed an immediate threat of serious physical harm. *Id.* at *5-7. Similarly, in *Wilkerson*, a police pursuit of a suspect who was initially "parked near a known drug house" in a stolen vehicle ended with the suspect's vehicle in a yard surrounded by officers. 610 F.3d at 548-49. During the pursuit, the suspect drove erratically and crashed into a telephone pole. *Id.* at 549. As officers approached the vehicle, the suspect quickly turned and accelerated. *Id.* One of the officers fell and another officer believed he had been run over. *Id.* The suspect failed to yield to direct commands to put his hands up and stop the vehicle, and continued to accelerate with an officer laying on the

---

[99]   Harmening Decl., ¶24.
[100]  *E.g.,* Wright Decl., Ex. 17, Reenactment Video with Devonte Cheeks at 6:59, 7:19, 14:43.
[101]  Wright Decl., Ex. 18, Inquest Transcript, Vol. I, at 62:21-24.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ground nearby the vehicle. *Id*. The Court found that in this "tense, uncertain, and rapidly evolving" situation, a reasonable officer had probable cause to believe that the threat to safety justified the use of deadly force. *Id*. at 550.

*Monzon v. City of Murietta* is also factually distinguishable. 966 F.3d 946 (9th Cir. 2020). There, the traffic stop at issue was a felony stop of a confirmed stolen vehicle, and the suspect exhibited far more dangerous driving behavior, swerving back and forth on the freeway, leaving and reentering the freeway, driving at speeds up to 100 miles-per-hour, running stop signs and stoplights, and crashing into a fence post. *Id*. at 949-50. The panel noted that first, the severity of Monzon's crime weighed in favor of the use of force. *Id*. at 952. The Court also emphasized that Monzon led officers on a dangerous high-speed chase at night, including on the freeway, thereby creating a grave public safety risk by fleeing from the police at speeds up to 100 mph while driving erratically. *Id.* It was "also undeniable that Monzon drove the van between and amongst the officers and their cruisers, so that when he eventually crashed into a police cruiser, the van was surrounded by officers on all sides." *Id.* at 954. In the present case, the only contact made between the suspect and Officers' vehicles was a result of the Officers' repeated PIT maneuvering. The dynamics that made the chase unsafe were of the Officers' own making—not the suspect's.[102]

Similarly, the authority cited by Defendants for the proposition that deadly force may be used to prevent a fleeing driver from recommencing escape all involved dangerous chases and are distinguishable on that basis. *Cf. Plumhoff v. Rickard*. 572 US 765 (2014) (suspect led police on a high-speed chase involving outrageously reckless driving, which lasted more than five minutes, exceeded 100 miles per hour, and included the passing of more than two dozen other motorists); *Forrettt v Richardson*, 112 F. 3d 416 (9th Cir. 1997) (suspect had committed a violent residential

---

[102]  Defendants also cite to the unpublished decision of *H.B. v. City of Torrance*, however, the parties in that case did not dispute the fact that the plaintiff drove erratically, swerving into oncoming traffic, and thus posed a significant and immediate threat.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

burglary where he had subdued and tied up three victims and shot one in the neck at point blank range and shot at another using revolver before fleeing and eluding capture for almost an hour). These cases further underscore the longstanding principle that deadly force may not be used to end a pursuit unless the suspect presents a clear threat to life of the officers or public. Without undisputed evidence of such, the question must be left to the jury.

**B.  Defendant Officer Rausch is Liable for His Use of Excessive Force.**

Officer Rausch violated the decedent's constitutional rights by conducting a pretextual traffic stop and using unlawful lethal force through the PIT maneuver he executed against the driver's-side of the Honda Accord. "A pretextual traffic stop occurs when a police officer relies on some legal authorization as 'a mere pretext to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement.'" *State v. Arreola*, 290 P.3d 983, 989 (2012) (quoting *State v. Ladson*, 979 P.2d 833, 842 (1999)). *See also Ladson*, 979 P.2d at 838. "Pretextual traffic stops are unconstitutional under article I, section 7" of the Washington State Constitution. *Arreola*, 290 P.3d at 989.

Officer Rausch's traffic stop of the Honda Accord unequivocally satisfies the definition of a pretextual traffic stop. His own statements confirm that he justified the stop (although unreasonably and incorrectly) by speculative criminal investigation into either vehicle theft or drug activity—not violation of the traffic code. The record reflects further indicia of pretext: Mr. Joseph-McDade was Black and had had prior contact with the Kent Police during which he reported feeling "harassed"; on the night of the incident, Officer Rausch was in possession of information that Mr. Joseph-McDade owned the vehicle, which was validly registered in his name. Having ruled out vehicle theft, the only remaining basis for the stop was pretext for the objectively unreasonable suspicion of drug activity and/or harassment of Mr. Joseph-McDade.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

Against the backdrop of the pretextual genesis of the encounter, Officer Rausch escalated the engagement by initiating pursuit and failing to obtain approval from any supervisor for his actions, in violation of department policy.[103] He deployed lethal force in ramming his patrol vehicle into the driver's side door of the Honda when there was absolutely no immediate threat to officer safety. The use of deadly force against a driver suspected of nothing more than committing a traffic violation is objectively unreasonable for the reasons set forth above, and Plaintiffs' expert specifically confirms that the use of force deployed by Officer Rausch when intentionally ramming the Honda was both lethal and unlawful.[104] Mr. Harmening also confirms a reasonable officer faced with the same or similar circumstances to those attendant to the pursuit of Mr. Joseph-McDade would have known the use of lethal force—particularly at a juncture when officers were not remotely in harm's way—was unlawful.[105]

Officer Rausch's decision to use excessive force certainly did not fall within the realm of a gray-area judgment call or the "'hazy border between excessive and acceptable force'" because Kent Policy and related guidance foreclosed the use of force under nearly identical circumstances.[106] *Cf. Brosseau*, 543 U.S. at 201, *quoting Saucier v. Katz*, 533 U.S., 194, 206 (2001). Officer Rausch's use of lethal force was in clear violation of the Kent Police Department's own policy regarding "Limitations on Use of Deadly Force."[107] Notably, Kent policy explicitly requires that an officer about to use deadly force "when feasible, issue a verbal warning to the suspect."[108] There is no evidence Officer Rausch issued any warning prior to using a PIT maneuver

---

[103] *See* Wright Decl., Ex. 15, Kent PD Policy #15.50 "Motor Vehicle Pursuits."
[104] Harmening Decl., ¶13, 14. Mr. Harmening also points out that the ramming was not a PIT, but a forcible collision.
[105] *Id.*
[106] *See, e.g.,* Wright Decl., Ex. 22, Kent PD Policy #3.10 (revised Oct., 2, 2014).
[107] Wright Decl., Ex. 23, Kent PD Policy #3.80 (revised March 8, 2017) (confining the use of force to capture or seize a "dangerous suspect" to situations " where there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of great bodily harm; the suspect's escape poses an imminent threat to others; and there is no reasonably safe means of preventing the suspect's escape.").
[108] *Id.*

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

rising to the level of deadly force. The totality of circumstances analysis discussed above applies

equally to Officer Rausch's use of excessive force, but is limited to the facts and circumstances at

the time the force was used, namely, before any threat was posed to either Officer's safety. Given

the policy violations, a reasonable officer in the Kent Police force, familiar with its policies, would

know the use of deadly force against Giovonn Joseph-McDade was unreasonable and unlawful.

*Compare Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (use of non-lethal force that was

both excessive and in violation of department policy could constitute a Fourth Amendment

violation). Accordingly, summary judgment on Plaintiffs' claims against Defendant Rausch should

be denied.

### C. Qualified Immunity Does Not Shield the Defendants' Conduct Because the Right to Be Free from Excessive Force was Clearly Established at the Time of the Incident.

To determine whether an officer is entitled to qualified immunity, trial courts ask whether

the facts alleged, taken in the light most favorable to the plaintiff, show "(1) the officer's conduct

violated a constitutional right, and (2) the right at issue was clearly established at the time of the

incident such that a reasonable officer would have understood his or her conduct to be unlawful

in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). Days old

decisional authority of the Supreme Court suggests refinement of the second prong of this test to

permit denial of qualified immunity upon a showing that a general constitutional rule already

identified in the decisional law applies to the facts of a case with "obvious clarity." *Taylor v.

Riojas*, No. 19-1261, 2020 WL 6385693, at *2 (U.S. Nov. 2, 2020) (per curiam).[109]

The Supreme Court long ago established that it is unconstitutional to use lethal force to

prevent the escape of a non-threatening suspect, *Tennessee v. Garner*, 471 U.S. at 11, and there is

---

[109] *See also Apodaca v. Raemisch*, 139 S. Ct. 5, 10 (2018) (statement of Sotomayor, J.); *Weise v. Casper*, 562 U.S. 976 (2010) (Ginsburg, J. and Sotomayor, J., dissenting) ("solidly established law 'may apply with obvious clarity' even to conduct startling in its novelty") (citations omitted.); *Mullenix* v. Luna, 577 U.S. at 24 (Sotomayor, J., dissenting) ("the crux of the qualified immunity test is whether officers have 'fair notice' that they are acting unconstitutionally, *citing Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

a clearly established right to be free from lethal force in the context of low-risk vehicular chases where there is no threat to the public or officers posed by the fleeing suspect. *Adams*, 473 F.3d at 994; *Acosta*, 83 F.3d at 1147; *Cowan*, 352 F.3d at 763. Every police officer should know that it is objectively unreasonable to use force that may result in serious bodily injury, or to shoot an unarmed person who: has committed no serious offense, has been given no warning of the imminent use of such a significant degree of force, and presents no objectively reasonable threat to the safety of the officer or other individuals. *See Deorle v. Rutherford,* 272 F.3d 1272 (9th Cir. 2001). With respect to Officer Rausch's use of lethal force, there was no threat to officer safety whatsoever.

For the same reasons articulated above, genuine issues of material fact as to whether it was reasonable for Officer Davis "to believe that his life or person was in danger," preclude summary judgment on qualified immunity grounds. *Cowan*, 352 F. 3d at 764. The parties fervently dispute whether there was *any* threat posed to Officer Davis by virtue of Mr. Joseph-McDade's vehicle. Plaintiffs' expert's opinion challenges whether Officer Davis was remotely in harm's way, or in fact, safely behind the cover of his patrol car when he first shot Mr. Joseph-McDade. His trajectory analysis establishes that Officer Davis fired his second shot after the Honda was already past him and moving away.[110] "When the reasonableness of [Defendant Davis]'s decision to shoot [Giovonn Joseph-McDade] depends on disputed issues of material fact, it is not a legal inquiry, but rather a question of fact best resolved by a jury." *McGregor*, 2018 WL 2317651, at \*5 (*citing Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003)).

If the totality of the facts and circumstance of this case are viewed in the light most favorable to Plaintiffs—as they must be—Defendants Rausch and Davis's own reckless conduct created any alleged threat that Mr. Joseph-McDade posed. *Maddox*, 2017 WL 4343031, at \*3

---

[110]   Harmening Decl., ¶18.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

(citing cases); *see also Crawley*, 2014 WL 2174848, at *6 (citing Ninth Circuit authority and holding that "it was clearly established that officers who intentionally or recklessly provoke a violent response are liable for the use of excessive force in violation of the Fourth Amendment"); *Nelson v. City of Los Angeles*, No. 11-5407, 2014 WL 6066053, at *12 (C.D. Cal. Nov. 13, 2014) (same).[111] This case simply does not fall in the gray area that public officials are meant to be protected from when acting reasonably—ramming an unarmed suspect who has committed a minor non-moving violation and shooting him dead when he presents no immediate risk to the officers or the public. It bears reiterating that Officer Davis was not privy to any of Officer Rausch's suspicions of criminal activity. *See United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir. 2019) (distinguishing a threat that "was not part of the totality of circumstances confronting the officers who ultimately stopped" the suspect).

The cases cited by Defendants in support of their qualified immunity argument are inapposite. *Mullenix v. Luna*, 136 S.Ct. 305 (2015), is highly distinguishable as it involved a fugitive who made threats upon the lives of the officers pursuing him; the police had a warrant for the suspect's arrest; chase speeds ranged between 85 and 110 miles per hour; and twice during the chase, the suspect called the police dispatcher, claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit, which threats were relayed, together with a report that the suspect might be intoxicated, to all concerned officers. Likewise, *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004), is distinguishable on similar grounds. In *Brosseau*, the suspect had a felony no-bail warrant out for his arrest on drug and other offenses. *Id.* at 195. The shooting officer believed the suspect was attempting to retrieve a weapon just prior to the shooting, and the

---

[111] Some of the Ninth Circuit authority relied on in these cases was partially abrogated by the Supreme Court's decision in *Mendez*, insofar as they "dress[ed] up every Fourth Amendment [warrantless entry] claim as an excessive force claim." 137 S. Ct. at 1548. The Court left untouched, however, this established precedent insofar as it held that "unreasonable police conduct prior to the use of force that foreseeably created the need to use it" is to be considered as a totality of the circumstance factor. *Id.*, at n.2; *see also Doornbos*, 868 F.3d at 583 (discussing this clearly established rule and *Mendez*); *Maddox*, 2017 WL 4343031, at *9 (same).

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

suspect subsequently pled guilty to the charge of felony eluding, admitting that he had driven "in a manner indicating 'a wanton or willful disregard for the lives ... of others.'" *Id.* at 197. *Brosseau* has no bearing on this case for the same reasons the Ninth Circuit identified in *Adams*; Brosseau was dissimilar to *Adams* as well as this case due to "the absence of warning and the lack of danger to the shooter" in both *Adams* and the case at bar. 473 F.3d at 994. Even if Officer Davis reasonably believed that Mr. Joseph-McDade's car posed a serious threat of harm to him, if Plaintiffs' evidence is believed—as it must at this juncture—"the decision to fire two shots at the car may well have not been one that a 'reasonably competent officer' would have made." *Cowan*, 352 F.3d at 763. Summary judgment should be denied.

### J.   Plaintiffs' State Law Claims Survive Under *Beltran*.

Defendants tautologically argue that, because they claim the Officers' conduct was reasonable, they cannot be found negligent under State law. However, the record set forth by Plaintiffs shows the Officers acted unreasonably in their pursuit of, and use of force on, Mr. Joseph-McDade—a non-violent, unarmed young man. Defendants ignore the binding authority of *Beltran-Serrano v. City of Tacoma*, 442 P.3d 608 (2019). *Beltran-Serrono* recognized a negligence cause of action under Washington state law based on a law enforcement officer's "failure to use ordinary care to avoid unreasonably escalating [an] encounter to the use of deadly force" and "failure to follow accepted practices" in the interactions leading up to a police shooting. *Id.* at 540. The Washington Supreme Court announced that the "core" of the negligence claim is that the officer "unreasonably failed to follow police practices calculated to avoid the use of deadly force." *Id.* at 544. Here, Plaintiffs have marshalled evidence that Officer Rausch pretextually stopped Mr. Joseph-McDade, that both Officers Rausch and Davis violated Kent Police Department policy in conducting their pursuit and in deploying lethal force, and, ultimately, unreasonably escalated a traffic stop into an encounter involving multiple uses of deadly force.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1

2

Defendants cite to *James v. City of Seattle*, CASE NO. C10-1612JLR, 15 (W.D. Wash.

3

Dec. 12, 2011), decided before *Beltran-Serrano. James,* however, emphasizes the importance of

4

certain *Graham* factors implicated in the reasonableness inquiry in the instant case, including the

5

severity of the initial crime that led to pursuit. Analogously, at the time that Mr. James was

6

subjected to the use of force, the only crime that officers had identified was the display of

7

mismatched license plates, a non-serious offense.[112]

8

9

In this case, Kent Officers' failure to use ordinary care or follow accepted practices in the

10

series of actions leading up to the shooting is encapsulated by the Kent Police Department's own

11

conclusion in a highly analogous training hypothetical that a vehicle pursuit under similar

12

circumstances should be terminated.[113] Moreover, the totality of circumstances analysis, discussed

13

above, further demonstrates the negligence of the Officers in rapidly escalating a traffic stop

14

encounter into repeated deployment of lethal of force. Months before the incident, on January 15,

15

2017, Kent police supervisors expressed concern that Officer Davis needed to moderate his

16

inclination to jump to the use of force before circumstances justified; he was told to "assess the

17

situation more before action is taken.[114] Officer Davis was specifically admonished to take "a few

18

extra moments to gain additional information at the scene before running in and taking action/using

19

force. In this case, officers already on scene may have provided additional information which may

20

have changed the response by Davis."[115] Consistent with the Kent police supervisors' concerns,

21

had Officer Davis taken a few extra moments to learn more information he may have changed his

22

23

24

25

26

---

[112] Consistently, the Ninth Circuit has found that misdemeanors that are not "inherently dangerous or violent" and do not justify a significant use of force. *Bryan v. MacPherson*, 630 F.3d 805, 823, 829 & n.12 (9th Cir. 2010). *See also Miller v. Clark Cnty*., 340 F.3d 959, 965-66 (9th Cir. 2003) (active evasion or flight by a non-felon generally favors a police officer's use of non-deadly force).

[113] Ex. 24, Pursuit Policy "Scenario," Kent Police Department, KPD Policy 21.2.2.

[114] Ex. 25, Kent Police Department Use of Force Report – Incident #17-380

[115] *Id.*

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

tactical response in this incident and Giovonn Joseph-McDade would be alive today. There is certainly sufficient evidence from which a jury could conclude Defendants acted negligently.

### K. Defendants Cannot Establish that the Decedent was Engaged in Commission of a Felony.

"[F]light itself…is not tantamount to guilt." *United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019). Yet, Defendants attempt to bootstrap their theory of Officer Davis's perception of a threat from Mr. Joseph-McDade's attempted escape from the cul-de-sac into proof of criminal liability, precluding Plaintiffs' state law claims.[116] Proof of any criminal offense, however, is wholly unsupported by the record. Factual disputes underlying the elements of each crime—on which the Defendants bear the burden of proof—foreclose summary judgment on these defenses.

First, Defendants' assault theory fails because they have neglected to marshal evidence probative of intent, which is also fundamentally a jury question. "[S]pecific intent either to create apprehension of bodily harm or to cause bodily harm is an essential element of assault in the second degree." *State v. Byrd*, 887 P.2d 369 (1995). Defendants' argument that an assault occurred wholly ignores the evidence that Mr. Joseph-McDade attempted to flee the cul-de-sac because he feared for his own life after being watched for at least fifteen minutes by Officer Rausch, pretextually stopped, chased into a cul-de-sac, repeatedly rammed by the police vehicle pursuing him, having his window smashed by a police officer, and seeing the same officer with his gun drawn. As Justice Stevens observed some twenty years ago—and the Ninth Circuit recognized as prescient in *Brown* last year—"Among some citizens, particularly minorities …there is [ ] the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden

---

[116]   Wash. Rev. Code 4.24.420 does not affect any right of action under 42 U.S.C. § 1983.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

presence." *Illinois v. Wardlow*, 528 U.S. 119, 132 (2000) (Stevens, J., concurring in part and dissenting in part).

With respect to felony eluding, the statute provides for a two-part conjunctive test: the suspect must 1) willfully fail to stop *and* 2) drive in a reckless manner while attempting to elude a pursuing officer. Wash. Rev. Code § 46.61.024(1). Defendants cannot prove Mr. Joseph-McDade drove in a reckless manner.[117] Although Defendants discuss the speed Mr. Joseph-McDade was driving, speed alone cannot establish the requisite culpable mental state of recklessness. *See* 11A Wash. Prac., Pattern Jury Instr. Crim. 90.05 (4th ed.) ("To operate a motor vehicle in a reckless manner means to drive in a rash or heedless manner, indifferent to the consequences."). Evidence of some conscious disregard of the danger to others is necessary. *State v. Vreen*, 994 P.2d 905, 911 (2000), affirmed 26 P.3d 236 (2001). Assuming, *arguendo*, that Mr. Joseph-McDade did engage in reckless driving, it cannot be said to be the proximate cause of his death. "The inquiry is whether a reasonable person could conclude that there is a greater probability that the conduct in question was the proximate cause of the plaintiff's injury than there is that it was not." *Mehlert v. Baseball of Seattle*, 404 P.3d 97 (2017). No reasonable person would expect, under the circumstances of this record, that the consequence for fleeing police officers would be death.

## IV.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment should be denied.

---

[117]  *E.g.,* Harmening Decl., ¶24.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

1  DATED this 12th day of November 2020, at Seattle, Washington.

2

3                                        SCHROETER, GOLDMARK & BENDER

4

5                                   By: *s/ Craig A. Sims*
                                        CRAIG A. SIMS, WSBA #28267
6                                       KAITLIN T. WRIGHT, WSBA #45241
                                        810 Third Avenue, Suite 500
7                                       Seattle, WA  98104
                                        Phone:  (206) 622-8000
8                                       Fax:  (206) 682-2305
                                        Email: sims@sgb-law.com
9                                              wright@sgb-law.com

10                                  P. BOSMANS LAW

11

12                                  By: *s/ Patricia Bosmans*
                                        PATRICIA BOSMANS, WSBA #9148
13                                      1607 25th Street Pl SE
                                        Puyallup, WA  98372-7112
14                                      Phone:  (253) 230-4737
                                        Fax:  (888) 235-6120
15                                      Email:  PBosmans_Law@outlook.com

16                                  *Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

1

2

3

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing and submitted courtesy copies via email to the following:

4

5

6

7

8

9

Stewart A. Estes, WSBA #15535
Derek C. Chen, WSBA #49723
KEATING, BUCKLIN & MCCORMACK
The Norton Building
801 Second Avenue, Suite 1210
Seattle, WA 98104
Phone: 206.623.8861
Fax: 206.223.9423
Email:  sestes@kbmlawyers.com
          dchen@kbmlawyers.com

☐ Via Facsimile
☑ Via First Class Mail
☐ Via Messenger
☑ Via Email
☐ Via Process Service

10

11

*Counsel for Defendants City of Kent, City of Kent Police Department, William Davis, and Matthew Rausch*

12

13

DATED this 12th day of November, 2020, at Seattle, Washington

14

15

16

17

*s/ Matthew Gonyea*
Matthew Gonyea,
Senior Litigation Paralegal
810 Third Avenue, Suite 500
Seattle, WA  98104
Tel: (206) 622-8000
Email: gonyea@sgb-law.com

18

19

20

21

22

23

24

25

26

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305