# EXHIBIT
# 1

KING COUNTY DISTRICT COURT
KENT DIVISION
HONORABLE JUDGE SUSAN MAHONEY PRESIDING

INQUEST IN THE DEATH OF          )
                                 )
JOSEPH GIOVONN M. MCDADE         )     No. 417IQ9738 KPA
                                 )
                     DECEASED.   )

VOLUME III

(Transcript of Proceedings)

9:00 A.M.

December 13, 2017

King County District Court
401 4th Avenue
Kent, WA 98032

Reported By:   Robert L.T. Thomas, Sr., CCR #2258

**COURT REPORTING OFFICES OF
ROBERT L.T. THOMAS, SR., INC.
913 North 36th Street
Renton, WA 98056
(425) 271-0333**

1                    A-P-P-E-A-R-A-N-C-E-S

2


3        FOR THE STATE:

4        Gretchen Holmgren
         King County Deputy Prosecuting Attorney
5        401 Forth Avenue
         Suite 2A
6        Kent, WA 98032-4429

7


8        FOR OFFICER WILL DAVIS:

9        Stewart Estes
         Derek Chen
10       Attorneys
         801 Second Avenue
11       Suite 1210
         Seattle, WA 98104

12


13


14       ALSO PRESENT:

15

         Fred Gendreau
16       Ofc. Will Davis

17

18

19

20

21

22

23

24

25

I-N-D-E-X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | JURY |
|---|---|---|---|---|---|
| RALPH HYETT | 5 | 21 | | | |
| FRED GENDREAU | 30 | 35 | 36 | 38 | 37 |
| WILLIAM DAVIS | 42 | 70 | | | |

| EXHIBITS: | | ID | ADMITTED |
|---|---|---|---|
| F | Re-enactment video | | 37 |
| G | Collision reconstruction disc | | 14 |
| T | Devonte cheeks phone calls | | 32 |

```
 1              The State will call Officer Davis.
 2                      JUDGE MAHONEY:  Please raise your right
 3         hand.
 4              Do you swear or affirm that the testimony you
 5         give today will be true under penalty of perjury?
 6                      THE WITNESS:  Yes, ma'am.
 7                      JUDGE MAHONEY:  Thank you.
 8              Please be seated.
 9                      THE WITNESS:  Thank you.
10    WILLIAM DAVIS              being duly sworn was called
11                                and testified as follows:
12                      JUDGE MAHONEY:  Go ahead Ms. Holmgren.
13                        DIRECT EXAMINATION
14    BY MS. HOLMGREN:
15    Q    Officer Davis can you please state your first and last
16         name and spell your last name for the record?
17    A    Yes, ma'am. I'm William Davis, D-a-v-i-s.
18    Q    And what's your current occupation?
19    A    Currently I'm employed with the City of Kent Police
20         Department and I'm assigned to the training center,
21         CJTC.
22    Q    And how long have you worked with the City of Kent?
23    A    A little over six years now.
24    Q    Did you have prior law enforcement experience?
25    A    Yes, ma'am.
```

```
1    Q    And so you were on shift for approximately four hours
2         when this incident occurred?
3    A    Approximately Yes, ma'am.
4    Q    And do you recall at what time on that early morning -
5         - in the early morning hours of June 24 that -- June
6         24 -- I apologize -- that you first heard over the
7         radio a request for a second unit by Officer Rausch?
8    A    I don't remember exactly. I believe it was 10 to 12
9         minutes after midnight. Somewhere in there.
10   Q    And what did you know at that time based on Officer
11        Rausch's request?
12   A    So Officer Rausch is a very, very good officer. He
13        doesn't get spooked or startled easily. He's
14        absolutely in control of his emotions so if he's
15        calling for a second unit he has seen signs of either
16        danger or something's just not right if he feels like
17        he needs a cover officer to respond to make sure of
18        his safety but everyone's safety.
19   Q    Well did you also hear testimony earlier from Office
20        Rausch regarding his observation at the AM-PM?
21   A    I did, yes.
22   Q    And at this time that you heard call out for a second
23        unit did you have any of that information?
24   A    No, ma'am I did not.
25   Q    And did you have any of that information during the
```

 1      life of this incident?

 2   A  No.

 3   Q  So when he made that call you had your understanding,

 4      based on your prior experience with Officer Rausch.

 5          But what was the specific nature of the stop?

 6   A  It was a traffic stop.

 7   Q  And do you recall where you were at the time in Kent

 8      when you heard that information?

 9   A  I do.

10          I was stopped in the Schloztky's parking lot on

11      256.

12          I had just finished speaking with a young lady

13      about a barking dog that she had mentioned about over

14      the phone.

15   Q  And approximately how far away were you at that time

16      from Officer Rausch's location?

17   A  From his location I was well within half a mile. I was

18      on 256 at approximately on the 102 hundred block. So,

19      I really wasn't that far away.

20   Q  Okay.

21          What did you -- what decision did you make upon

22      hearing that request over the radio?

23   A  I knew that I was very close, and I just finished my

24      call so I was available. So I decided to go and assist

25      him and back him up.

1                    C E R T I F I C A T E

2   STATE OF WASHINGTON  )
    COUNTY OF KING       )
3
    I, ROBERT L.T. THOMAS, SR., the undersigned Certified Court
4   Reporter, pursuant to RCW 5.28.010 authorized to administer
    oaths and affirmation in and for the State of Washington,
5   do hereby certify:

6   That the annexed and foregoing hearing of each witness
    named herein was taken stenographically before me and
7   reduced to typewriting under my direction, consisting of
    pages 1 through 108.
8
    I further certify that all objections made at the time of
9   the hearing to my qualification or the manner of taking the
    hearing, or to the conduct of any party have been noted by
10  me upon doing the hearing.

11  I further certify that I am not a relative or an employee
    or attorney or counsel of any of the parties to said
12  action, or a relative or employee of any such attorney or
    counsel, and that I am not financially interested in the
13  same action or the outcome thereof.

14

15  IN WITNESS WHEREOF, I have here unto set my hand and
    affixed my Seal this      day of       2020.
16

17

18

19

20

21

22
    _____
23  ROBERT L.T. THOMAS, SR.
    Washington State Certified Court Reporter
24  WA CCR No. 2258
    Residing at Renton, Washington
25  My CCR Certification Expires 9-24-20

EXHIBIT
2



Deposition of
# William Davis

**Date:** December 10, 2020

**Case:** RE: ESTATE OF GIOVONN JOSEPH-McDADE, v. CITY OF KENT, et al.,

**No.** 2:20-CV-00771-BJR

**Court Reporter:** Debra S. Kaesberg, CSR/RPR/CCR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
www.spreporting.com

Page 1

                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
                        AT SEATTLE


SONIA JOSEPH, individually  )
and as Special              )
Administrator of the        )
ESTATE OF GIOVONN           )
JOSEPH-McDADE, and          )
GIOVANNI McDADE,            )
individually,               )
                            )
            Plaintiffs,     )     #2:20-CV-00771-BJR
                            )
        vs.                 )
                            )
CITY OF KENT, a Washington  )
municipality; CITY OF KENT  )
POLICE DEPARTMENT; WILLIAM  )
DAVIS; MATTHEW RAUSCH; and  )
JOHN DOES 1-10,             )
                            )
            Defendants.     )


      VIDEOTAPED DEPOSITION OF WILLIAM DAVIS


          Taken on behalf of Plaintiffs
             December 10, 2020




          Debra S. Kaesberg, CSR/RPR/CCR
           Certified Shorthand Reporter
             License No. 084-004210
                C.C.R. No. 670

Page 4

1                UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
2                    AT SEATTLE
3

  SONIA JOSEPH, individually    )
4  and as Special             )
  Administrator of the ESTATE   )
5  OF GIOVONN JOSEPH-McDADE,    )
  and GIOVANNI McDADE,        )
6  individually,             )
                      )
7           Plaintiffs,   )
                      )
8          vs.          )   #2:20-CV-00771-BJR
                      )
9  CITY OF KENT, a Washington    )
  municipality; CITY OF KENT    )
10 POLICE DEPARTMENT; WILLIAM    )
  DAVIS; MATTHEW RAUSCH; and    )
11 JOHN DOES 1-10,           )
                      )
12           Defendants.   )
13
14        VIDEOTAPED DEPOSITION OF WILLIAM DAVIS,
  produced, sworn, and examined on behalf of
15 Plaintiffs, December 10, 2020, between the hours
  of 9:02 a.m. Pacific and 5:41 p.m. Pacific of
16 that day, via Zoom videoconference, before Debra
  S. Kaesberg, Registered Professional Reporter and
17 Certified Shorthand Reporter.
18
19              A P P E A R A N C E S
20        APPEARING TELEPHONICALLY:  The
  Plaintiffs were represented by Mr. Craig A. Sims
21 and Ms. Kaitlin T. Wright of the law firm of
  Schroeter, Goldmark & Bender, 810 Third Avenue,
22 Suite 500, Seattle, Washington 98104;
23                   and
24        APPEARING TELEPHONICALLY:  Ms. Patricia
  Bosmans of the law firm of P. Bosmans Law, 1607
25 25th Street P1 SE, Puyallup, Washington
  98372-7112.

**William Davis**
**December 10, 2020**

Page 5

1        APPEARING TELEPHONICALLY:  The
Defendants were represented by Mr. Stewart A.
2    Estes of the law firm of Keating, Bucklin &
McCormack, The Norton Building, 801 Second
3    Avenue, Suite 1210, Seattle, Washington  98104.

4

5

6    ALSO PRESENT:

7        Cathy Parker/Schroeter, Goldmark & Bender

8        Matthew Gonyear/Schroeter, Goldmark & Bender

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**William Davis**
**December 10, 2020**

Page 6

1            IT IS HEREBY STIPULATED AND AGREED by

2    and between Counsel for the Plaintiffs and

3    Counsel for the Defendants, that this deposition

4    may be taken in shorthand by DEBRA S. KAESBERG, a

5    Registered Professional Reporter and Certified

6    Shorthand Reporter, and afterwards transcribed

7    into typewriting, and the signature of the

8    witness is not waived by agreement of counsel and

9    the witness.

10

11                    O-O-O

12

13                WILLIAM DAVIS,

14    of lawful age, being produced, sworn and examined

15    on the part of the Plaintiffs, and after

16    responding "Yes" to the oath administered by the

17    court reporter, deposes and says:

18

19            * * * * * * * * * * *

20

21            VIDEOGRAPHER:  This is the videotaped

22    deposition of William Davis.  Today's date is

23    December 10th, 2020.  The time is 9:02 a.m.

24    Pacific Standard Time.  We are now on the record.

25                And, Counselors, will you please

**William Davis**
**December 10, 2020**

Page 211

 1          Q.    Did you observe, at any point prior
 2    to you getting out of your police vehicle within
 3    the cul-de-sac, did you observe anything that
 4    caused you to believe that reasonable force --
 5    that -- strike that.
 6                    Prior to you getting out of your car
 7    in the cul-de-sac, did you observe anything that
 8    led you to believe it would be reasonable to
 9    apply deadly force?
10          A.    No, sir.
11          Q.    Are you sure of that?
12          A.    I am quite certain of that.
13          Q.    Based upon your observations of what
14    took place that evening during the pursuit, it is
15    your perspective that there was no point, prior
16    to you getting out of the car, where you believed
17    deadly force would have been appropriate; is that
18    correct?
19          A.    That is correct.  Yes, sir.
20          Q.    I want to go back to the time and
21    place when you first engaged in the pursuit.
22          A.    Okay.
23          Q.    So you received the information over
24    the radio from Officer Rausch, and then you went
25    to where he was located or in that area; is that

William Davis
December 10, 2020

Page 225

1        Q.    Why is that?

2        A.    This is Kent Police Department.  This

3   appears to be a Valley com coding.  I'm not privy

4   to Valley com coding, I've never heard of

5   priority E, Priority 1, Priority 2.  That is not

6   terminology we use.

7             It looks like they are using that as

8   their statistics gathered from dispatch.  Because

9   dispatch may use that terminology, does not mean

10  that that is the Kent Police Department

11  terminology.

12       Q.    So is it your perspective that on

13  June 24th, 2017, when you received the call from

14  Officer Rausch, that was identified as a Priority

15  2 from Valley com, that you believe that there

16  was more going on that represented -- that did

17  not represent a minimal hazard, but a more

18  dangerous situation for Officer Rausch?

19            MR. ESTES:  Objection to form.

20       A.    I don't know what Officer Rausch had.

21  I know Officer Rausch was calling for assistance.

22  I'm sorry, we don't use a Priority 2s.  Like I

23  said before, when I was talking about looking at

24  that sheet, there's things on that sheet I still

25  to this day don't know what they mean.  That

William Davis
December 10, 2020

Page 228

1            When you engaged in the pursuit, what
2    exactly was the reason Officer Rausch attempted
3    the traffic stop on Giovonn Joseph-McDade?
4            A.    If I remember correctly, he said
5    there was a traffic violation or something to
6    that effect.
7            Q.    Do you recall the specific traffic
8    violation?
9            A.    I do not, sir.
10           Q.    Do you know if it was a -- or did you
11   know at that time whether it was a broken
12   taillight?
13           A.    I did not know what the violation
14   was, no, sir.
15           Q.    Between the time period where you
16   engaged in the pursuit and just prior to you
17   getting out of the car, can you tell us how many
18   pedestrians you saw on the street at that point
19   in time, or during that point in time?
20           A.    I don't recall any pedestrians from
21   the time I got to Applebee's to the end of the
22   pursuit.
23           Q.    Can you tell us what the traffic was
24   like between the time period where you engaged in
25   the pursuit until the time you got out of your

William Davis
December 10, 2020

Page 229

1    vehicle in the cul-de-sac?
2         A.    Yes, sir.  Traffic was very light, if
3    any.
4         Q.    And when you say "very light," what
5    does that mean?
6         A.    It means I can't recall if there was
7    any traffic.
8         Q.    Aside from the radio broadcast, were
9    there any other -- was there any other type of
10   communication going on between you and
11   Officer Rausch during this pursuit?
12        A.    No, sir.
13        Q.    Did you receive any information as
14   you engaged in the pursuit as to whether the
15   Honda Accord that Mr. Joseph-McDade was driving,
16   whether it was stolen?
17        A.    I did not.  I remember after we made
18   the turn onto 244, dispatch gave the -- I believe
19   the registration information.  But that was right
20   about the same time as the PIT, the first PIT
21   attempt that he missed.  And I don't recall
22   exactly what she had said with that.
23        Q.    And while you may not recall exactly
24   what was said, did you receive any information at
25   the time that the vehicle was stolen?

William Davis
December 10, 2020

1     **A.     No, sir.**

2          Q.     Do you have any knowledge or

3     information as to whether or not Officer Rausch

4     requested information on the vehicle's license

5     plate prior to attempting the traffic stop?

6          **A.     Do I know specifically if he did or**

7     **didn't?  Is that the question?**

8          Q.     Yes, sir.

9          **A.     Specifically, I do not know.**

10         Q.     You indicated during your earlier

11    recitation of your version of the facts, that

12    there was speeds that ranged, I believe, up to

13    60 miles per hour; is that correct?

14         **A.     I believe so, yes, sir.**

15         Q.     How long, whether in duration or

16    time, were speeds approaching or reaching

17    60 miles an hour?

18         **A.     I don't know exactly how long.  My**

19    **speeds were greater than 60 trying to catch up to**

20    **them.  And -- but it was a short pursuit, so it**

21    **probably was not very long.**

22              **And can we take the crime statistics**

23    **down?**

24         Q.     Yeah, just one moment.

25              So again, the question stands, in

William Davis
December 10, 2020

1  terms of how long, whether in time or duration,

2  were speeds at or approaching 60 miles per hour?

3      A.   I would say less than -- less than a

4  minute, but I don't know for sure.

5      Q.   Were speeds at 60 miles an hour for a

6  majority of the pursuit?

7      A.   I don't believe so.  I would not say

8  the majority of it, no.

9      Q.   Why would you say that speeds were

10 not approaching 60 miles an hour for a majority

11 of the pursuit?

12     A.   Because on the CAD I had just seen,

13 it shows where he had pulled over.  He slowed

14 down to 30 miles an hour.  Officer Rausch said

15 they were getting ready to bail.  And from there

16 to 244th isn't that great a distance, and I

17 caught up to them by the time we got to 244, and

18 I don't believe our speeds got back up to 60

19 before we hit the roundabout.

20     Q.   At any point in time when the pursuit

21 entered the residential neighborhood, did the

22 speeds ever approach 60 miles an hour?

23     A.   I don't know.  244 is also a

24 residential area.  I don't know what the speeds

25 were between the failed PIT that he completely

William Davis
December 10, 2020

Page 232

1  missed when we all started to have to slow down

2  to navigate the roundabout.  There's a span of a

3  distance there.  So I don't know what the speeds

4  were.

5        Q.    At any point in time, do you have an

6  understanding as to whether or not the speeds

7  that Mr. Giovonn Joseph-McDade was driving his

8  car, whether it was in excess of 60 miles per

9  hour?

10        A.    I don't.  I don't know.

11        Q.    Do you have any ability to determine

12  at what point in time, or at any point in time

13  during the pursuit, what the speeds were that

14  Mr. Giovonn Joseph-McDade was driving at any

15  point in time?

16        A.    I don't recall if I called out our

17  speeds on 244th or not.  That would be the only

18  time I would personally know roughly what his

19  speed was.

20        Q.    Is there any other indication as to

21  how fast Mr. Giovonn Joseph-McDade was driving

22  his car outside of what you might have called out

23  on the radio?

24        A.    What Officer Rausch had broadcast.

25        Q.    Are there any other indicators aside

**William Davis**
**December 10, 2020**

Page 233

1   from those things that you just described in

2   terms of how fast Mr. Giovonn Joseph-McDade would

3   have been driving?

4        A.   Not that I recall, no, sir.

5        Q.   You indicated that Mr. Giovonn

6   Joseph-McDade was driving, I believe, in a

7   reckless manner or something like that, when you

8   presented your -- your outline and your version

9   of the event.

10            Tell me all the factors that lead you

11  to believe that he was operating his car in a

12  reckless manner.

13       A.   He was fleeing from police who were

14  in pursuit, is one factor.  He was well above the

15  posted speed limit, which is a second factor.

16  His passenger was trying to get out of the

17  vehicle and was unable to.

18            He was driving it directly at a

19  police officer:  He drove on the sidewalk.  He

20  drove into a park.

21       Q.   I want to focus in on the time period

22  where you first engaged in the pursuit to the

23  time just before you got out of your car in the

24  cul-de-sac.  So between --

25       A.   Okay.

William Davis
December 10, 2020

Page 234

1        Q.    -- that time period, I want to focus

2   on what are all the factors that lead you to

3   believe that Mr. Giovonn Joseph-McDade operated

4   his vehicle in a reckless manner.

5        A.    So in that very, very limited

6   snapshot.

7        Q.    Yes.

8        A.    I don't know, other than driving onto

9   the sidewalk and navigating the roundabout at

10  well above the posted speed limit, I don't know

11  that there was a lot that was -- I could term as

12  reckless.

13       Q.    When did Mr. Giovonn Joseph-McDade

14  drive onto the sidewalk as he was operating his

15  car?

16       A.    Just prior to me getting out.

17       Q.    And so that was after that he was hit

18  by Officer Rausch as well; is that correct?

19       A.    Yes, sir.

20       Q.    Okay.  So before being hit by

21  Officer Rausch, and you say then he drove onto

22  the sidewalk, you indicated that one of the

23  factors that lead you to believe that he was

24  operating his car in a reckless manner was that

25  he drove around a roundabout in excess of the

**William Davis**
**December 10, 2020**

Page 235

1   speed limit.

2         How fast was he driving around the

3   roundabout?

4         **A.    I can't estimate exactly how fast he**

5   **was going.   I believe those are designed for a**

6   **fairly low speed.**

7         Q.    Was he able to navigate the

8   roundabout based on the speed that he was going?

9         **A.    Yes.**

10        Q.    And so if we used logic, you would

11   agree that if the roundabout is designed for a

12   low speed, if Mr. McDade was able to navigate the

13   roundabout, that he therefore would have been

14   driving around the roundabout at a low speed?

15        **A.    No.**

16        Q.    Does that make logical sense to you,

17   sir?

18        **A.    That is not logical at all.**

19        Q.    Do you have the ability to determine

20   exactly how fast Mr. McDade was driving around

21   the roundabout?

22        **A.    No, sir, I do not.**

23        Q.    So if you don't know the speed of

24   which he was driving around the roundabout, you

25   can't say with absolute certainty that he was

**William Davis**
**December 10, 2020**

Page 246

```
 1   That's, like we discussed earlier, when it --

 2   right about that time is when it dawned on me, I

 3   have a rider in the car with the doors unlocked

 4   just a few feet away from the suspect.

 5           At that point, I moved up, put myself

 6   between the rider and the driver.

 7       Q.   At this point, you identify or use

 8   the term "suspect."  Who are you referring to

 9   specifically when you use the term "suspect," and

10   then what is that person suspected of having

11   done?

12       A.   Mr. McDade, eluding.  How would you

13   like me to refer to him as, sir?

14       Q.   After -- after you made the command

15   to stop the car, whatever the commands were, talk

16   to us about what happened next.

17       A.   So when I went up, I could see him

18   staring straight ahead.  The passenger looked

19   over -- looked at me, puts his hands up, and he's

20   trying to grab the door handle as if to get out.

21           I tap on the window with my

22   flashlight.  And right about that time, yelling

23   at him turn the car off, he starts to back up.

24       Q.   You indicated that you tapped on the

25   window with the flashlight.  Earlier in our
```

**William Davis**
**December 10, 2020**

Page 297

1

2                          REPORTER CERTIFICATE

3

4          I, DEBRA S. KAESBERG, Certified
   Shorthand Reporter, do hereby certify that there
   came before me via Zoom videoconference,

5

6                          WILLIAM DAVIS,

7   who was by me first duly sworn; that the witness
   was carefully examined, that said examination was
8   reported by myself; translated and proofread
   using computer-aided transcription, and the above
9   transcript of proceedings is a true and accurate
   transcript of my notes as taken at the time of
10  the examination of this witness.

11          I further certify that I am neither
12  attorney nor counsel for nor related nor employed
   by any of the parties to the action in which this
13  examination is taken; further, that I am not a
   relative or employee of any attorney or counsel
14  employed by the parties hereto or financially
   interested in this action.

15          Dated this 13th day of December, 2020.

16

17

18  _____
           DEBRA S. KAESBERG, CSR, CCR, RPR

19

20

21

22

23

24

25

EXHIBIT

3



# Deposition of
# **Matthew Rausch**

**Date:** December 16, 2020

**Case:** Estate of Giovonn Joseph-McDade and Giovanni McDade, individually v. City of Kent, a Washington Municipality; City of Kent Police Department; William Davis; Matthew Rausch; and John Does 1-10

**No.** 2:20-cv-00771-BJR

**Court Reporter:** Carol A. Haas, RPR, CSR, CCR

Paszkiewicz Court Reporting
Phone: (618) 307-9320 / (855) 595-3577 toll-free
Fax: 618-855-9513
Web Site: www.spreporting.com

```
              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
                     AT SEATTLE




SONIA JOSEPH, Individually and as  )
Special Administrator of the       )
ESTATE OF GIOVONN JOSEPH-McDADE    )
and GIOVANNI McDADE, individually, )
                                   )
          Plaintiffs,              )
                                   )
vs.                                )NO. 2:20-cv-
                                   )00771-BJR
CITY OF KENT, a Washington         )
Municipality; CITY OF KENT POLICE  )
DEPARTMENT; WILLIAM DAVIS;         )
MATTHEW RAUSCH; and JOHN DOES 1-10,)
                                   )
          Defendants.              )
```

THE VIDEOTAPED DEPOSITION OF
MATTHEW RAUSCH
(VIA ZOOM VIDEO PLATFORM)

Taken on behalf of the Plaintiffs
December 16, 2020

Carol A. Haas, RPR, CSR, CCR

Registered Professional Reporter

Page 2

1       I N D E X   O F   E X A M I N A T I O N S

2                                                       Page

3   Examination by Mr. Sims                               6

4

5

6           I N D E X   O F   E X H I B I T S

7                                                      Page
                                                  Referenced
8
    Exhibit 1,  Applicant Background, 10/16/14          77
9
    Exhibit 2,  Driving Skill report                    79
10
    Exhibit 3,  Driving Skill: Moderate and             82
11              High Stress Conditions

12  Exhibit 4,  Driving Skill: Normal Conditions        83

13  Exhibit 5,  Accident Review/Finding, 5/6/17         85

14  Exhibit 6,  Memorandum Re: IA Complaint            101

15  Exhibit 7,  Use of Force Complaint                 106

16  Exhibit 8,  Use of Force Report                    108

17  Exhibit 9,  Photo of Honda Civic                   183

18  Exhibit 10, Compelled Statement                    194

19

20

21  *Marked upon electronic receipt by the reporter.

22  (Exhibits were retained by the court reporter for
    attachment to transcripts, with original exhibits
23  returned to Mr. Sims.)

24

25

Page 3

1                  UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
2                          AT SEATTLE

3

4

5

6    SONIA JOSEPH, Individually and as  )
     Special Administrator of the        )
7    ESTATE OF GIOVONN JOSEPH-McDADE     )
     and GIOVANNI McDADE, individually,  )
8                                         )
              Plaintiffs,                 )
9                                         )
     vs.                                  )NO. 2:20-cv-
10                                        )00771-BJR
     CITY OF KENT, a Washington          )
11   Municipality; CITY OF KENT POLICE   )
     DEPARTMENT; WILLIAM DAVIS;          )
12   MATTHEW RAUSCH; and JOHN DOES 1-10,)
                                          )
13            Defendants.                 )

14

15

16

17           THE VIDEOTAPED DEPOSITION OF MATTHEW

18   RAUSCH (VIA ZOOM VIDEO PLATFORM), produced, sworn,

19   and examined on behalf of the Plaintiffs, on

20   December 16, 2020, between the hours of 11:02 a.m.

21   and 6:16 p.m. CST, of that day, before Carol A.

22   Haas, Registered Professional Reporter, Certified

23   Shorthand Reporter, and Certified Court Reporter.

24

25

Page 4

1                    A P P E A R A N C E S

2

3             APPEARING VIA ZOOM:  The Plaintiffs were

4    represented by Mr. Craig A. Sims, of the law firm of

5    Schroeter, Goldmark & Bender, 810 Third Avenue,

6    Suite 500, Seattle, Washington 98104.

7

8             APPEARING VIA ZOOM:  The Defendants were

9    represented by Mr. Stewart A. Estes, of the law firm

10   of Keating, Bucklin & McCormack, 801 Second Avenue,

11   Suite 1210, Seattle, Washington 98104.

12

13            ALSO PRESENT:  Ms. Kaitlin Wright,

14   Mr. Matt Gonyea, and Ms. Cathy Parker, of the law

15   firm of Schroeter, Goldmark & Bender, 810 Third

16   Avenue, Suite 500, Seattle, Washington 98104.

17

18            ALSO PRESENT:  Nichole Bartholomy,

19   Videographer.

20

21

22

23

24

25

Page 5

```
1           IT IS HEREBY STIPULATED AND AGREED by and

2   between Counsel for the Plaintiffs and Counsel for

3   the Defendants, that this deposition may be taken in

4   shorthand by Carol A. Haas, a Registered

5   Professional Reporter, Certified Shorthand Reporter,

6   and Certified Court Reporter, and afterwards

7   transcribed into typewriting.

8

9                 * * * * * * * * *

10

11                     0-0-0

12

13           THE VIDEOGRAPHER:  We are now on the

14      record.  This is the videotaped deposition of

15      Matthew Rausch.  Today's date is December 16th,

16      2020.  The time is 11:02 a.m. Central Standard

17      Time.

18           All attorneys present will be

19      indicated on the stenographic record.  The

20      court reporter will now swear in the witness.

21

22                 * * * * * * * * *

23

24                     0-0-0

25
```

Page 6

1                     MATTHEW RAUSCH

2

3      of lawful age, being produced, sworn, and examined

4      on the part of the Plaintiffs, and after responding

5      "Yes," to the oath administered by the court

6      reporter, deposes and says:

7

8                     * * * * * * * *

9

10              Examination by Mr. Sims

11        Q    Good morning, sir.  My name is Craig Sims,

12     and I'm one of the lawyers representing the

13     plaintiffs in this matter.  Let's begin this

14     conversation with having you tell us your first and

15     last name and provide us the spelling of the same.

16        **A    Sure.  My name is Matthew Rausch.  First**

17     **name, M-A-T-T-H-E-W.  Last name, Rausch,**

18     **R-A-U-S-C-H.**

19        Q    Mr. Rausch, as we are conducting this

20     deposition over a video platform and we are not in

21     the same room, can you please identify where you are

22     currently located?

23        **A    Sure.  I am at Kent Police & Fire Training**

24     **Center located in the Kent, Washington, in a small**

25     **conference room.**

[Examination by Mr. Sims]

Page 162

1    continue through going westbound on 244th Street

2    another block, and it turns to the north into a

3    cul-de-sac.

4        Q    So let's focus for just a moment.  We

5    talked about the travels and the chase on 104th

6    Avenue Southeast that then went westbound on

7    Southeast 244th Street.  And you confirmed that

8    there were no pedestrians, no vehicles.  Did you

9    also observe Mr. Giovonn Joseph-McDade use his turn

10   signal at any point in time between 104th and the

11   time that you were just about to leave 244th Street?

12       A    I'm sorry, which timeframe?  Between which

13   sections?

14       Q    From the time of the initial chase at

15   104th Avenue Southeast to the time period where you

16   were just about to complete the chase at 244th prior

17   to entering the cul-de-sac.

18       A    Yes.  He had it on a number of times.

19       Q    So what do you mean "a number of times"?

20   Was it turned off, turned on?  What do you mean by

21   that?

22       A    He had both his left and right signals on

23   a couple times through the pursuit.

24       Q    Were the turn signals right and left going

25   the entire time or were they turned on, turned off

[Examination by Mr. Sims]

Page 163

1    at different times?

2         A    From what I recall, it was different times

3    through the pursuit.

4         Q    At what point in time do you recall the

5    signals being used by Mr. Giovonn Joseph-McDade?

6         A    As soon as he initially left the

7    Applebee's lot and he came out on 104th and turned

8    northbound, he turned his right signal on for a

9    block or two, if I had to say.  And then turned it

10   off and continued northbound.  And then turned it

11   back on when he was making a westbound turn onto

12   Southeast 244th Street.

13        Q    Which signal was turned on when

14   Mr. Joseph-McDade went westbound to 244th Street?

15        A    His driver's side left-hand signal.

16        Q    And as he was making the turn onto 244th,

17   he turned on his left signal.  What direction was he

18   turning?  Left or right?

19        A    Left.

20        Q    Did you recall ever seeing

21   Mr. Joseph-McDade use his turn signal at any other

22   times outside of the two occasions in which you just

23   told us about?  At any point during the chase.

24        A    Those are the only two I recall

25   specifically.

[Examination by Mr. Sims]

Page 167

1  lights were illuminating but his turn signal was

2  illuminating as well; is that correct?

3      **A    From what I recall, yes.**

4      Q    As Mr. McDade made his way around the

5  roundabout, do you know where Officer Rausch was at

6  this point in time?  I'm sorry, Officer Davis.

7      **A    He was right behind me.  I don't recall**

8  **exactly where he was.**

9      Q    Did Mr. Joseph-McDade successfully

10 navigate his way around the roundabout prior to

11 entering the cul-de-sac?

12     **A    It appeared so, yes.**

13     Q    And to make sure that we're on the same

14 page, a roundabout is essentially a cement circle or

15 something like that in the middle of the road that

16 causes people to slow down and then drive around in

17 order to get to the street that they want to get to?

18     **A    Correct.**

19     Q    It wasn't the best technical explanation,

20 but you agree with me on that?

21     **A    Yeah.  That was a decent explanation.**

22     Q    And did Mr. McDade run over the roundabout

23 as he was negotiating the turn?

24     **A    No, not that I recall.**

25     Q    Do you know Mr. Joseph-McDade's speed that

[Examination by Mr. Sims]

Page 169

1   in his car?

2          A     No.  I wasn't looking at my speedometer.

3          Q     Did you notice any witnesses present as

4   you entered the cul-de-sac?  I'm sorry, any

5   pedestrians.

6          A     None that I observed, no.

7          Q     Let me ask a clean question.  As you

8   entered the cul-de-sac, did you witness any

9   pedestrians in the area of the cul-de-sac?

10         A     I don't.  I didn't observe any.

11         Q     As you entered into the cul-de-sac, did

12  you observe any vehicles that were parked on the

13  side of the road in the cul-de-sac?

14         A     No.  From what I recall, the vehicles were

15  in the driveways.

16         Q     When you entered the cul-de-sac, did

17  you -- up into the point in time where you attempted

18  a second vehicle collision, did you observe

19  Mr. Joseph-McDade drive his car onto the sidewalk in

20  the cul-de-sac?

21         A     No.  And I didn't attempt a vehicle

22  collision.  I attempted a PIT maneuver.

23         Q     How fast were you driving when you

24  attempted this second maneuver at the -- within the

25  cul-de-sac?

Page 206

1                    REPORTER CERTIFICATE

2          I, Carol A. Haas, Certified Court

3    Reporter, do hereby certify that there came before

4    me via videoconference on December 16, 2020,

5                       MATTHEW RAUSCH

6          Who was by me first duly sworn; that the

7    witness was carefully examined, that said

8    examination was reported by myself, translated and

9    proofread using computer-aided transcription, and

10   the above transcript of proceedings is a true and

11   accurate transcript of my notes as taken at the time

12   of the examination of the witness.

13         I further certify that I am neither

14   attorney nor counsel for nor related nor employed by

15   any of the parties to the action in which this

16   examination is taken; further, that I am not a

17   relative or employee of any attorney or counsel

18   employed by the parties hereto or financially

19   interested in this action.

20         Dated this 19th day of December, 2020.

21

22

23

24         _____

25         Carol A. Haas, RPR, CCR, CSR

# EXHIBIT
# 4



**Rausch**

**10**

12/16/2020

**Kent Police Department**
**Order to Provide Statement and *Garrity* Warning**

### Case: Kent Case No. 17-9738 and All Associated Cases From Kent and Outside Agencies

I, <u>Matthew Rausch</u>, understand that I am being questioned as part of an official investigation of the Valley Investigations Team into the above case.  I understand that I have been directed by Chief Thomas to provide a written statement and/or answer questions related to the performance of my official duties or my fitness to perform those duties.   This direction constitutes an order to provide a written statement and/or answer questions.   I understand that if I refuse to provide a written statement or answer questions, or fail to do so truthfully, that refusal or failure, in and of itself, may constitute conduct that warrants employment discipline, up to and including termination.

**I understand, however, that I am entitled to the right not to be compelled to incriminate myself as guaranteed by the laws and the Constitutions of the state of Washington and the United States.  As such, if I do provide a statement and/or answer questions, neither my statements or answers, nor any information or evidence that is gained by reason of those statements or answers, can or will be used against me in any criminal proceeding.**

While I understand that my statements, answers, or any information or evidence that is gained by reason of my statements or answers cannot be used against me in any criminal proceeding, I further understand that these statements and answers may be used, and may be used against me, during the course of a non-criminal review of my conduct by the Kent Police Department, whether by way of board review, internal affairs, and/or another employment review or investigation process.

I have read and understand this document in its entirety, understand its terms, and I:

☒  Agree to truthfully answer questions.

☐  Refuse to answer questions.

I additionally acknowledge that I signed this document prior to the commencement of the investigative interview or prior to providing my written statement.

Officer: _____          6·29·17/1324
                       *Signature*                                   *Date and Time*

Witness: _____          6/29/ne157
                       *Signature*                                   *Date and Time*

Compelled Statement
of Matthew Rausch

I, Matthew Rausch, understand that I am being questioned as part of an official investigation of the Valley Investigations Team into the above case. I understand that I have been directed by Chief Thomas to provide a written statement and/or answer questions related to the performance of my official duties or my fitness to perform those duties. This direction constitutes an order to provide a written statement and/or answer questions. I understand that if I refuse to provide a written statement or answer questions, or fail to do so truthfully, that refusal or failure, in and of itself, may constitute conduct that warrants employment discipline, up to and including termination.

I understand further that I am entitled to the right not to be compelled to incriminate myself as guaranteed by the laws and the Constitutions of the State of Washington and the United States. As such, if I do provide a statement and/or answer questions, neither my statements or answers, nor any information or evidence that is gained by reason of those statements or answers, can or will be used against me in any criminal proceeding. I understand that my statements, answers, or any information or evidence that is gained by reason of my statements or answers cannot be used against me in any criminal proceeding.

I have been a police officer since 2015. I attended the 720 hour BLEA, and have received numerous additional trainings since then, including in the areas of deadly force, EVOC, and vehicle stops.

On June 24, 2017 I was on routine patrol in the city of Kent, county of King, state of Washington. I was driving a fully marked department police patrol vehicle. It was equipped with functioning emergency lights and audible siren that I function tested at the beginning of my shift, which was from 8:00 PM to 6:00 AM. I was also wearing a fully marked Police Jumpsuit.

Nothing of note had happened prior to this incident. At about 0005 hours, I entered the ARCO AM/PM gas station's parking lot located at 10402 SE 256th St. I entered the lot from the south entrance and noticed a tan 1990's, four door Honda near the gas pumps. It was bearing WA plate #AJZ1572.

There appeared to be two occupants in the vehicle; a driver and front passenger. There was a third male walking towards the car as I entered the lot. This male was smiling and laughing as he was approaching the Honda. He opened up the rear passenger side door and was about to get inside when he looked over at me pulling into the lot in my police vehicle. The male stopped for a moment and then had a scared look on his face. He appeared hesitant now to enter the car and looked around the rest of the parking lot. He then slowly entered the car as if not to draw attention to himself.

I know based on my training and experience that 1990's-early 2000's Honda sedans are commonly stolen vehicles. Vehicle theft is a significant problem in Kent. I ran a routine

WACIC/DOL inquiry of the Honda and it returned to a 1994 Honda Accord that had expired and cancelled registration.

The driver then pulled away from the gas pumps and towards the 104th Ave SE entrance/exit. I followed in my vehicle. As we were slowly driving through the lot the driver turned his head all the way around and was watching me as if he was trying to see what I was going to do. In this light, he appeared to be a white male, possibly Hispanic. He saw I was headed the same direction and he quickly turned back around in the lot and pulled back up to a gas pump. The driver's behavior was very odd and it appeared as if he was trying to avoid being stopped or confronted by me. I then drove around all of the gas pumps and saw that the driver had exited the Honda, leaving his door wide open. I was unsure of where he went. The two other occupants of the vehicle were now watching me as I proceeded through the lot.

I exited the ARCO and went north on 104th Ave SE about a block or so before turning off to see if I could observe the Honda. I could still see it was parked at the gas pumps.

The occupants of the Honda were behaving very strangely and I believed that possible criminal activity was occurring. I watched for a few moments and I saw the rear passenger step out of the vehicle and look around the ARCO lot. It appeared to me that he was looking for my police vehicle. The male then slowly walked away from the vehicle towards 104th Ave SE. I then saw the driver get back into the driver's seat of the Honda. The vehicle then pulled away from the pumps and back towards 104th Ave SE.

Based on the occupant's suspicious behavior and what I had observed, I believed I may have stumbled across a "hand to hand" narcotics sale. I know based on my training and experience that drug users and drug dealers will often meet at locations to buy/sell illegal narcotics. Specifically, I know that the area of 104th Ave SE / SE 256th St is a high crime area and has been identified by our department as an area that needs additional police presence. I have personally made and assisted fellow officers make numerous drug related arrests in this area.

The Honda exited the ARCO and headed north on 104th Ave SE. I was on the west side of 104th Ave SE and pulled out behind the Honda to conduct a traffic stop. I saw the driver of the Honda look over at me as I was crossing over 104th Ave SE to get behind the vehicle. He quickly turned into the Applebee's parking lot located at 25442 104th Ave SE, Kent, WA. The Honda pulled into a parking space and stopped as I entered the Applebee's lot.

I advised over the radio that I was making a traffic stop and I activated my overhead emergency lights. I could see they were functioning properly as the red and blue lights reflected off my surroundings. I pulled behind the Honda and stopped. Before I could advise where I was or the vehicle I was with, the driver of the Honda opened his door, stepped out and faced me.

I exited my vehicle and based on my training and experience ordered the driver to get back into his car. The driver got back into his vehicle. I then advised dispatch I was at Applebee's and provided the license plate of the Honda. Additionally, I asked for a second unit to assist me because the behavior of the driver was causing me concern.

2

I heard Officer Davis answer over the radio that he would be in route to assist me.  As he said this over the radio the driver of the Honda placed the vehicle in drive and quickly accelerated out of the parking spot and onto 104th Ave SE. The vehicle made no attempt to slow down or stop to check for traffic as he attempted to accelerate away from me.  I followed and advised dispatch I was trying to get on the radio but was getting interrupted by other radio traffic.  After a few seconds, I was finally able to advise dispatch that I was in pursuit of the Honda.  My emergency lights were still activated.  I activated my audible siren and could hear it functioning properly.

The Honda headed north on 104th Ave SE.  I advised via the radio the reason for my stop (traffic infraction), that there was no traffic at this point, and he was traveling at about 50 mph.  He was in the northbound lanes.  At about the 25000 block or so he slowed to about 30 mph.  It appeared he was trying to find a spot to stop in order to run from the vehicle.  He then quickly accelerated to about 60 mph.  We continued northbound and crossed the intersection of 104th Ave SE and SE 248th St through a green light. It should be noted that the posted speed limit on 104 Ave SE is 35 mph. The area commonly has lots of pedestrian traffic.

I could now see a police vehicle with emergency lights approaching me from behind.  As the Honda approached SE 244th St., the driver slowed and entered the center turn lane, turning westbound on SE 244th St.  Officer Davis then advised he was behind me and would now be "calling" the pursuit.  I attempted to PIT the vehicle as we went up the slight hill in about the 10300 block of SE 244th ST. My attempt to PIT was unsuccessful as I was unable to achieve proper vehicle positioning.  I did not make contact with the vehicle during this PIT attempt.

The Honda continued westbound and entered the roundabout at SE 244th St and 100th Ave SE.  The Honda entered and drove counter clockwise around the roundabout.  I followed him.  The Honda tried to continue southbound on 100th Ave SE but Officer Davis was able to enter the roundabout clockwise and cut it off.  The Honda then accelerated westbound, continuing on SE 244th St.  I again followed.

This portion of SE 244th St turns to the north and into a cul-de-sac at about the 9900 block.  The Honda entered the cul-de-sac and drove to the north side.  It turned to its left and I conducted a PIT on the vehicle. The PIT caused the Honda to spin and face towards the south.  My car ended up facing north. However, the PIT did not disable the vehicle and it continued to try and evade Officer Davis and me.  The suspect tried to drive around Officer Davis to our west but he was able to cut off the suspect's route.  The Honda drove up and onto to a resident's front yard and driveway trying to again evade capture.  Officer Davis cut off his route by using his patrol vehicle.  The Honda was now boxed in to the front by a house on its passenger side and Officer Davis' vehicle on its driver's side.  The Honda was on the passenger side of Officer Davis' vehicle at an angle to his vehicle. The fronts of the cars were closer than the rears.

As this was unfolding, I was turning my vehicle around and heading over to pin in the Honda to prevent it from moving backwards and end the pursuit.  Seeing that the driver was now driving into a residential area and into a home's yard to try and evade capture, he was a danger to the public and needed to be stopped.

3

For a few seconds I thought that the pursuit was now over.  The Honda was safely boxed in between the house and Officer Davis's vehicle and it appeared as if the Honda would not be able to get away.

I saw Officer Davis exit his patrol vehicle and run around the rear of his vehicle to the rear passenger side corner near his tail gate and safely out of the way of the Honda.  His duty pistol was drawn and pointed at the driver.  He was yelling at the driver of the Honda.  I was not able to make out his commands because there was a great amount of noise from the suspect's engine revving and my siren, but I could hear his voice yelling and I could see his lips moving.  I could hear the Honda's engine revving very loudly over my loud audible siren.  I saw the driver of the Honda look over his left shoulder at us and he had determined look on his face.  It appeared he was trying to get the Honda into a gear but was struggling.

The Honda then quickly reversed and turned, orienting itself towards Officer Davis who was behind his vehicle.  I was unable to pin the Honda from behind when it was stopped on the yard because I could not get there in time after the PIT.  Officer Davis was now directly behind his patrol vehicle and still yelling at the driver of the Honda.  His duty pistol was still out and pointed at the Honda.  The front driver's side of my patrol vehicle was to Officer Davis' right and the Honda was about 15 or more feet in front of him.  I could clearly see Officer Davis illuminated by the Honda's head lights, as they were on and pointed directly at him now. I also recognized that Officer Davis was wearing a fully marked Police Jumpsuit.

I again heard the engine of the Honda revving very loudly.  In a very short period of time, it accelerated toward Officer Davis. Officer Davis was in the direct path of the Honda and it appeared that the Driver was intentionally attempting to drive his vehicle straight at Officer Davis to run him over.  The Honda could have continued in reverse to get greater distance from him before accelerating forward, or it could have turned to its left to avoid him altogether.  However, the driver clearly chose to try to run Officer Davis over.  Due to the positioning of the suspect vehicle and Officer Davis, I believed he was great danger of being struck by the suspect vehicle.  As the driver accelerated the vehicle, I saw the driver duck behind the dash of the vehicle as if to avoid being shot. There was now only a small space between Officer Davis' patrol vehicle and mine where he was standing that the Honda was trying to get through.

I was so concerned that the Driver was going to run Officer Davis over, I pushed the accelerator in my vehicle to the floor, attempting to force the vehicle to stop or change directions to prevent it from hitting Officer Davis, or at least slow it down so it did not strike Officer Davis with as much speed.  I was unable to get in front of the Honda and my vehicle struck the Honda somewhere on the driver's side.  I was able to slow the vehicle down a little. I later observed significant damage to the front of my vehicle. At about the same time as I struck the Honda, Officer Davis discharged his pistol through the front windshield of the Honda.

The Honda was able to get by my vehicle and take off out of the cul-de-sac. I lost sight of Officer Davis for a moment and feared that he had been struck. I then saw that he somehow wasn't hit or was still standing after being hit by the Honda and he was standing near the back of his patrol vehicle.

4

I aired "Shots fired" via my radio and advised the Honda was traveling east bound back onto SE 244th St.  Officer Davis entered his vehicle and we went after the Honda again.  The Honda made a deliberate left turn out of the cul-de-sac that lead me to believe he was still trying to escape.  The Honda then drove up over the curb on the south side of SE 244th St, down a slight grass decline, and into Canterbury Park where it came to rest.

I saw the front passenger exit and begin to run west before giving up and dropping to the ground.  Officer Davis exited his vehicle and I did the same.  I drew my duty weapon and ordered the passenger to stay on the ground and not to move.  He said something along the lines of, "I don't know why he ran!"  I again ordered him to stay on the ground.  I could see the driver slumped over the center console and into the passenger seat.  He was not moving.

Additional officers arrived moments later and detained the passenger.  The Assisting Officers and I approached the Honda to detain the driver and provide medical aid.  The driver's door was locked and the Honda was still in drive with the engine running.  Fearing that the Honda might be able to move, I smashed the driver's window and opened the door.  I put the Honda into Park and turned the vehicle off.

The driver was pulled out from the passenger side door. Officer Davis began making lifesaving efforts by giving CPR. An Officer took Officer Davis' place, attempting lifesaving efforts. I overheard one of my fellow officers asking if anyone had a chest seal for a gunshot wound.  I carry a trauma kit in the front passenger seat of my patrol vehicle and I ran back to my vehicle, grabbed my trauma kit, and gave it to the officers providing lifesaving efforts on the driver.

Matthew Rausch
June 29 , 2017

Joseph-McDade_I 0025

EXHIBIT

5



**Kent Police Department**
**Order to Provide Statement and *Garrity* Warning**

### Case: Kent Case No. 17-9738 and All Associated Cases From Kent and Outside Agencies

I, <u>William Davis</u>, understand that I am being questioned as part of an official investigation of the Valley Investigations Team into the above case.  I understand that I have been directed by Chief Thomas to provide a written statement and/or answer questions related to the performance of my official duties or my fitness to perform those duties.  This direction constitutes an order to provide a written statement and/or answer questions.  I understand that if I refuse to provide a written statement or answer questions, or fail to do so truthfully, that refusal or failure, in and of itself, may constitute conduct that warrants employment discipline, up to and including termination.

**I understand, however, that I am entitled to the right not to be compelled to incriminate myself as guaranteed by the laws and the Constitutions of the state of Washington and the United States.  As such, if I do provide a statement and/or answer questions, neither my statements or answers, nor any information or evidence that is gained by reason of those statements or answers, can or will be used against me in any criminal proceeding.**

While I understand that my statements, answers, or any information or evidence that is gained by reason of my statements or answers cannot be used against me in any criminal proceeding, I further understand that these statements and answers may be used, and may be used against me, during the course of a non-criminal review of my conduct by the Kent Police Department, whether by way of board review, internal affairs, and/or another employment review or investigation process.

I have read and understand this document in its entirety, understand its terms, and I:

☒  Agree to truthfully answer questions.

☐  Refuse to answer questions.

I additionally acknowledge that I signed this document prior to the commencement of the investigative interview or prior to providing my written statement.

Officer: _____         6-29-17   1056
                    *Signature*                          Date and Time

Witness: _____         06/29/17 1051
                    *Signature*                          Date and Time

Joseph-McDade_I 0026

COMPELLED STATEMENT
OF WILLIAM DAVIS
June 29, 2017

I, William Davis, understand that I am being questioned as part of an official investigation of the Valley Investigations Team into the above case. I understand that I have been directed by Chief Thomas to provide a written statement and/or answer questions related to the performance of my official duties or my fitness to perform those duties. This direction constitutes an order to provide a written statement and/or answer questions. I understand that if I refuse to provide a written statement or answer questions, or fail to do so truthfully, that refusal or failure, in and of itself, may constitute conduct that warrants employment discipline, up to and including termination.

I understand further that I am entitled to the right not to be compelled to incriminate myself as guaranteed by the laws and the Constitutions of the State of Washington and the United States. As such, if I do provide a statement and/or answer questions, neither my statements or answers, nor any information or evidence that is gained by reason of those statements or answers, can or will be used against me in any criminal proceeding. I understand that my statements, answers, or any information or evidence that is gained by reason of my statements or answers cannot be used against me in any criminal proceeding.

I initially attended the POST Academy in another state where I received a week of EVOC training, use of force training, vehicle stops and deadly force trainings. I attended approximately three Firearms instructor trainings that each had a component of force training. At my first employment, I held the following positions: K9 handler (patrol and narcotic K9's), patrol supervisor, tactical team member, team leader for the tactical team, firearms instructor, DT instructor, plain clothes narcotics, highway drug interdiction, search and rescue, and an FTO.

Since my lateral transfer to Kent Police Dept., I have received at least the following training. I completed the lateral academy through WSCJTC; an initial training period when I started that went over use of force, deadly force, firearms, etc.;  a yearly deadly force review and update class during block training; quarterly Use of Force training; the active shooter Force on Force training; two full day EVOC courses and one low light backing course; several block trainings where traffic stops were practiced; block trainings where use of force is used and practiced during scenarios several times a year; regular briefing trainings about force; two Firearms instructor courses; DT instructor course; and PIT training yearly. While at Kent PD I have been a Patrol Officer, FTO, Firearms instructor, and DT instructor.

On June 23, 2017 in Kent, Washington I was assigned to routine patrol for the 8:00 PM to 6:00 AM graveyard shift.  I was wearing my Kent Police Department issued uniform.  This uniform has a cloth badge on the left chest, Kent Police Department

1

Joseph-McDade_I 0027

patches on both arms and, "POLICE" in large reflective letters across the back.  I was driving a  black and white Tahoe that was clearly marked as a Police patrol vehicle with emergency lights  on top, front, both sides, and the rear of the vehicle.  I had a ride-along passenger in the front seat.  My radio call number that night was 2K44.

The shift had been fairly routine until this incident. I had just finished taking a call for service about a barking dog complaint.  I then parked in the  Schlotzsky's parking lot on 256 ST to complete the barking dog complaint by telephone.  At approximately 0016 hours, I heard Officer Rausch advise  dispatch that he was going to be out on traffic at the Applebee's location at 25442 104  Ave SE Kent, WA.  As soon as he advised dispatch that he would be out on traffic he requested a  second unit.

I responded over the radio to dispatch that I was only a few blocks away and I would back up  Officer Rausch.  I pulled onto 256 ST from the parking lot and drove towards 104 Ave.  As I was  approaching the intersection of 104 Ave and 256 ST, I heard Officer Rausch advise dispatch that  the vehicle was taking off on him and that he was in pursuit.

I activated my emergency lights and siren.  I cleared the intersection and turned north onto 104  Ave.  I then drove north on 104 Ave to catch up to Officer Rausch and the fleeing vehicle.  The  pursuit speeds at this point had varied from 20-60 miles per hour.  There was very little traffic  on 104 Ave at this time.

I caught up to Officer Rausch near the 24600 block on 104 Ave.  Just as I caught up the vehicle turned west onto 244 St.  I advised dispatch that I was the second unit in the pursuit and that I  would be conducting radio communications for the pursuit.  Officer Rausch attempted to  perform a Pursuit Interdiction Technique (PIT).  He attempted this on the driver's side of the  vehicle.  Officer Rausch did not appear to have made contact with the vehicle.

The suspect vehicle then accelerated and continued to travel west bound on 244 ST.  We approached 100 Ave on 244 ST.  I advised dispatch of our location and direction of travel.  The  intersection at 244 St and 100 Ave has a roundabout as a traffic control device.  The suspect  vehicle and Officer Rausch went around the right side of the roundabout.  I went around the  left side of the roundabout in the opposite direction.  I intended to intentionally strike the vehicle at low speeds in an  attempt to stop this pursuit.

2

As the suspect vehicle came around the roundabout I was unable to intentionally strike it.  When the suspect vehicle cleared the corner, I was positioned so that if I intentionally struck it I  would have struck the driver's side door.  Striking the driver's side door is considered lethal force.  I did not believe that the suspect's actions had risen to that level of force at that point in time, and therefore I intentionally avoided any contact with the suspect's vehicle.

The vehicle then accelerated and traveled westbound on 244 St again. I slowed down to let  Officer Rausch pass so that we did not hit each other.  I advised dispatch of our current  direction of travel.  I also advised that the road was a dead-end in the cul-de-sac.

Shortly after this the vehicle turned northbound onto 99 Ave and into the cul-de-sac. The vehicle held to the east side of the cul-de-sac. At this point, it appeared that Officer Rausch attempted another PIT on the vehicle. It appeared that he made contact, but the PIT was not effective in disabling the suspect vehicle. Officer Rausch's vehicle ended up pointing to the north. The suspect vehicle then continued around the apex of the cul-de-sac.

When I saw this, I turned and took a shorter path around the curve of the cul-de-sac. I again was intending to intentionally strike the vehicle. As I positioned my patrol vehicle to strike the suspect vehicle, the suspect accelerated. When he did this, it once again positioned our vehicles so that if I was to strike him, it would have been in the driver's side door. I still did not believe that that level of force was appropriate at this time.

I was able to see that there were two occupants of the vehicle.  As the vehicle navigated the corner, I was able to drive beside him and slowly force him off of the roadway without making contact. We were traveling at approximately  10 miles an hour as I boxed the suspect vehicle in. The cul-de-sac was a residential area that was lined with houses. There were  several vehicles parked in the driveways along this route.

I continued to direct the vehicle towards the parked vehicles without making contact.  At this point, the suspect vehicle  could not go forward any further and stopped.  I exited my patrol vehicle and went around the  back of my patrol vehicle. I saw that the suspect vehicle had stopped.  My emergency lights were all  still activated but the siren cut out when I put the patrol vehicle in park.

3

Joseph-McDade_I 0029

The driver was looking straight ahead. I covered the driver and his passenger with my pistol (a Glock Model 34 in caliber 9 MM) and said something to the effect of, "turn the car off." The suspect did not turn the car off but it did not move either. I took approximately two steps forward which put me near the suspect's driver's side window.

I hit his window with my sidearm and told him to turn the car off. The driver continued to look straight ahead. The passenger appeared to raise his hands and then grab for the door handle as though he was trying to exit the vehicle. I assumed that he was either going to surrender or flee.

The driver suddenly put the car in reverse and backed up quickly. When he started moving backwards I moved to the rear driver's side of my patrol vehicle. I was approximately 3 yards behind my rear bumper and off to the side. The driver pulled backwards and turned approximately 90 degrees. He had started out facing south, and now he had reversed and turned the vehicle until he was facing east, placing my vehicle and myself directly in his path

I challenged the driver by holding my firearm at low ready with the weapon mounted flashlight turned on. In a loud and clear voice I yelled, "Police Stop." When I did this I clearly saw the driver raise his hands above his head. He crossed his arms in front of his face. I took this as a nonverbal communication that he was giving up. In my mind the next step was to initiate a felony stop as the driver had surrendered. I was prepared to hold the suspects at this location until enough units arrived to safely complete the felony stop. The possible movement of the suspect vehicle was blocked to the front, but not to the rear as Officer Rausch had not yet arrived to block him after the PIT attempt.

As I was positioned there I heard the engine of the suspect vehicle rev up. The vehicle could have continued in reverse and moved further away from me and then driven forward. Or it could have turned to its left and driven yards away from me as he was not blocked in to that side yet. Instead, the vehicle then launched directly at me from approximately 2-3 car lengths away. As the vehicle accelerated towards me, I was in fear for my life as I did not have enough time to move behind my vehicle. I might fall if I ran backwards, and I could not safely turn my back to the car to run forward. I thought it was a certainty that the vehicle was attempting to strike me as it was driving directly towards me. Even if I had been able to retreat behind my bumper, the suspect could have rammed my vehicle and pushed it in to me. If he struck the passenger side door he could injure or kill my ride-along. At this point the vehicle could have turned to its left (north) to go around me. It did not do this. The driver was targeting me with the vehicle.

I raised my sidearm to shoot the driver in an attempt to stop him from running me over. As I did this I could see the driver clearly. He was looking out the windshield in my direction. This also reaffirmed my belief that he was targeting me and I was about to be struck by the car.

About this time Officer Rausch came in from my right and rammed the suspect vehicle with his patrol car. Officer Rausch struck the driver's side of the suspect car

with the front of his patrol car. I could see that Officer Rausch's patrol car was now imbedded into the suspect's vehicle. The suspect vehicle did not stop driving towards me.  It slowed down during impact then the engine revved up again and it pulled forward away from Officer Rausch's patrol car.

This is what I knew at this point. We had been involved in a pursuit with this vehicle. The driver was very determined not to be taken into custody. His vehicle had been struck twice by Officer Rausch and he was not stopping. The passenger of the vehicle appeared to have been trying to get out of the vehicle when it had stopped. The driver had appeared to submit when he saw me with my firearm pointed at him. After apparently submitting to arrest he had accelerated directly at me. Based on the driver's action and direction of the vehicle, the driver was trying to strike me with the vehicle. Based on my training and experience, the human body is not designed to be struck by a moving vehicle. This leads to serious injury and death. After being struck by Officer Rausch's vehicle the suspect vehicle accelerated again coming directly at me. The driver was very committed to escaping and might go to any lengths to do so. I was afraid that I was going to be seriously injured or killed by the vehicle when it struck me.

Based on these facts I was in a deadly force situation. In an attempt to stop the driver from running me over, I fired twice from my duty pistol as the suspect vehicle continued to drive at me.  At this point I was in front of the vehicle on the passenger side of the hood. Prior to Officer Rausch striking the vehicle I could plainly see the driver. After the intentional striking the windshield seemed to shatter and I could not clearly see the driver. The driver continued to accelerate. I may have moved a short distance backwards as the car accelerated towards me. Officer Rausch's contact with the suspect vehicle slowed it down enough to allow me to escape serious injury or death.

As the vehicle passed me I was able to look into the passenger compartment through the passenger side window. I could clearly see the passenger curled up in a ball on the seat. His head was down and his hands were over his head in a defensive posture. This suggested to me that the passenger clearly knew I was a police officer ordering the car to stop with my weapon drawn and pointed at the windshield. As the car passed me, the mirror missed me by less than a foot.  I was so close to the vehicle that I could only see part of the passenger through the window as I looked down through it. The car did not stop at this point but tried to leave the same way it had come into the cul-de-sac.

I heard Officer Rausch advise dispatch that shots had been fired by 2K44 and that the car had just tried to run over 2K44. I also advised dispatch that shots had been fired and the driver had tried to run me over. I ran back to my patrol vehicle and renewed the pursuit. I drove to the bend in the road at 99 Ave and 244 ST. From there I could see that the suspect vehicle appeared to have run off the road and was stopped in the park on the south side of the road.  It was approximately 10-12 yards off of the roadway facing east.

5

I exited my patrol vehicle and took up a position to cover the driver.  The driver of the vehicle  was slumped over onto the front seat with his upper body lying on the seat with his head on the passenger side seat.  His lower body was still in the driver's side floor compartment area.  The passenger was out of the car and laying on the  ground on his stomach his hands were up in a position of surrender.

I provided cover as other Officers arrived.  Officer Rausch and another Officer detained the  passenger.  When the passenger was detained, Officer Lindstrom, Officer Morris and I moved to the vehicle.  I tried to open the driver's side door but it would not open.  I did notice that the  window was either rolled down or gone.

When we could not get the suspect out, I went around the vehicle on the trunk side.  I grabbed  the front passenger side door, which was partially opened.  When I went to open it further the  bottom caught on the sidewalk.  I grabbed the door and forcefully jerked it open far enough to  get the suspect out.

Officer Lindstrom grabbed one arm and I grabbed the other arm.  I believe I grabbed the  suspect's right arm.  We had to drag him across the seat.  At one point his legs got caught in the  driver's side floor area and I jerked on his arm to get him out.

As soon as we got him out of the vehicle we placed him on the ground.  I started giving him  chest compressions.  I asked Officer Lindstrom to check the suspect for weapons as I continued  to give him chest compressions.  I believe I completed approximately 10-12 chest compressions  before another Officer took over providing CPR.

I stepped away from the incident.  I could hear Officers calling for a chest bandage and a  defibrillator.  I contacted Sgt. Vance and completed the Public Safety Notice with her.

William Davis
6-29-17

6

Joseph-McDade_I 0032

EXHIBIT
6



# DES MOINES POLICE DEPARTMENT

## TRANSCRIPTION REQUEST

| | |
|---|---|
| | CASE **17-1559** CITE **Inv.** |
| To<br>**RECORDS** | |
| From<br>Det. F. Gendreau | Date/Time<br>**06-24-2017 / 1000** |

## STATEMENT INFORMATION

**Log #:** _22_          **Length:** 33          **Statement of** Annamarie K. Decker
<br>                                                                      *(name)*

☐ **Victim**     ☐ **Suspect**     ☒ **Witness**     ☐ **Other** _____

**In Custody?:** ☐ **YES**     ☒ **NO**     **N:/ Drive Filename:** 17-1559 Decker

**Comments:** OIS investigation for Kent PD case #17-9738

## RECORDS

Signature: *Kathi Larson*          Date/Time Completed: _10/25/17   0354_

## OFFICER

On the below listed date and time I received the transcribed statement from Records Unit. I have reviewed the transcribed statement which is a true and accurate reflection of the recorded interview.

F. GENDREAU          0002          06-26-2017   0736
<br>**Officer Reporting**          **Serial No.**          **Date/Time**

Joseph-McDade_I 0279

## DES MOINES POLICE DEPARTMENT
CASE:  17-1559
June 24th, 2017 at 0351 Hours
Statement Taken By
Detective Fred Gendreau
Person Being Interviewed
Annamaria K. Decker

FG     Alright.  This statement concerns an investigation being conducted by the Des Moines Police Department under case number 17-1559; referencing Kent case number 17-9738.  We're at the Kent Police Department.  This is Detective Gendreau and present during this interview is Detective Mike Thomas and um, uh, Kent PD Officer Annamaria Decker.  And Anna, you haven't gone through the academy yet, is that right?

AD     Yes sir.

FG     Okay.  Today's date is July 24th, 2017 and the time is 0351 hours.  Um, Annamarie, are you aware that this statement is being recorded?

AD     Yes.

FG     And we have your permission to record this statement?

AD     Yes.

FG     Okay.  Can you spell your, your first and last name for me?

AD     Yes. A-N-N-A-M-A-R-I-A D-E-C-K-E-R.

FG     Okay.  So um, tonight or actually, what time did this happen on CAD?

MT     Started 0016.

FG     Okay.  So it's the 24th still.  What, tell us what uh, so since April you've, you were hired by Kent Police, right?

AD     Yes.

FG     And you have not gone through the academy and you've just been riding and working with Kent.

Joseph-McDade_I 0280

on 244th and we'd seen the car to the right, in the park, like it had driven like, through the park and the passenger got out of the vehicle. He laid down on the ground with his arms out and just laid there. The driver, we, I couldn't see the driver and Officer Davis and Officer Rausch got out and had him at gun point and they waited for back up before they moved in. And then other officers came and they went to pull the driver out, they pulled him out through the passenger side of the vehicle and um, they started to do um, chest compressions on him. I'm not sure who started it, I didn't see that, but I, then I'd seen Officer Lindstrom take over and do chest compression and Officer Morris was there and he was um, asking for a um, the chest patches and then uh, Sergeant Vance arrived. Um, they started taping off the scene and eventually the um, paramedics arrived, or medic, or somebody arrived and then I was, I went behind the crime scene tape and they told me to just stay out of the way.

FG   Okay. We'll probably go through that uh, a little bit slower,

AD   Okay.

FG   but that was,

AD   (Laughs)

FG   at least we have an idea of

MT   Yea.

FG   what happened here.

MT   When you said 108, you're talking about the street

AD   Street.

MT   108? Street, is where,

AD   Yes.

MT   okay. Okay.

FG   Do you know what the traffic stop initially was for, do you have any idea?

AD   I'm not sure, all I heard was a traffic stop.

Joseph-McDade_I 0282

FG    Okay.  And when you, did you see Officer Rausch with that vehicle in the Applebee's parking lot or just

AD    No,

FG    out on the street?

AD    they were on the street.

FG    Okay.  So the vehicle was already not yielding to Officer Rausch at the time.

AD    Correct.  We'd seen it had its blinker on.  I could see that, but, and Officer Rausch was saying he thought it was going to be pull over, looking for somewhere, but it didn't.

FG    Okay.  What did you see in reference to Officer Rausch's car?  Did he have his lights and sirens on?

AD    He did have his lights and sirens on um, like I said I'd seen the vehicle with its blinker on, its right veh uh, right passenger side uh, blinker on.

FG    Mhmm (Affirmative).

AD    And I could just see Officer Rausch's car right behind him.

FG    Okay.  And, and which direction on 108th are you going, north or south?

AD    We were going north.

FG    Okay.  And um, how, how fast was this suspect vehicle going?

AD    Um, I heard him call out that it was going uh, 30 miles per an hour and then it dropped down to 20 and then I'm not sure what, how much it accelerated.

FG    So relatively slow?

AD    Yea.

FG    And can you describe for us, did that vehicle, that suspect vehicle, maintain that speed throughout this entire um, pursuit,

AD    ...

---

Joseph-McDade_I 0283

AD    Yes. When he went to back up, when he put his car, I could see him. Like when he put his car in reverse, um, he was not ducking down when he went to put it in drive and go forward. He ducked down and the passenger still had his hands out of the vehicle because um, I believe Officer Rausch and Officer Davis were yelling like get out of the vehicle. And um, so the passenger threw his hands out the window, trying to show that, you know, he was trying to be compliant and the driver put it in drive. I'd seen him duck down, like trying to get behind the wheel and go forward.

FG    Okay. Did you ever get out of the car?

AD    I did not get out of the car.

FG    Was Officer Rausch out of the car?

AD    I could not see, I do not know.

FG    You could hear him yelling, but

AD    I could hear him

FG    you couldn't see him.

AD    yelling, but I could not actually see him where I was at.

FG    Okay. Um, when the car, did Officer Davis have his lights and sirens activated

AD    Yes.

FG    too? Were they active, were the sirens activated when they were yelling at the driver?

AD    Yes.

FG    Okay. Um,

(Clears throat)

FG    at the point where he backs this car up, what happens next?

AD    Um, he proceeded to go through, between both of the cars.

---

Specialist K. Larson/1401      Page 12

MT    ......  Okay.

FG    Are, is, are your patrol cars equipped with um, on board cameras?

AD    No uh, I don't believe they are, no.

FG    No, okay.  Alright.  I don't think I have any other questions.

MT    I don't think I do either.

FG    Do you?  Is there anything else that you think that's important that we didn't ask you that we should know about?  That you can remember?

AD    Uh, no I think we went over everything, everything that I'd seen.

FG    Okay.  Um, do you certify or declare under penalty of perjury under the laws of the state of Washington that what you just told us, the foregoing is true and correct and that you're willing to testify to that in a court of law?

AD    Yes.

FG    Okay.  This statement is concluded at 0423 hours on June 24th, 2017.


Statement Participants
FG – Detective Fred Gendreau (Interviewer)
MT – Detective Mike Thomas (Interviewer)
AD – Annamaria K. Decker (Interviewee)

June 25th, 2017 at 0356 Hours
Case #17-1559

Joseph-McDade_I 0305

EXHIBIT

7

CAD/Ti                                                                      Page 1 of 7

# Detailed History for Police Incident #KP170044526 As of 07/12/2017 09:53:49

Output for: DP0002

**Priority:**E  **Type:**SHOTMP  – Shooting Medic
**Location:**APPLEBEES, KEN  at 25442 104TH AVE SE, KEN
**LocCross:**btwn SE 254TH PL and SE 256TH ST

| Created: | 06/24/2017 00:16:31 | PD35 | V01265 |
|----------|---------------------|------|--------|
| Entered: | 06/24/2017 00:16:31 | PD35 | V01265 |
| Dispatch: | 06/24/2017 00:16:31 | PD35 | V01265 |
| Enroute: | 06/24/2017 00:16:31 | PD35 | V01265 |
| Onscene: | 06/24/2017 00:16:31 | PD35 | V01265 |
| Transprt: | 06/24/2017 01:22:34 | PD35 | V01265 |
| Complete: | 06/24/2017 01:34:52 | KPM525 | K19854 |
| Closed: | 06/24/2017 10:15:32 | PD36 | V01183 |

**PrimeUnit:**5T59  **Dispo:**T  **Type:**SHOTMP  – Shooting Medic
**Agency:**KP  **Group:**K2  **Beat:**K2  **RD:**KP280
**XREF:**  **Service:**Fire  **Inc:**KF170011787  **Type:**SHOTMF  **Agency:**KF
**Case#:**CAP170007840, CKP170009738   ☑ Detail

| | | | |
|---|---|---|---|
| 00:16:31 | CREATE | V01265/PD35 | **Location:** APPLEBEES, KEN **Type:** T **Group:** K1 **RD/MapBox:** KP280 **Plate:** AJZ1572 **TypeDesc:** Traffic Stop **LocDesc:** at 25442 104TH AVE SE, KEN **LocCross:** btwn SE 254TH PL and SE 256TH ST **Priority: 2** **Agency:** KP **LocType:** C |
| 00:16:31 | ENTRY | V01265/PD35 | **Plate:** AJZ1572 |
| 00:16:31 | DISPOS | V01265/PD35 | 2K21 **Location:** APPLEBEES, KEN **Operator:** K15250 **OperNames:** RAUSCH, MATT |
| 00:16:31 | -PRIU | | 2K21 |
| 00:16:31 | RFT | V01265/PD35 | 2K21 **Comment:** INQUIRY CADQ,,,,,,,,,,,,,,AJZ1572,,,,,,, |
| 00:16:31 | -PREMIS | | **Comment:** PPR, FPR |
| 00:16:38 | BACKER | V01265/PD35 | 2K25 **UnitID:** 2K21 **Location:** APPLEBEES, KEN **Operator:** K57081 **OperNames:** REED, JACOB |
| 00:16:38 | BACKER | V01265/PD35 | 2K44 **UnitID:** 2K21 **Location:** APPLEBEES, KEN **Operator:** K94153 **OperNames:** DAVIS, WILL (FTO) |
| 00:16:48 | MISCN | V01265/PD35 | 2K21 **Comment:** NB 104, AIR CLOSED |
| 00:17:03 | MISCN | V01265/PD35 | 2K21 **Comment:** IN PURSUIT - TRFC VIOL...NO TRFC, SPEEDS 20, SLOWING DOWN |
| 00:17:12 | LOGM | V01304/PD36 | **Message:** MSGID011706240717014821 **MessageType:** HTML **Received:** 06/24/2017 00:16:37 **Comment:** TAN 94 HOND ACCORD |
| 00:17:12 | MISCN | V01265/PD35 | 2K21 **Comment:** SPEEDS 30, TRYING TO FIND PLACE TO BAIL |
| 00:17:21 | MISCN | V01265/PD35 | 2K21 **Comment:** APPR 248 , GRN LT, NB, SPEEDS 60 |
| 00:17:28 | BACKER | V01265/PD35 | K913 **UnitID:** 2K21 **Location:** APPLEBEES, KEN **Operator:** K57815 **OperNames:** KALLIR, DAVE & KRIEGER |

Joseph-McDade_I 0009

|          |          |                  |                                                                                 |
|----------|----------|------------------|---------------------------------------------------------------------------------|
|          |          |                  | (SPAN)                                                                          |
| 00:17:28 | BACKER   | V01265/PD35      | K914 UnitID: 2K21 Location: APPLEBEES, KEN Operator: K78061 OperNames: MILLS, CHRIS & GHOST (T/D) |
| 00:17:33 | MISCN    | V01265/PD35      | 2K21 Comment: WB ON 244                                                          |
| 00:17:53 | MISCN    | V01265/PD35      | 2K21 Comment: FAIL PIT, STILL WB                                                 |
| 00:18:15 | MISCN    | V01265/PD35      | 2K44 Comment: CALLING PURSUIT..GOING DOWN DEAD END 99/244                        |
| 00:18:27 | LOGM     | V01265/PD35      | 2K21 Message: MSGID011706240718014848 MessageType: HTML  Received: 06/24/2017 00:17:36 Comment: DOL ON VEH |
| 00:18:27 | *BACKER  | K52246/KPM561    | 2K57 UnitID: 2K21 Location: APPLEBEES, KEN Operator: K52246 OperNames: BRATLIEN, ERIN |
| 00:18:48 | MISCN    | V01265/PD35      | 2K44 Comment: SHOTS FIRED - EB ON 244                                            |
| 00:18:53 | MISCN    | V01265/PD35      | 2K44 Comment: TRIED TO RAM 44                                                    |
| 00:18:54 | *BACKER  | K84124/KPM529    | 2K55 UnitID: 2K44 Location: APPLEBEES, KEN Operator: K84124 OperNames: LEVI, MATTHEW |
| 00:18:58 | -XREF    |                  | Service: P  Inc: #KP170044527  Type: OSA  Agency: TP                             |
| 00:19:00 | MISCN    | V01265/PD35      | 2K44 Comment: IN PARK                                                            |
| 00:19:03 | -XREF    |                  | Service: P  Inc: #KP170044528  Type: OSA  Agency: DP                             |
| 00:19:09 | MISCN    | V01265/PD35      | 2K44 Comment: 2 AT GP                                                            |
| 00:19:13 | *BACKER  | K45653/KPM527    | 2K41 UnitID: 2K44 Location: APPLEBEES, KEN Operator: K45653 OperNames: CLIFT, JASON |
| 00:19:26 | MISCN    | V01265/PD35      | 2K44 Comment: ENT OFF 100 - GO WB ON 244                                         |
| 00:19:32 | MISCN    | V01265/PD35      | 2K44 Comment: NEED AID, DRIVER OVER DRIVERS SEAT                                 |
| 00:19:44 | BACKOS   | V01265/PD35      | 6K33 UnitID: 2K44 Location: APPLEBEES, KEN Operator: K11768 OperNames: VANCE, HEATHER |
| 00:19:50 | ONSCN    | V01265/PD35      | K913                                                                            |
| 00:19:51 | *BACKER  | K91100/KPM520    | 2K33 UnitID: 2K44 Location: APPLEBEES, KEN Operator: K91100 K39049 OperNames: MEDINA, MICHAEL; WOLCOTT, T(VCDU,AFIS,FTO,PEER) |
| 00:20:13 | *BACKER  | K58426/KPM567    | 2K43 UnitID: 2K44 Location: APPLEBEES, KEN Operator: K58426 OperNames: BRENNAN, RANDY |
| 00:20:17 | CLOS     | V01304/PD36      | 2K21 Location: CANTERBURY PARK, KEN                                              |
| 00:20:24 | ONSCN    | V01265/PD35      | 2K44                                                                            |
| 00:20:26 | MISCN    | V01300/PD39      | Comment: TONED TO FEDERAL WAY                                                    |
| 00:20:33 | MISCN    | V01265/PD35      | 2K44 Comment: NEED MEDICS                                                        |
| 00:20:35 | CLOS     | V01304/PD36      | 2K44 Location: CANTERBURY PARK, KEN                                              |
| 00:20:38 | BACKER   | V01300/PD39      | 3W39 UnitID: 2K43 Location: APPLEBEES, KEN Operator: WP0234 WP0059 OperNames: AN, JAE; DAVIS, ERIC |
| 00:20:38 | BACKER   | V01300/PD39      | 3W26 UnitID: 2K43 Location: APPLEBEES, KEN Operator: WP0201 OperNames: ANTHOLT, JUSTIN (VCDU, AFIS) |
| 00:20:44 | *BACKER  | K51141/KPM550    | 6K37 UnitID: 2K44 Location: CANTERBURY PARK, KEN Operator: K51141 OperNames: GROVE, ANDY |
| 00:21:01 | -ASSOC   |                  | Service: F  Inc: #KF170011787  Type: SHOTMF Agency: KF  Comment: CANTERBURY PARK |
| 00:21:31 | -MISCA   |                  | Comment: NEEDS MEDICS NOW, IN LIFE SAVING                                        |

Joseph-McDade_I 0010

|          |         |                |                                                                                              |
|----------|---------|----------------|----------------------------------------------------------------------------------------------|
|          |         |                | MEASURES                                                                                     |
| 00:21:33 | MISCN   | V01265/PD35    | 6K33 Comment: NEED FD TO GO IN                                                               |
| 00:21:34 | *BACKER | K67266/KPM548  | 2K37 UnitID: 2K44 Location: CANTERBURY PARK, KEN Operator: K67266 OperNames: STEINER, SAM (AFIS/FTO) |
| 00:21:37 | BACKER  | V01300/PD39    | 3W14 UnitID: 3W26 Location: APPLEBEES, KEN Operator: WP0207 OperNames: BLACKSHEAR, R B        |
| 00:21:43 | CLOS    | V01304/PD36    | 6K33 Location: CANTERBURY PARK, KEN                                                          |
| 00:21:47 | ASSOC   | V01244/FD23    | Service: F                                                                                   |
| 00:22:08 | -MISCA  |                | Comment: ENTER OFF 100TH, WB ON 244- DRIVER DOWN IN PASSENGER SEATS                          |
| 00:22:22 | *ONSCN  | K45653/KPM527  | 2K41                                                                                         |
| 00:22:28 | *ONSCN  | K58426/KPM567  | 2K43                                                                                         |
| 00:23:04 | CHANGE  | V01265/PD35    | 6K33 Type: T-->SHOTMP Response: None-->F:3P1K1S Priority: 2-->E TypeDesc: Traffic Stop-->Shooting Medic |
| 00:23:21 | *ONSCN  | K51141/KPM550  | 6K37                                                                                         |
| 00:23:27 | *ONSCN  | K52246/KPM561  | 2K57                                                                                         |
| 00:24:15 | *ONSCN  | K91100/KPM520  | 2K33                                                                                         |
| 00:24:18 | ASSOC   | V01304/PD36    | Service: F                                                                                   |
| 00:24:32 | ASSOC   | V01302/FD22    | Service: F                                                                                   |
| 00:24:52 | BACKOS  | V01265/PD35    | 6K36 UnitID: 6K37 Location: CANTERBURY PARK, KEN Operator: K45645 OperNames: CLARK, TOM       |
| 00:25:00 | CLOS    | V01304/PD36    | 2K21 K913 K914 2K25 2K33 2K37 2K41 2K43 2K44 2K55 Location: CANTERBURY PARK, KEN             |
| 00:25:00 | CLOS    | V01304/PD36    | 2K57 3W14 3W26 3W39 6K33 6K36 6K37 Location: CANTERBURY PARK, KEN                            |
| 00:25:14 | *CHGLOC | WP0207/WPM512  | 3W14                                                                                         |
| 00:25:20 | CHGLOC  | V01304/PD36    | 3W14 3W26 3W39                                                                               |
| 00:26:35 | -MISCA  |                | Comment: 6K33 INQUIRING ON ETA                                                               |
| 00:28:44 | MISCN   | V01265/PD35    | 2K55 Comment: FD COMING IN                                                                   |
| 00:29:15 | *CHGLOC | K84124/KPM529  | 2K55 Location: 24200 100TH AVE SE, KEN Comment: BLOCKING TRAFFIC                             |
| 00:29:17 | *ONSCN  | K84124/KPM529  | 2K55                                                                                         |
| 00:31:22 | MISCN   | V01265/PD35    | 2K41 Comment: REQ W CITY TO RESPOND TO SHUT SPRINKLERS OFF IN PARK THAT TURNED ON            |
| 00:33:38 | *CLEAR  | WP0201/WPM561  | 3W26                                                                                         |
| 00:33:41 | PRMPT   | V01300/PD39    | 3W39                                                                                         |
| 00:33:43 | *CLEAR  | WP0207/WPM512  | 3W14                                                                                         |
| 00:36:18 | *CHGLOC | K57815/KPM547  | K913 Location: STN Comment: TRANSPORT DECKER 19                                              |
| 00:40:01 | *BACKER | K46135/KPM566  | 2K51 UnitID: 2K21 Location: CANTERBURY PARK, KEN Operator: K46135 OperNames: MURPHY, MATTHEW (VCDU) |
| 00:41:54 | *ONSCN  | K57815/KPM547  | K913                                                                                         |
| 00:42:06 | *RFT    | K11768/KPM549  | 6K33 Comment: INQUIRY WANT,,,,CHEEKS, DEVONTE,07281997,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,  |
| 00:42:11 | CHGLOC  | V01265/PD35    | 2K41 Location: STN Comment: W 2K44                                                           |
| 00:42:14 | *LOGM   | K11768/KPM549  | 6K33 Message: MSGID011706240742015398 MessageType: Text Received: N Comment                 |
| 00:42:16 | *LOGM   | K11768/KPM549  | 6K33 Message: MSGID011706240742015399 MessageType: Text Received: N Comment                 |
| 00:42:23 | *LOGM   | K11768/KPM549  | 6K33 Message: MSGID011706240742015404                                                       |

Joseph-McDade_I 0011

CAD/Ti                                                                    Page 4 of 7

|  |  |  |  |
|---|---|---|---|
| | | | MessageType: Text  Received: N Comment |
| 00:42:37 | *RFT | K11768/KPM549 | 6K33 Comment: INQUIRY WANT,,,,MCDADE, GIVONN,10231996,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, |
| 00:43:06 | *RFT | K11768/KPM549 | 6K33 Comment: INQUIRY WANT,,,,MCDADE,GIVONN M,10231996,,,,,,,,,,,,,,,,,,,,,,,,,,,,, |
| 00:43:23 | *RFT | K11768/KPM549 | 6K33 Comment: INQUIRY WANT,,,,MCDADE,GIVONN M,10221996,,,,,,,,,,,,,,,,,,,,,,,,,,,,, |
| 00:43:37 | *RFT | K11768/KPM549 | 6K33 Comment: INQUIRY WANT,,,,JOSEPH MCDADE,GIVONN M,10221996,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, |
| 00:43:45 | *LOGM | K11768/KPM549 | 6K33 Message: MSGID011706240743015486 MessageType: Text  Received: N Comment |
| 00:44:24 | *LOGM | K11768/KPM549 | 6K33 Message: MSGID011706240744015498 MessageType: Text  Received: N Comment |
| 00:44:47 | REDIR | V01304/PD36 | Group: K1-->K2 |
| 00:44:59 | MISCN | V01265/PD35 | 6K36 Comment: ON TAC |
| 00:45:05 | CLOS | V01265/PD35 | 2K21 K914 Location: STN |
| 00:46:16 | *BACKOS | K35735/KPM528 | 2K22 UnitID: 2K21 Location: STN  Operator: K35735 OperNames: CORTINAS, BRIAN |
| 00:47:29 | *MISCN | K35735/KPM528 | 2K22 Comment: WAS ONSCENE SINCE ABOUT 0020 HOURS. |
| 00:47:35 | *CLEAR | K35735/KPM528 | 2K22 |
| 00:48:14 | *ONSCN | K45653/KPM527 | 2K41 |
| 00:48:28 | BACKOS | V01304/PD36 | 4K12 UnitID: 2K57 Location: CANTERBURY PARK, KEN Operator: K65246 OperNames: GUNDERSON, GARRETT Comment: ARRIVED W/FIRST GROUP RIGHT AFTER SHOTS FIRES |
| 00:48:28 | BACKOS | V01304/PD36 | 4K16 UnitID: 2K57 Location: CANTERBURY PARK, KEN Operator: K22318 OperNames: GOFORTH, SEAN Comment: ARRIVED W/FIRST GROUP RIGHT AFTER SHOTS FIRES |
| 00:48:31 | BACKOS | V01265/PD35 | 2K53 UnitID: 2K55 Location: 24200 100TH AVE SE, KEN Operator: K19854 K77681 OperNames: MORRIS, ELI (FTO); LINDSTROM, JENNIFER (PEER) |
| 00:49:04 | MISCN | V01265/PD35 | 2K53 Comment: VIN MATCHES |
| 00:49:30 | MISCN | V01265/PD35 | 2K43 Comment: CRIME SCENE LOG - FRONT E74 |
| 00:49:41 | CLOS | V01265/PD35 | 2K43 Location: CRIME SCENE LOG - FRONT E74 |
| 00:51:12 | *CLEAR | K46135/KPM566 | 2K51 |
| 00:57:21 | BACKER | V01304/PD36 | 5K2 UnitID: 2K21 Location: STN  Operator: K46245 OperNames: LONTZ, TIM (PEER) |
| 00:59:38 | LOGM | V01304/PD36 | Message: MSGID011706240759015793 MessageType: Text  Received: 06/24/2017 00:59:10 Comment: CHEEKS MISD/TUKWILA PD- FTA THEFT 3 $3000 |
| 01:00:04 | *CLEAR | K45645/KPM543 | 6K36 |
| 01:02:13 | LOGM | V01304/PD36 | Message: MSGID011706240802015847 MessageType: Text  Received: 06/24/2017 00:59:08 Comment: CHEEKS MISD/SEATTLE MUNI COURT |
| 01:02:19 | CALLBK | V01304/PD36 | Terminal: PD35 Comment: CONFIRMED THRU TUKWILA PD- DEVONTE CHEEKS 072897- FTA THEFT3 $3000 |
| 01:02:35 | LOGM | V01304/PD36 | Message: MSGID011706240802015858 MessageType: HTML  Received: 06/24/2017 00:59:07 Comment: CHEEKS DOL- INSTRUCTIONAL PERMIT DWLS3 |

Joseph-McDade_I 0012

| 01:02:43 | MISCN | V01304/PD36 | Comment: CHEEKS GOOD TO GO TO SCORE |
|---|---|---|---|
| 01:03:08 | LOGM | V01304/PD36 | Message: MSGID011706240803015872 MessageType: Text  Received: 06/24/2017 00:59:06  Comment: CHEEKS ORDER W/GUERRA |
| 01:11:17 | BACKER | V01304/PD36 | 10K11  UnitID: 2K21  Location: STN  Operator: K45902 OperNames: CHURCH, TRACEY (CMDR) |
| 01:13:48 | MISCN | V01304/PD36 | Comment: VALLEY UNIT ADVISED APPROX 20 AGO TO RESPOND |
| 01:15:50 | CLOS | V01304/PD36 | 5K2  Location: KENT PD, KEN |
| 01:16:10 | *CLEAR | K67266/KPM548 | 2K37 |
| 01:22:34 | TRANSP | V01265/PD35 | 2K53  Location: KENT PD, KEN  Mileage: 97965 |
| 01:24:45 | *CLEAR | K84124/KPM529 | 2K55 |
| 01:29:23 | *CLEAR | K65246/KPM542 | 4K12 |
| 01:32:01 | *CASE | K52246/KPM561 | 2K57  Case#: CKP170009738 |
| 01:32:13 | *CLEAR | K91100/KPM520 | 2K33 |
| 01:32:40 | *CLEAR | K52246/KPM561 | 2K57 |
| 01:34:52 | *CMPLT | K19854/KPM525 | 2K53 |
| 01:40:21 | MISCN | V01304/PD36 | 2K43  Comment: BLOCKING OFF SIDEWALK TO KEEP CAMERAS BACK |
| 01:48:24 | CLOS | V01265/PD35 | 6K33  Location: STN |
| 01:48:55 | *ONSCN | K51141/KPM550 | 6K37 |
| 01:53:26 | BACKER | V01265/PD35 | 5D1  UnitID: 2K44  Location: CANTERBURY PARK, KEN Operator: DP9901  OperNames: SHEPARD, BILL |
| 01:54:31 | BACKER | V01241/PD32 | 10R5  Operator: RP1441  OperNames: EDDY, JEFFREY |
| 02:05:03 | BACKER | V01241/PD32 | 5R1  UnitID: 10R5  Location: APPLEBEES, KEN  Operator: RP7110  OperNames: RADKE, RUSSELL (SGT/VCDU) |
| 02:05:37 | BACKER | V01241/PD32 | 5R201  UnitID: 5R1  Location: APPLEBEES, KEN Operator: RP6847  OperNames: JAY, CHAD |
| 02:07:25 | DISPER | V01287/PD40 | 5A8  Operator: AP3995  OperNames: FAINI, DOUG (VCDU/NEGO) |
| 02:07:25 | DISPER | V01287/PD40 | 5A28  Operator: AP8460  OperNames: MATT, JOSH (VCDU) |
| 02:18:06 | ONSCN | V01241/PD32 | 5R201 |
| 02:25:22 | MISCN | V01304/PD36 | 6K33  Comment: AIR OPEN, UNITS SWITCHED TO PRIMARY** |
| 02:26:44 | BACKER | V01300/PD33 | 5D3  UnitID: 5D1  Location: CANTERBURY PARK, KEN Operator: DP0002  OperNames: GENDREAU, FRED |
| 02:29:43 | PRMPT | V01241/PD32 | 5R1  Comment: Preempted and dispatched to call #KP170044542 |
| 02:29:44 | MISCN | V01304/PD36 | 6K33  Comment: ADVISED KING5 SENDING SOMEONE TO LOC |
| 02:30:20 | PRMPT | V01241/PD32 | 5R201  10R5  Comment: Preempted and dispatched to call #KP170044542 |
| 02:30:47 | XREF | V01241/PD32 | Service: P  Inc: #KP170044542  Type: OSA2  Agency: KP |
| 02:33:47 | ONSCN | V01287/PD40 | 5A8  Location: KENT PD |
| 02:44:59 | BACKER | V01300/PD33 | 5T59  UnitID: 5D3  Location: CANTERBURY PARK, KEN Operator: TP581A  OperNames: HANN, LARRY |
| 02:59:16 | PRMPT | V01304/PD36 | 4K16 |
| 03:01:23 | BACKER | V01194/PD33 | 5D2  UnitID: 5D1  Location: CANTERBURY PARK, KEN Operator: DP0702  OperNames: WEST, JAY |
| 03:02:02 | CLOS | V01194/PD33 | 5D1  Location: KENT PD |

Joseph-McDade_I 0013

| 03:02:10 | CLOS | V01194/PD33 | 5D3 Location: KENT PD |
|---|---|---|---|
| 03:02:18 | CHGLOC | V01194/PD33 | 5D2 Location: KENT PD |
| 03:02:26 | CHGLOC | V01194/PD33 | 5T59 Location: KENT PD |
| 03:22:51 | BACKOS | V01304/PD36 | 2K57 UnitID: 2K21 Location: STN Operator: K52246 OperNames: BRATLIEN, ERIN |
| 03:25:44 | -XREF | | Service: P Inc: **#DP170008851** Type: OSA1 Agency: DP |
| 03:31:45 | ONSCN | V01194/PD33 | 5D2 5T59 |
| 03:32:22 | CLOS | V01265/PD40 | 5A28 Location: KENT PD |
| 03:54:00 | *CLEAR | K51141/KPM550 | 6K37 |
| 03:56:44 | MISCN | V01284/PD36 | 2K57 Comment: 1 IC ON TUKWILA WARRANT |
| 03:57:07 | BACKOS | V01284/PD36 | 4K16 UnitID: 2K57 Location: STN Operator: K22318 OperNames: GOFORTH, SEAN |
| 03:57:08 | TRANSP | V01284/PD36 | 2K57 4K16 Location: SCORE JAIL, DES Comment: 1 MALE |
| 03:57:47 | CASE | V01287/PD40 | 5A28 Case#: CAP170007840 |
| 04:02:36 | CHGLOC | V01284/PD36 | 2K53 |
| 04:02:56 | CHGLOC | V01284/PD36 | 2K53 Location: SCENE |
| 04:12:49 | CLOS | V01194/PD33 | 5D2 Location: CANTERBURY PARK |
| 04:13:05 | *CMPLT | K52246/KPM561 | 2K57 |
| 04:13:25 | BACKOS | V01194/PD33 | 5D5 UnitID: 5D2 Location: CANTERBURY PARK Operator: DP0202 OperNames: EMLY, CASEY |
| 04:14:28 | *CLEAR | K19854/KPM525 | 2K53 |
| 04:24:32 | CLEAR | V01284/PD36 | 5K2 |
| 04:32:08 | CMPLT | V01284/PD36 | 4K16 |
| 04:33:39 | *CLEAR | K57815/KPM547 | K913 |
| 04:34:23 | CLEAR | V01284/PD36 | 2K25 |
| 04:35:09 | *BACKOS | K77681/KPM509 | 2K24 UnitID: 2K43 Location: CRIME SCENE LOG - FRONT E74 Operator: K77681 OperNames: LINDSTROM, JENNIFER (PEER) |
| 04:37:27 | *ONSCN | K45653/KPM527 | 2K41 |
| 04:42:13 | *CLEAR | K45653/KPM527 | 2K41 |
| 04:50:35 | CLEAR | V01284/PD36 | 4K16 |
| 04:52:45 | PRMPT | V01287/PD40 | 5A8 Comment: Preempted and dispatched to call #AP170046606 |
| 04:53:06 | BACKOS | V01287/PD40 | 5A8 UnitID: 5A28 Location: KENT PD Operator: AP3995 OperNames: FAINI, DOUG (VCDU/NEGO) |
| 05:35:04 | MISCA | V01346/CR08 | Comment: NABOR/HUYNH, NGAN/206.859.8742 REQ FONE FOR QS |
| 05:38:55 | *BACKER | K12861/KPM546 | 2K20 UnitID: 2K24 Location: CRIME SCENE LOG - FRONT E74 Operator: K12861 OperNames: CHAPMAN, COREY |
| 05:40:55 | CLEAR | V01284/PD36 | 6K33 |
| 05:44:35 | *ONSCN | K12861/KPM546 | 2K20 |
| 05:57:28 | CLEAR | V01284/PD36 | 2K57 |
| 05:57:40 | *CLEAR | K78061/KPM512 | K914 |
| 05:58:33 | BACKOS | V01284/PD36 | 2K33 UnitID: 2K21 Location: STN Operator: K46290 OperNames: MAJACK, DARIN (NEGO) |
| 06:09:29 | SCDOFF | V01284/PD36 | 2K20 |
| 06:09:34 | CLEAR | V01284/PD36 | 2K20 |
| 06:11:08 | CLEAR | V01284/PD36 | 2K24 |

Joseph-McDade_I 0014

| Time | Event | Unit | Details |
|---|---|---|---|
| 06:11:27 | *BACKOS | K12861/KPM509 | 2K20 UnitID: 2K21 Location: STN Operator: K12861 OperNames: CHAPMAN, COREY |
| 06:19:17 | *CHGLOC | K58426/KPM567 | 2K43 Location: STN |
| 06:23:57 | *ONSCN | K58426/KPM567 | 2K43 |
| 06:27:36 | CLEAR | V01284/PD36 | 2K33 |
| 06:27:46 | CLEAR | V01284/PD36 | 2K43 |
| 06:28:04 | BACKOS | V01284/PD36 | 2K43 UnitID: 2K21 Location: STN Operator: K46290 OperNames: MAJACK, DARIN (NEGO) |
| 06:34:04 | SCDOFF | V01287/PD40 | 5A8 |
| 06:34:06 | PRMPT | V01287/PD40 | 5A8 |
| 07:19:51 | CLEAR | AP8460/APW033 | 5A28 Dispo: R |
| 08:16:44 | REQUST | V01229/PD33 | 5D2 Rtype: TOW Community: KEN -Community: KEN - Company: KENLYN -Location: APPLEBEES, KEN |
| 08:17:29 | MISCN | V01229/PD33 | 5D2 Comment: LYNNS TOW ENRT |
| 08:40:35 | *MISCN | K12861/KPM509 | 2K20 Comment: TOW ONSCENE |
| 08:45:11 | *BACKER | K37862/KPM566 | 2K50 UnitID: 2K20 Location: STN Operator: K37862 OperNames: JAMES, CHELLSI |
| 08:46:30 | *CLEAR | K37862/KPM566 | 2K50 |
| 09:04:53 | *CLEAR | K46290/KPM561 | 2K43 Dispo: T |
| 09:05:08 | *CLEAR | K12861/KPM509 | 2K20 |
| 09:05:48 | SCDOFF | V01284/PD36 | 2K21 |
| 09:05:48 | SCDOFF | V01284/PD36 | 2K44 |
| 09:05:51 | CLEAR | V01284/PD36 | 2K21 2K44 |
| 09:05:56 | CLEAR | V01284/PD36 | 10K11 |
| 10:13:48 | CLEAR | V01183/PD36 | 5D1 5D2 5D3 5D5 |
| 10:15:32 | CLEAR | V01183/PD36 | 5T59 |
| 10:15:32 | -PRIU | | 5T59 |
| 10:15:32 | -CLEAR | | |
| 10:15:32 | CLOSE | V01183/PD36 | |

[06/25/2017 ]

| Time | Event | Unit | Details |
|---|---|---|---|
| 15:16:17 | XREF | V01003/PD35 | Service: P Inc: #KP170044899 Type: FUP Agency: KP |
| 15:16:27 | -PREMIS | | Comment: PPR, FPR |

Joseph-McDade_I 0015

# EXHIBIT

# 8

# STATE OF WASHINGTON
## DEPARTMENT OF HEALTH

### CERTIFICATE OF DEATH



CERTIFICATE NUMBER: **2017-028595**

DATE ISSUED: **08/06/2020**
FEE NUMBER: **73736**

FIRST AND MIDDLE NAME(S): **GIOVONN MICHAEL**
LAST NAME(S): **JOSEPH-MCDADE**

COUNTY OF DEATH: **KING**
DATE OF DEATH: **JUNE 24, 2017**
HOUR OF DEATH: **12:45 AM**
SEX: **MALE**     AGE: **20 YEARS**
SOCIAL SECURITY NUMBER: **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**

PLACE OF DEATH: **OTHER PLACE**
FACILITY OR ADDRESS: **100TH AVE SE & SE 244TH ST**
CITY, STATE, ZIP: **KENT, WASHINGTON 98030**

RESIDENCE STREET: **29322 35TH AVE S**
CITY, STATE, ZIP: **AUBURN, WA 98001**
INSIDE CITY LIMITS: **YES**     COUNTY: **KING**
TRIBAL RESERVATION: **NOT APPLICABLE**
LENGTH OF TIME AT RESIDENCE: **7 YEARS**

HISPANIC ORIGIN: **NO, NOT SPANISH/HISPANIC/LATINO**
RACE: **WHITE, BLACK, ASIAN INDIAN**

BIRTH DATE: **OCTOBER 22, 1996**
BIRTHPLACE: **BELLEVUE, WA**

FATHER: **GIOVOANNI LEMAR MCDADE**
MOTHER: **SONIA MICHAEL JOSEPH**

MARITAL STATUS: **SINGLE, NEVER MARRIED**
SURVIVING SPOUSE: **NOT APPLICABLE**

METHOD OF DISPOSITION: **BURIAL**
PLACE OF DISPOSITION: **CALVARY CATHOLIC CEMETERY**

OCCUPATION: **STUDENT**
INDUSTRY: **STUDENT**
EDUCATION: **SOME COLLEGE CREDIT, BUT NO DEGREE**
US ARMED FORCES: **NO**

CITY, STATE: **SEATTLE, WASHINGTON**
DISPOSITION DATE: **JULY 03, 2017**

FUNERAL FACILITY: **M B DANIEL MORTUARY SERVICES LLC**

INFORMANT: **SONIA MICHAEL JOSEPH**
RELATIONSHIP: **MOTHER**
ADDRESS: **29322 35TH S AUBURN, WA 98001**

ADDRESS: **339 BURNETT AVENUE SOUTH SUITE 304**
CITY, STATE, ZIP: **RENTON, WASHINGTON 98057**
FUNERAL DIRECTOR: **HENRY C. MELTON**

CAUSE OF DEATH:
A: **MULTIPLE GUNSHOT WOUNDS**
INTERVAL: **SECONDS**
B:
INTERVAL:
C:
INTERVAL:
D:
INTERVAL:

OTHER CONDITIONS CONTRIBUTING TO DEATH:

MANNER OF DEATH: **HOMICIDE**
AUTOPSY: **YES**
WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE
CAUSE OF DEATH: **YES**
DID TOBACCO USE CONTRIBUTE TO DEATH: **NO**
PREGNANCY STATUS IF FEMALE: **NO RESPONSE**

DATE OF INJURY: **JUNE 24, 2017**
HOUR OF INJURY: **12:20 AM**
INJURY AT WORK: **NO**
PLACE OF INJURY: **ROADWAY**

CERTIFIER NAME: **TIMOTHY L. WILLIAMS, MD**
TITLE: **CORONER/ME**
CERTIFIER ADDRESS: **325 9TH AVENUE #359792 MEDICAL EXAMINER**
CITY, STATE, ZIP: **SEATTLE, WA 98104**
DATE SIGNED: **JUNE 26, 2017**

LOCATION OF INJURY: **100TH AVE SE & SE 244TH ST**

CITY, STATE, ZIP: **KENT, WASHINGTON 98030**
COUNTY: **KING**
DESCRIBE HOW INJURY OCCURRED: **SHOT DURING CONFRONTATION WITH LAW ENFORCEMENT**

CASE REFERRED TO ME/CORONER: **YES**
FILE NUMBER: **17-1240**
ATTENDING PHYSICIAN: **NOT APPLICABLE**

IF TRANSPORTATION INJURY, SPECIFY: **NOT APPLICABLE**

LOCAL DEPUTY REGISTRAR: **LIZ OGDEN**
DATE RECEIVED: **JUNE 29, 2017**

NOT VALID IF PHOTOCOPIED OR ALTERED

DOH 422-132 King (8/18)

Washington State Department of
**Health**

DOH 422-034 August 2019

Mail to: **Center for Health Statistics**
P.O. Box 47814
Olympia, WA 98504-7814
360-236-4300

## Affidavit for Correction

**This is a legal document. Complete in ink and do not alter.**

### STATE OFFICE USE ONLY

| State File Number | Fee Number | Initials | Date | Affidavit Number |
|---|---|---|---|---|
| | | | | |

**Required**

**Required information must match current information on record**

Record Type: ☐ Birth   ☐ Death   ☐ Marriage   ☐ Dissolution (Divorce)

| 1. Name on Record: | | | 2. Date of Event: | 3. Place of Event: |
|---|---|---|---|---|
| First | Middle | Last | MM/DD/YYYY | (City or County) |

| 4. Father/Parent Full Birth Name (Spouse A for Marriage or Dissolution) | | | 5. Mother/Parent Full Birth Name (Spouse B for Marriage or Dissolution) | | |
|---|---|---|---|---|---|
| First | Middle | Last/Maiden | First | Middle | Last/Maiden |

6. Name of Person Requesting Correction: _____ Relationship to Person on Record: ☐ Self ☐ Parent(s) ☐ Guardian ☐ Funeral Director ☐ Informant ☐ Other (specify) _____ ☐ Hospital

7. Return Mailing Address:
PO Box or Street Address _____ City _____ State _____ Zip

Telephone Number: ( ) _____  Email Address: _____

### Use the section below for requesting any changes on the record. The record is incorrect or incomplete as follows:

| The record currently shows: | The true fact is: |
|---|---|
| 8. | 9. |
| 10. | 11. |
| 12. | 13. |

### I declare under penalty of perjury under the laws of the State of Washington that the forgoing is true and correct.

| 14a. Signature: | 14b. Signature of 2nd parent (if required): |
|---|---|
| Printed name:                    Date: | Printed name:                    Date: |

### INSTRUCTIONS – go to www.doh.wa.gov for more information

Required proof documentation must be submitted with the affidavit and include full name and birth date. Examples of proof documentation include:
- Birth/Marriage/Divorce record
- Certificate of Naturalization
- Military record (DD-214)
- Hospital/medical record
- School transcripts
- Copy of Passport / Enhanced ID
- Social Security Numident Report
- Green/Permanent Resident card (I-551)

**You must use a Driver's license, Social Security card, or hospital decorative birth certificate as proof documentation.**

#### Birth Certificates
1. Only a parent(s), legal guardian (if the child is under 18), or the named individual (if 18 or older) may change the birth certificate.
2. **The proof(s) must match** the asserted fact(s). For example, if the affidavit says the name should be Mary Ann Doe, the proof must show the name to be Mary Ann Doe.
3. Proof documentation must be five or more years old or established within five years of birth.
4. This affidavit cannot be used to add a parent to a birth certificate (use Acknowledgement of Parentage form DOH 422-159).

**Child under 18**
- If legal guardian(s), include certified court order proving guardianship.
- Up to age one or up to one year following the filing of an Acknowledgement of Parentage form, last name can be changed once to either parents' name on certificate (can be any combination of the first, middle or last names); thereafter, a court order is required to change the last name.
- No proof is required to change the first or middle name.*
- To correct parent's information, one proof documentation is required.
- To correct the sex of the child, one proof documentation from a medical provider is required.

**Adult (18 years or older)**
- Only the adult can change his or her birth certificate.
- If the first or middle name is missing, three pieces of proof documentation are required.
- If the first, middle and/or last name is misspelled, or month and/or day of birth is incorrect, two pieces of proof documentation are required.
- To correct parent's birth date, place of birth, or name, one proof documentation is required.

*To change any part of the name of a child using this form, **signatures from both parents listed on the certificate are required.** If one parent is deceased, submit a death certificate with request.

#### Death Certificates
1. Only the informant may change the non-medical information without proof documentation. The funeral director, executors/administrators, or a family member may change the non-medical information with proof documentation. Family members are spouse or registered domestic partner, parent, sibling, or adult child or stepchild. Marital status requires a certified court order if someone other than the informant is requesting the change.
2. The medical information (cause of death) may be changed only by the certifying physician or the coroner/medical examiner.

#### Marriage/Dissolution (Divorce) Certificates
1. Personal facts (minor spelling changes in name, date or place of birth, or residence) may be changed by the person with one piece of proof documentation.
2. To change the date or place of marriage or dissolution, the officiant (marriage) or clerk of court (dissolution) must complete and submit the affidavit.



Certificate not valid unless the Seal of the State of Washington changes color when heat applied.

**CERTIFIED**

Jeffrey S. Duchin, MD
HEALTH OFFICER

**Public Health**
Seattle & King County
STATE OF WASHINGTON



0 4 2 6 6 3 7 5

EXHIBIT

9

# DES MOINES POLICE DEPARTMENT

## FOLLOW UP REPORT

sclosure

O.K.   NO

CASE#

**17-1559**

| Classification | Location of Occurrence |
|---|---|
| **DEATH INVESTIGATION** | **24400 block 100th Ave SE Kent WA** |
| Victim | Phone Numbers |
| | Hm#        Wk# |

**Case reference:** V.I.T. OIS / Kent Police case 17-9739, Auburn Police case 17-7841, Tukwila Police case 17-4523, and Renton Police case 17-7884

### June 24th 2017 at 0137 hours

I received a VIT Code Red text to my work cellular phone reference an officer involved shooting in the City of Kent. The text requested investigators and evidence technicians meet at the Kent Police Department for briefing. I responded to Kent Police Department from my residence.

**Around 0300 hours** I arrived at the Kent Police Department, Detective West arrived at the same time and we went to the briefing room located in Kent PD. The briefing for this incident had concluded prior to our arrival and investigators had already been assigned tasks.

I was advised this incident was assigned Kent Police case 17-9738. Detective M. Lorette was assigned as the Kent Police Liaison.

Kent Police Commander T. Church advised she had custody of a wallet found on the driver who had been shot. She also advised there was a witness waiting to be interviewed.

Auburn Police Commander M. Hirman provided an overview of events for those who were not present during the initial briefing, in summary. He also supplied a CAD history for this event and Google map of the area where this incident unfolded. From the briefing, CAD history and map I learned the following information;

*I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

fficer Reporting  F. Gendreau                                    Serial No. 0002

| ribution: | Date & Time Signed July 21st 2017 / 1600 | Supervisor Reporting         Serial No. |
|---|---|---|
| Evidence Disposition | Case Status Code | Spillman Entry By |
| P      R      D      H | 8 | |

DMPD  F/U 6/01

PAGE  1        OF  23

KPD 011458

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

Kent Police Officer Rausch (2K21) initiated a traffic stop on Washington vehicle license plate AJZ1572 at Applebee's located at 25442 104th Ave SE in Kent. Officer Rausch was driving a marked Kent Police Tahoe vehicle and was wearing a full police uniform.

Investigators later learned the license plate AJZ1572 was expired in February 2017 and had been cancelled. A new plate was issued, Washington BBA7092, which was not affixed to the vehicle. Washington plate BBA7092 is registered to Giovonn M. Joseph McDade, date of birth 10-22-1996 at the address of 29322 35th Ave South, Auburn Washington (here after referred to as McDade for this report). McDade's license to drive is suspended in the third degree.

The vehicle was driven by McDade and a passenger, later identified as Devonte Cheeks, date of birth ████-1997 was in the right front passenger seat (here after referred to as Cheeks for this report).

Commander M. Hirman reported the initiated traffic stop by Officer Rausch, turned into an attempt to elude police when McDade fled the Applebee's parking lot in his vehicle. McDade reportedly turned northbound on 104th Ave SE out of the Applebee's parking lot with Officer Rausch following behind McDade's vehicle with the lights and siren activated in his patrol vehicle, giving McDade a visual and audible indication to stop his vehicle.

Kent Police Officer Will Davis (2K44) and a Kent Police recruit, later identified as Annamarie Decker, soon joined the pursuit as the second involved police vehicle. Officer Davis was driving a fully marked and lighted police Tahoe and was wearing a police uniform. Recruit Decker was not wearing a uniform. Officer Davis had activated his emergency lights and siren and advised dispatch that he would take over calling (directions) of the pursuit route.

Speeds reported by the pursuing officers varied from twenty miles per hour to sixty miles per hour northbound on 104th Ave SE from the 25400 block. McDade turned westbound onto SE 244th Street from 104th Ave SE. It was recorded in CAD history that Officer Rausch made an attempt to use a pursuit interdiction technique (PIT) at the intersection of 104th and 244th, which was un-successful.

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting  F. GENDREAU  

Serial No. 0002

KPD 011459

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

McDade continued to drive westbound on SE 244th Street and through a roundabout intersection at 100th Ave SE, continuing westbound on S 244th Street, before the roadway made a northbound turn onto 99th Ave South, which dead ends in a cul-de-sac.

In the cul-de-sac, Officer Rausch again attempted a pursuit interdiction technique, making contact with McDade's vehicle. Commander M. Hirman reported McDade's vehicle came to a rest possibly facing the pursuing Kent Police vehicles (this is speculative). Officer Davis had exited his vehicle and was giving verbal commands. At some point McDade drove between the two marked Kent Police vehicles at which time Officer Davis fired his duty weapon, apparently striking McDade as he sat in the driver's seat.

It was reported no other police vehicles were in the cul-de-sac at the time of this incident.

After passing between the two Kent Police vehicles, McDade continued to drive the vehicle going southbound on 99th Ave South and then eastbound onto South 244th Street, before his vehicle left the roadway in a southeasterly direction and came to rest in the grass of Canterbury Park addressed at 24409 100th Ave SE Kent.

Duty assignments had been assigned as follows: Renton Police were processing the scene where this shooting incident took place as well as McDade's vehicle.

Auburn Police Detective Joshua Matt was drafting a search warrant application for the vehicle McDade had been driving.

Port of Seattle Police Detectives D. Beam and D. Carlton were assigned to canvas the neighborhood surrounding the incident.

Commander M. Hirman reported Kent Police Officer Davis was processed and released. Officer Rausch was also released. Renton Police investigators had taken Officer Davis' duty weapon and uniform as evidence.

Recruit Annamarie Decker was waiting to be interviewed as a witness (here after referred to as Decker for this report).

I reviewed the CAD history for this incident and noted the following key information:

---

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting  F. GENDREAU               Serial No. 0002

PAGE  3   OF  23

KPD 011460

# DES MOINES POLICE DEPARTMENT
## FOLLOW UP CONTINUATION

CASE#
17-1559

- 00:16:31 Washington license plate AJZ1572 is ran by 2K21, Officer Rausch, who makes a traffic stop at Applebee's

- 00:16:38 2K44, Officer Davis answers as a backing officer

- 00:16:48 The radio air traffic is closed and Officer Rausch announces pursuit, this is followed by details of travel and conditions of roadway

- 00:17: 33 the pursuit is westbound on South 244th Street

- 00:17:53 Officer Rausch announces a failed PIT

- 00:18:48 Officer Rausch announces "shots fired , eastbound 244th moments later he states "tried to ram forty four"

- 00:19:32 Officer Davis requests aid respond for driver

**Around 0400 hours** Detective Thomas and I interviewed Decker in a conference room at the Kent Police Department. She agreed to give a digitally recorded statement, in summary I learned the following ormation.

Decker told us she was riding with Officer William Davis when she heard Officer Rausch announce a traffic stop over the radio at Applebee's (Restaurant), she was unaware what the stop was for. Being close to the area, Officer Davis acted as a backup officer and responded toward Officer Rausch's location.

Decker said Officer Rausch's traffic stop turned into a pursuit, which she and Officer Davis soon joined as the second unit, calling the pursuit route. Decker said she saw both Officer Rausch and Davis had the lights and sirens activated on their emergency vehicles.

Decker said the pursuit eventually went west on 244th where Officer Rausch attempted an unsuccessful PIT maneuver, Decker heard this on the radio but was unaware if Officer Rausch made contact with McDade's vehicle. The pursuit continued west on 244th entering a cul-de-sac. Decker said she believed Officer Davis and Rausch had cornered the vehicle in the cul-de-sac. Decker said Officer Davis exited his vehicle and was giving the driver (McDade) verbal commands to stop and exit his vehicle. Decker said the passenger (Cheeks) had his hands out the passenger side window and she saw the driver (McDade) duck

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting  F. GENDREAU

Serial No. 0002

**KPD 011461**

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#

17-1559

down in his seat. Decker said she remembered the vehicle backing up, hearing two gunshots and the vehicle leave between Officer Rausch and Davis's vehicle. Decker said she believed as the vehicle left, it was going to strike their patrol vehicle and she prepared for the impact. The vehicle drove out of the cul-de-sac toward 244th.

Decker Officer Davis got back in the vehicle to pursue, as they came around the corner at 99th and 244th, McDade's vehicle had left the roadway and drove into the park. Decker said by the time Officer Rausch and Davis arrived where McDade's vehicle came to a rest, the passenger (Cheeks) was out of the vehicle lying in the grass with his arms outstretched. Decker said eventually other Kent Police and medics arrived.

The above only summarizes Decker's statement which is approximately thirty three minutes in length and should be referred to for context and greater detail. I later copied Decker's statement to a dedicated DMPD computer drive for transcription purposes. I then copied the same file to a CD which I later placed into evidence as item FJG-1.

**Around 0600 hours** Detective Thomas and I arrived at the scene to obtain a reference of the area and to meet with Renton Police who were processing the area for evidence. The scene was secured with crime scene tape and there were uniformed Kent patrol officers acting as scene security and keeping a log of entry.

At the scene I met with Renton Evidence Technician C. Jay, Detective Sgt. Radke and Detective C. Edwards. Des Moines Police Detectives West and Emly were already on scene. Detective Emly was assigned to assist Renton in collection of evidence.

I later walked through the scene located in the cul-de-sac. I noted a debris field of what appeared to be pieces of a vehicle in the cul-de-sac east of the address of 24319 99th Ave South.

I noted residential addresses in the cul-de-sac, which appeared to have home security cameras. I attempted contact at 24313 99th Ave South, however no one answered the door, I left a business card on the door. I was advised the address of 24319 99th Ave South had a non-functioning camera, Detective Thomas

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting   F. GENDREAU

Serial No. 0002

PAGE  5   OF  2 3

KPD 011462

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

had spoken with the home owner as he left for work. Detective Thomas and I also contacted the address of ███████████, and spoke with Shiva S. Lal, date of birth█████████████. He advised us he had no home surveillance system, further he did not witness this incident but heard police sirens.

Along South 244th Street in the 9900 block, I could see black scuff marks on the south curbing where McDade's vehicle left the roadway, traveling in a southeasterly direction through a sloped grassy area into Canterbury Park. The vehicle came to rest facing eastbound in the park, partially over the north sidewalk.

There were impressions in the grass left from the vehicle's tires consistent with its direction of travel and resting place. I could also see the vehicle left a gouge in the concrete sidewalk from its right side wheels.

I noted damage to the left rear passenger side door and left front bumper of McDade's vehicle. The driver's side window was broken out and there was glass on the driver's seat. The front passenger door was open and I saw a body covered with a blanket, laying just outside the front passenger door.

In the windshield of the vehicle I saw what appeared to be two bullet defects in the glass, nearer the passenger side of the vehicle. The two defects appeared somewhat oblong in the glass and the edges of the defects suggested the projectile traveled from the outside to the inside of the vehicle. Knowing McDade was struck in the driver's seat, coupled with the location of the defects, suggested when the rounds entered the windshield, the vehicle and shooter were at an angle to each other. This would not take into account any motion of the vehicle or officer.

Looking into the vehicle through the open windows I did not see any defects in the upholstery or other parts of the vehicle as a secondary reference that would assist in trajectory.

I then looked at Officer Rausch's patrol vehicle. I saw there was damage to his bumper and push-bars. The push-bars had been bent up at an angle from right to left, as if something struck his vehicle and continued. A portion of the push-bumper on the right side was missing.

I then looked at Officer Davis patrol vehicle, I did not note damage to it.

---

...rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting  F. GENDREAU                    Serial No. 0002

KPD 011463

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

**Around 0700 hours** I spoke with Auburn Police Detective Joshua Matt. Detective Matt advised me the search warrant application had been approved, he later emailed a copy to my cellular phone. I reviewed the search warrant prior to service.

Detective Thomas and I then executed the search warrant on McDade's vehicle as Renton Evidence Technician C. Jay took photographs and Renton Detective C. Edwards packaged evidence removed from the vehicle.

On the driver's side seat I located a black notebook, inside this notebook I found court paperwork bearing McDade's name and a vehicle title application in his name for the vehicle we were searching. Also on the driver's seat was an Apple Ipod Touch. Between the driver's seat and the center console, near the seatbelt attachment, I located a plastic container with what appeared to be marijuana inside. In the area of the center console I located a cellular telephone, it appeared to be an Apple Iphone-7. On the passenger side floorboard I found a Washington State identification card bearing the name Devonte Cheeks. Also on the passenger side front floorboard was a Powerade sports drink bottle in fruit punch flavor. I noted the liquid ide did not appear to be Powerade and was not the color of fruit punch. There was also a two liter green plastic 7-Up bottle on the floorboard. I noted the liquid inside the 7-Up bottle did not resemble 7-Up soda, but was a greenish / purplish colored liquid.   Under the front passenger seat was a Ball canning jar containing suspected marijuana.  All these items were collected as evidence and later turned over to Detective Emly for entry into the evidence system.

The King County Medical examiner later arrived and took custody of McDade's body, they provided case number 17-1240.


**June 26th 2017**

**Around 0700 hours** I received Decker's transcribed statement from DMPD records. The statement is attached and incorporated by reference into this report.


*tify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting  F. GENDREAU                          Serial No. 0002

PAGE  7    OF  23

KPD 011464

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|-------|
| 17-1559 |

**Around 0930 hours** I attended a briefing with Detectives Thomas, Emly and West along with Detective Sgt. Shepard and Evidence Technician Agnew to discuss this case. It was determined we would conduct a video re-enactment with Decker and possibly Cheeks at the scene.

I called the SCORE jail and confirmed Cheeks was still in custody. I requested Detective West review Cheeks jail phone calls for conversations regarding this incident.

Detective Thomas responded to The Kent Police Department to meet with Decker.

**Around 1030 hours** I reviewed the video recorded interview of Cheek's conducted by Tukwila Police Detectives at Kent Police Department. The video is in segments and the audio is faint. The recorded interview was later copied by Detective West to a USB drive for prosecutorial review. The audio / video recorded statement should be referred to for details. It was not sent for transcription as the audio is faint.

**Around 1400 hours** Detective Sgt. Shepard, Detective West and I drove to the scene of this incident meet with Detective Thomas. Decker agreed to conduct a video re-enactment as to her recollection of events leading up to the shooting incident.

Upon arrival I met with Detective Thomas and Kent Detectives M. Lorette and Detective Sgt. Ford.

Detective Thomas, Decker and I drove from the scene to the 25400 block of 104th Ave in the City of Kent. I operated a video camera as Detective Thomas drove and Decker directed / narrated us through the route she remembered Officer Rausch and Davis took, while pursuing McDade's vehicle during the early morning hours of 06-24-17.

When we arrived at the scene of the shooting incident, Decker directed / narrated us through placement of Officer Davis, Rausch and McDade's vehicles as she recalled them being that morning. The two video files are approximately thirteen minutes in length and should be referred to for details. I later turned the video camera over to Detective West who copied the video files to a dedicated DMPD computer drive and then onto a USB drive for prosecutorial review.

_rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington._

| Officer Reporting  F. GENDREAU | Serial No. 0002 |
|---|---|
| | PAGE  8  OF  23 |

KPD 011465

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

**Around 1600 hours** Detective Thomas and I responded the SCORE jail where we spoke with Devonte Cheeks in the BAC room. After initial introductions, I explained to Cheeks we had reviewed the video recorded interview he completed the night of the shooting with Tukwila Police. I explained to Cheeks it was not clear to us what happened in the cul-de-sac and asked if he was willing to conduct a video re-enactment, as he remembered events unfolding in the early morning hours of this incident.

Cheeks said he knew McDade for about ten years and thought of him as family. I asked Cheeks about drug and alcohol consumption use, before this incident unfolded. Cheeks said he had smoked marijuana about two hours before McDade picked him up, but he did not feel as though he was intoxicated. I asked Cheeks if he knew if McDade had consumed any alcohol or narcotics and he said he did not know what McDade did before picking him up.

Cheeks asked if we could help get him out of jail and I told him no. I did tell him we could only take him for the re-enactment, but he had to be returned to the SCORE facility on his warrants. Because of the hour I knew Cheeks would miss his meal at SCORE so we offered him something to eat before returning. Cheeks asked if we had a cigarette and I told him no, but we could stop by our PD after and I could get him one while he ate dinner.

Cheeks agreed to attend the video re-enactment and Detective Thomas and I transported him toward the scene in Detective Thomas's vehicle. Cheeks sat in the front passenger seat and I sat in the back center as Detective Thomas drove.

As we drove, I spoke with Cheeks who explained he and McDade had gone to the AM-PM located at 254th and 104th in Kent to get gas. He said they left the AM-PM and pulled into Burger king to meet a friend named Giovanni Fashaw (spelling). Devonte said as soon as they pulled into the parking lot and parked in a stall, he saw police car lights behind them and told McDade something to the effect of, I'm done, its over I have warrants. Cheeks said McDade briefly got out of the car to contact the officer, but then got back in the vehicle and said something to the effect of, we are running. McDade then fled in the vehicle with Cheeks as a passenger. Cheeks said he did not know why McDade took off and was telling him to stop and let him out.

*...rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting   F. GENDREAU        Serial No. 0002

PAGE 9   OF 23

KPD 011466

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#

17-1559

Once in the area for the re-enactment to take place, Cheeks first directed us to the Burger King Parking lot located at 25240 104th Ave SE. In the parking lot Cheeks said he was not sure if this was the right location, he then directed us to the Dairy Queen located at 25206 194th Ave SE. Again Cheeks said he was not sure if this was the right location of the initial contact.

I told Cheeks we had listened to police radio traffic from a recording that led us to believe the initial stop took place at the Applebee's restaurant located at 25442 104th Ave SE. Detective Thomas drove to the parking lot of Applebee's and Cheeks told us this was the spot where they were stopped and apologized for the confusion.

I started the video camera as Detective Thomas and Cheeks conversed. Cheeks directed us out of the parking lot and northbound on 104th Ave. From there Cheeks said they turned left onto a side street, he initially was unsure which road they took, again we told him we had an understanding of where this incident unfolded and we directed him toward where this incident unfolded.

As we entered the cul-de-sac at 244th and 99th, Cheeks said he remembered a police Tahoe being ry close to their vehicle. Cheeks said he told McDade "Oh shit, its over we are done." Cheeks said McDade told him they were going to get out and run from the vehicle (which he later explained that he considered McDade meant run on foot).

Cheeks said as they came to the end of the cul-de-sac, McDade attempted to turn around, as he turned his vehicle, Cheeks said the police Tahoe hit McDade's vehicle. Cheeks said McDade continued to turn and as they rounded the cul-de-sac, Cheeks said he saw three or four police vehicles in front of them. Cheeks said McDade was looking for an opening between police vehicles, he remembered seeing one police officer "right ahead of us" Cheeks said there were police vehicles on both sides of McDade's vehicle as they came to a stop and that McDade was looking for an opening between the police vehicles. Cheeks said he looked up and saw a police officer standing with his gun out, near the right front of McDade's vehicle. Cheeks said the police officer was yelling at them, saying something to the effect of, stop the car, turn off the car, and get out of the car (Cheeks was later asked how close he thought the officer was standing to McDade's vehicle and he said three to five feet from the hood).

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting  F. GENDREAU                                    Serial No. 0002

KPD 011467

# DES MOINES POLICE DEPARTMENT
## FOLLOW UP CONTINUATION

CASE#
17-1559

At this point Detective Thomas exited his vehicle while Cheeks stayed in the vehicle and directed Detective Thomas to where he remembered seeing the police officer standing. Cheeks said he thought the police officer saw that McDade had no intention of stopping, so the officer fired his gun he believed, at least three times.

Cheeks said after McDade was shot he (Cheeks) ducked down in the car. Cheeks said he could hear the engine of McDade's vehicle revving and that McDade accelerated, driving between police vehicles and turned out of the cul-de-sac, but lost consciousness and drove into the park. Cheeks did not recall a collision with any vehicles as they left the cul-de-sac.

Post interview Detective Thomas and I allowed Cheeks time to visit McDade's memorial in the park, we then took Cheeks to get food and then back to DMPD where he was allowed to eat and smoke a cigarette before being returned to SCORE.

The video recorded re-enactment with Devonte Cheeks is approximately eighteen minutes long and should be referred to for context of questions and details provided by Cheeks. I later turned the video camera over to Detective West who copied the video files to a dedicated DMPD computer drive and then onto a USB drive for prosecutorial review.

**Around 1730 hours** I took a phone call from a male who identified himself as Devonte Cheeks father. He wanted general information regarding the case.

**Around 1800 hours** I spoke with POSPD Detective D. Beam regarding security video hew had obtained from a residence and a statement from a witness, obtained from a residence in the cul-de-sac where this incident occurred. Arrangements were made to get a copy of the video and statement the following day.

## June 27th 2017

Detective Thomas and I met with Detective Beam from the Port of Seattle Police (POSPD). He supplied me with a USB flash drive containing security video from a doorbell camera located at 24314 99th Ave South. Also on the USB flash drive was a statement from witness Hoang Pham, two photographs taken

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting   F. GENDREAU                                    Serial No. 0002

PAGE 11   OF 23

KPD 011468

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

from the vantage point Pham who witnessed this incident, a diagram drawn by Pham and a recorded interview with Pham taken by POSPD Detectives Beam and Landers.

I later reviewed witness Pham's audio recorded statement and watched the video from the doorbell camera.

Witness Pham's residence is located in the northeast corner of the cul-de-sac ████ ██ ██, with his doorbell camera pointed toward the southwest with a view of the cul-de-sac.

Upon reviewing the video surveillance I saw McDade's vehicle enter the cul-de-sac followed by two police vehicles, both of which have their emergency lights activated. I could also hear sirens for one or both police vehicles. As McDade's vehicle enters the cul-de-sac and starts to make a westerly turn it is struck in the left rear door by a pursuing police vehicle (reported to be Officer Rausch's vehicle). The other police vehicle maintains it direction of travel and appears to drive toward the direction McDade's vehicle, cutting the cul-de-sac in what appears to be an attempt to block the pursued vehicles path. It should be noted portions of the video are washed out from the bright lights of the police vehicles flashing lights.

I could hear what sounded like the engine of McDade's vehicle revving and then I could hear what I assumed was a police officer yelling "get out of the car." McDade's vehicle is visible backing up and the engine is heard revving again before the vehicle accelerates forward, an impact is heard followed seconds later by what sounds like two gunshots in succession.

McDade's vehicle is visible leaving the cul-de-sac at a high rate of speed, the tires can be heard squealing, before the video shuts off.

The video surveillance is approximately thirty seconds in length. I later supplied the USB flash drive to Detective West who copied the video and photographs to a dedicated DMPD computer drive and later to another USB thumb drive for prosecutorial review.

**Around 1100 hours** I contacted Detective M. Lorette from the Kent Police Department and requested they hold Officer Rausch's vehicle for possible collision reconstruction. Detective Lorette later

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting   F. GENDREAU

Serial No. 0002

PAGE 12   OF 23

**KPD 011469**

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

called me to advise the vehicle repairs had been started but were stopped. Further, Officer Rausch's vehicle had the CDR downloaded at the Kent City shops, Detective Lorette later emailed me a copy of the CDR.

**Around 1300 hours** I called WSP and left a message for Detective Sgt. S. Moate requesting she call me about collision reconstruction for the involved vehicles.

**Around 1400 hours** I attended a meeting at Kent Police Department in which we presented a power point with our investigative results to date. This was later copied to a USB flash drive to reference with this case.

### June 28th 2017 through July 2nd 2017

I was out of the office and took no investigative steps other than answering phone calls and emails regarding this case.

Detective Thomas advised he and Detective West had obtained security video from the AM-PM Mini Market at 254th and 104th. They had also made arrangements to have Officer Rausch's patrol vehicle and McDade's vehicle transferred to the Renton Police Department for collision reconstruction.

**Around 1100 hours** I obtained an email from POSPD Detective D. Carlton. Detective Carlton stated they had completed canvasing the neighborhood in the area of this incident. Detective Carlton supplied me with three addresses where contact was not made, 24319 99th Ave South, 24324 99th Ave South and 9916 South 244th Street.

I spoke with Detective Emly who stated she had been in contact with WSP regarding collision reconstruction. It was relayed to me that WSP requested Renton PD handle any collision investigation regarding the involved vehicles. I later spoke with Detective Thomas who said he made arrangements with Renton Police Sgt. B. Judd to have the vehicles towed to Renton Police Department for further investigation.

---

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting   F. GENDREAU                    Serial No. 0002

KPD 011470

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

### June 29th 2017

I received an email from POSPD Detective D. Carlton that included follow up reports from both Detective Beam and Carlton. I was also advised he had a CD-R of security video from two homes he would drop off at DMPD.

### June 30th 2017

I spoke with Detective Thomas who advised me he obtained a copy of Officer Davis and Rausch's reports.

### July 3rd 2017

I read Officer Davis' and Rausch's reports regarding this incident. Their reports should be referred to for detail about their specific involvements.

**Around 1150 hours** I faxed a request to the King County Medical Examiner's office for records of McDade's autopsy report.

**Around 1300 hours** I emailed Renton Police Sgt. Judd the CDR download from Officer Rausch's patrol vehicle to assist in the reconstruction efforts.

Detective West and I reviewed AM-PM surveillance video. McDade's vehicle appears to be occupied by at least two people. On camera ten, at 0005 hours, McDade is seen drinking from what appears to be the two liter 7-Up bottle we recovered during the search warrant service of his vehicle. It does not appear McDade purchased gasoline at the time as reported by Cheeks.

Detective West discovered that the video from AM-PM's camera sixteen was the wrong date, Detective West contacted the owner who stated he would be available the following day to retrieve the correct day.

**Around 1430** I reviewed the security videos supplied by POSPD Detective D. Carlton. Two separate security videos were obtained, one from the residence of Frank Worley located ███████ ████ ██ ████ and a second from the residence of Brian Nguyen located ██████ ███ ██ ████.

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting  F. GENDREAU

Serial No. 0002

**KPD 011471**

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#

17-1559

From Worley's security video I saw McDade's vehicle driving westbound on South 244th Street followed by two police vehicles with their emergency lights activated, the vehicles travels out of view of the camera. A short time later McDade's vehicle comes back into view and drives onto the grass in Canterbury Park followed by two police vehicles.

From Nguyen's surveillance video I saw three short clips. One clip shows McDade's vehicle along with police vehicles entering the cul-de-sac, as the vehicles come to a stop the camera shuts off. It should be noted from Nguyen's video, it appears Officer Davis' vehicle comes to a stop facing south or southeast and not facing McDade's vehicle as reported by Decker, but in front of it, his back bumper to the front of McDade's vehicle. This is consistent with Officer Davis report. Further, there is a structural support pole on the home, which blocks a portion of the video. Because of wash out from bright lights, one can only assume the vehicle behind Officer Davis' in  fact McDade's based on other security video's and officer accounts.

When the vehicle's leave the cul-de-sac the motion of police vehicles trigger the camera again, McDade's vehicle is not observed in this clip. I was advised by POSPD investigators that Nguyen's camera system is motion activated, it is possible McDade's vehicle triggered  and activated  the camera, but only caught the police vehicles as they pursued McDade out of the cul-de-sac.

Both Officer Davis and Rausch's report narratives are consistent with and corroborate what I have already viewed and heard on home surveillance videos and from business security cameras to date.  The exception would be any direct quotes made by officers as the only audio obtained to date is from the Pham doorbell camera in which commands can be heard.

**July 4th 2017**

I sent a text message to AM-PM owner/manager Philip Baskaron (⬛⬛⬛⬛⬛) requesting a copy of camera sixteen's surveillance video from the date of this incident. Baskaron later sent me a message stating he would be available today to obtain the video.

**Around 1000 hours** Detective Thomas and I contacted Baskaron at the AM-PM. Baskaron was able to download camera sixteen's video onto a USB flash drive we provided. I later supplied the USB flash

---

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting  F. GENDREAU                     Serial No. 0002

KPD 011472

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

**CASE#**
17-1559

drive to Detective West who copied the video file to a dedicated DMPD computer drive and then onto a second USB flash drive for prosecutorial review.

 **Around 1030 hours** Detective Thomas and I conducted a neighborhood canvas of the addresses supplied to me by POSPD Detective Carlton. We first went to 9916 South 244th Street, there was no answer so I left a business card on the door. We next went to 24324 99th Ave South, again there was no answer and I left a business card on the door. Lastly we went to 24319 99th Ave South. Initially I left a business card on the door, however just as we were leaving the homeowner arrived. The occupants of this address were identified as Wakene Siminae, date of birth &#9608;&#9608;-78 &#9608;&#9608;&#9608;&#9608; ) and his wife Bruktite Gebremariam, date of birth &#9608;&#9608;7-1986 &#9608;&#9608;&#9608;&#9608; ). There is what appears to be a camera in the front room window of this residence which faces the cul-de-sac to the east. We were advised the camera does not really work and she stated it was fake, she explained it was set up to deter crime.

 Gebremariam said she did not witness the incident but heard what she thought to be a police officer yelling something to the effect of, get out of the car, twice, then heard what she believed to be gunshots.

## July 5th 2017

 I received a phone call from a female, who I later identified as Mitzi A. Davis, date of birth &#9608;&#9608;2-1974 &#9608;&#9608;&#9608;&#9608; ). Mitzi said she lived at &#9608;&#9608;&#9608; &#9608;&#9608; &#9608;&#9608;&#9608; and had found my card on her door.

 Mitzi said she has no home surveillance video. I asked her if she witnessed this incident and she told me no. Mitzi did say she heard sirens and what she thought was a police officer yelling then heard popping noises and sounds of a vehicle. Mitzi said her bedroom is in the back of the house so it was not clear to her what was being said, she only assumed it was an officer because she had heard the sirens.

 **Around 1330 hours** I met with Kent Police Detective M. Lorette and obtained related Kent Police reports associated with this incident. Detective Lorette also provided me with a CD of photographs taken by responding Kent Police Officers. I later turned the CD over to Detective West who copied the CD to a dedicated DMPD computer drive and then onto a USB flash drive for prosecutorial review.

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting   F. GENDREAU      Serial No. 0002

KPD 011473

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

**Around 0930 hours** I received an email from POSPD Detective D. Carlton. Detective Carlton reported the security video he obtained from the residence of Frank Worley, located at ████ ████ ████, was approximately six minutes long. Apparently there was other footage on Mr. Worley's computer hard drive that was not downloaded by Detective Carlton because of technical difficulties. Detective Carlton said he was contacted by Frank Worley who indicated he was now able to download the entire video file.

**Around 1330 hours** I called the King County Photo lab and inquired about them making still images from video surveillance from AM-PM mini market as well as from the video security at the Pham residence. I also inquired as to whether it was possible to enhance the video from Pham's residence as the lights from the police vehicles wash out portions of the video.

**Around 1500 hours** I spoke with Frank Worley on the telephone (████████). Arrangements were made to leave a USB flash drive at his residence which he agreed to copy his security video file to.

**Around 1700 hours** Detective Emly dropped off a USB flash drive at Frank Worley's residence. He later sent me a text message indicating he had completed the download and would place the USB flash drive back outside his residence for pickup.

**Around 1800 hours** I copied the digitally recorded statement of Hoang Pham from the USB flash drive provided to me by POSPD Detective D. Beam on June 27th to a dedicated DMPD computer drive for transcription purposes.

I reviewed the other involved Kent Police reports. The reports from other responding Kent Police Officer's convey their involvement post pursuit and shooting. Of note in Officer Lindstrom's report of removing a wallet from McDade's pants as they gave aid. In the wallet she located suspected narcotics.

## July 6th 2017

**Around 0900 hours** I emailed Renton Police Sgt. B. Judd a copy of the search warrant regarding McDade's vehicle.

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting   F. GENDREAU            Serial No. 0002

PAGE _17_ OF _23_

KPD 011474

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

**Around 0930 hours** I received the transcribed copy of Pham's statement from DMPD records, a copy of which is attached and incorporated by reference into this case file.

**Around 1000 hours** Detective Thomas and I went to the Worley residence where I picked up the USB flash drive Frank Worley had recorded on from his home security system. I later turned the USB flash drive over to Detective West who copied it to a dedicated DMPD computer drive and then onto a second USB flash drive for prosecutorial review. The video depicts what I initially described as well as other police activity such as additional units responding, which is consistent with the other Kent Police Officer Reports, such as aid being rendered.

**Around 1100 hours** I received a report from Des Moines Police Evidence Technician C. Agnew indicating she had recovered evidence from the King County Medical Examiner's Office. Some of these items were of non-evidentiary value and were personal belongings of McDade.

**Around 1400 hours** I received a phone call from the KCSO Photo laboratory. Arrangements were made to bring a copy of the AM-PM video and Pham's doorbell video to the laboratory for potential enhancement.

## July 11th 2017

**Around 1030 hours** I met with Michael Sage at the King County Photo lab and left him a USB flash drive containing the AM-PM surveillance and the home video from Pham's residence.

## July 12th 2017

**Around 0900 hours** I called the attorney's office McDonald, Hoague and Bayless (206-622-1604) representing the family of McDade. I spoke with and answering service who told me they would email Tim Ford, the family's attorney. I advised the answering service we had received several personal belongings of McDade's back from the King County Medical Examiner's Office that I would like to return to the family if they desired. I left my contact information for future communications.

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting  F. GENDREAU                      Serial No. 0002

PAGE 18 OF 23

KPD 011475

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

**Around 0910 hours** I received a phone call from Attorney Tim Ford. Ford stated he would contact McDade's family and make arrangements to have McDade's personal belongings returned. I supplied Ford with my contact information for future communications.

**Around 0930 hours** I emailed King County Photo Laboratory, Michael Sage. I sent him a request to make still photographs from the AM-PM surveillance video and to possibly enhance the surveillance video as well as make still images from Pham's home security system.

**Around 1030 hours** I called the WSP Crime Scene Response Team and spoke with Mary Kellar, a forensic scientist, regarding the bullet defects through the windshield of McDade's vehicle. My specific question to Kellar was one of trajectory of the bullets fired. Kellar stated because there are no secondary impacts, trajectory analysis would not be accurate and WSP would not recommend it. Further she said because glass is easily disrupted, trajectory through glass is very subject to interpretation and is not reliable.

**Around 1045 hours** I called Brian Johnson a crime scene investigator. Johnson runs Advice Associates, a forensic investigation and consulting business. Johnson stated he may be able to break down video surveillance from Pham's doorbell camera into time sequence. We planned to meet later so he could review the video files.

**Around 1430 Hours** I met with Johnson, in Fife. I supplied him with a copy of Pham's video surveillance and pictures of the defects in McDade's vehicle windshield on a USB thumb drive. I requested the video be broken down by seconds to show movement of vehicles and time sequenced between events.

## July 13th 2017

I received a voice mail message from attorney Tim Ford who stated he had spoken with McDade's family. Ford requested the non-evidentiary items returned to DMPD by the King County Medical Examiner's Office be brought to his office located at 705 2nd Ave in Seattle, which he would have returned to the family.

**Around 1100 hours** I emailed Kent Detective M. Lorette to obtain permission to have Johnson start work on Pham's surveillance video, which was later approved.

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting   F. GENDREAU

Serial No. 0002

KPD 011476

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

**Around 1100 hours** I spoke with KC Prosecutor Mark Larson regarding the release of Officer Davis' uniform and firearm from evidence to be returned to Kent Police, which he approved.

**Around 1125 hours** I had Officer Davis' uniform removed from evidence for laundering and eventual return to Kent PD.

**Around 1230 hours** I had Officer Davis' firearm removed from evidence and turned over to Detective West, a certified firearms instructor. Detective West function tested the firearm and fired two rounds from it at the WCJTC firing range. The two casings fired from Officer Davis' handgun were collected as reference and will be forwarded to WSP for comparison with the two casings recovered at the scene. The firearm was returned to evidence.

**Around 1600 hours** I emailed Renton Sgt. Judd a copy of the video security files from Nguyen's home camera to reference for the reconstruction efforts.

## July 14th 2017

I received an email forwarded to me by Des Moines Commander D. Jenkins from Kent Police Chief K. Thomas regarding release of all available security video recordings, both home security, business surveillance and investigation re-enactments, as well as jail phone calls between witness Cheeks and his father. It was requested these items be copied to a USB flash drive for release to McDade's family's attorney.

## July 17th 2017

**Around 0600 hours** I received Officer Davis' uniform.

**Around 0700 hours** I requested Detective West copy all available electronic evidence obtained as part of this investigation to a USB flash drive, to comply with Chief Thomas' request for information.

**Around 0730 hours** I requested Officer Davis' firearm be removed from evidence to be returned to Kent Police.

---

rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting  F. GENDREAU                    Serial No. 0002

PAGE 20 OF 23

**KPD 011477**

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#
17-1559

**Around 0830 hours** I was contacted by Bryan Johnson from Advice Associates. Johnson completed the requested examination of Pham's home security video, which he labeled project number P17-07-001. I met with Johnson, in Fife, and was supplied with a USB flash drive, DVD-R and written report. Johnson was able to examine Pham's video and break down significant events in the video into seconds, frames and total frames from the start of the video clip to its conclusion.

Johnson's full report is attached and incorporated by reference into this report and should be referred to for detail. I later placed the DVD-R and USB flash drive into evidence at DMPD.

**Around 1113 hours** I received an emailed copy of Tukwila Detective E. DeVries' report.

**Around 1118 hours** I released evidence items CRE-26, Officer Davis' uniform and CRE-27, Officers Davis' duty weapon to Kent Detective M. Lorette (see evidence release). Detective Lorette was also supplied with the USB flash drive to comply with Chief Thomas' request.

**Around 1400 hours** I completed a WSP laboratory request to have evidence item JW-6, control casings recovered after Detective West test fired Officer Davis' duty weapon, compared to evidence item CRE-3 and CRE-4, casing recovered at the scene.

## July 18th 2017

**Around 1500 hours** I had Evidence Technician C. Agnew remove Officer Davis' firearm magazines from evidence and turn them over to me.

## July 19th 2017

**Around 1100 hours** I met with Kent Detective M. Lorette and returned Officer Davis' firearm magazines, items CRE-28, 29 and 30.

**Around 1430 hours** I received Tukwila Police Detective L. Hann's report.

*tify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting  F. GENDREAU                                    Serial No. 0002

PAGE 21 OF 23

KPD 011478

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

## July 20th 2017

Evidence Technician C. Agnew gave me a copy of King County AFIS examination report, regarding evidence items CRE-10, 12, 14, 16 and 17 submitted for examination. No individualizations were made to Cheeks or McDade on the evidence items submitted for examination.

## July 21st 2017

I received an email from Michael Sage of the King County photo lab. He reported he was able to extract and separate all the frames from Pham's home surveillance and create 444 still images from those frames. He reported most of the images are washed out from police vehicle lights. Sage said he was working on still images from the AM-PM mini Market.

## Summary of evidence to date:

Evidence items CRE-10, 12 and 14 which contained suspected marijuana and CRE 16 and 17 which contained an unknown liquid were sent to AFIS for processing.

Evidence items CRE-16 and 17 were then transferred from AFIS to the Washington State Patrol Crime Laboratory for toxicology examination of their contents.

Evidence items CRE 24 and 25 were sent to the Washington State Patrol Crime Laboratory for identification.

JW-6, CRE-3 and 4 were sent to the Washington State Patrol Crime Laboratory for comparison.

## Summary of pending reports:

Renton Police are in the process of completing a reconstruction of the collision between McDade and Rausch's vehicles. It's planned to have Davis and Rausch then watch the reconstruction video for accuracy and to indicate to investigators where they were at the time of the shooting

A request was made to the King County Medical Examiner's Office to obtain McDade's autopsy and toxicology reports as well as any photographs.

---

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting  F. GENDREAU

Serial No. 0002

PAGE 22 OF 23

KPD 011479

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

| CASE# |
|---|
| 17-1559 |

All laboratory results are pending except AFIS as noted above.

**Case:** This case investigation is current to date, any future investigative follow up will be documented on a separate report and attached to this case.

*rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Dated July 21st 2017 in Des Moines, King County, Washington.*

Officer Reporting   F. GENDREAU                    Serial No. 0002

**KPD 011480**

# DES MOINES POLICE DEPARTMENT
# FOLLOW UP CONTINUATION

CASE#

17-1559

...rtify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Dated July 21st 2017 in Des Moines, King County, Washington.

Officer Reporting   F. GENDREAU

Serial No. 0002

PAGE        OF

KPD 011481



# DES MOINES POLICE DEPARTMENT

Evidence Report for Case Number: 17-1559

17-1559

**Printed By:** FRED GENDREAU
**Time / Date Printed:** 10:09:40 06/24/17

| | | |
|---|---|---|
| **ID Number:** 30274 | **Type:** EVI | **Local ID:** FJG 1 |
| **Item:** CD | **Color:** / | |
| **Brand:** | **Quantity:** 0 | |
| **Model:** | **Measure:** | |
| **Serial #:** | **Description:** FJG-1 / CD | |

**Comments:**
FJG-1 / CD / STATEMENT OF ANNEMARIE DECKER (KENT PD)

**Transaction:** INIT INITIAL ENTRY BY OFFICER          **Date:** 10:08:50 06/24/17
**Who to/from:** F GENDREAU          **Custodian:** F GENDREAU          **Location:** EVIDENCE LOCKER
**Reason:**

Officer Signature / Badge #: _____ #0002

KPD 011482



# DES MOINES POLICE DEPARTMENT

Evidence Report for Case Number: 17-1559

**17-1559**

**Printed By:** FRED GENDREAU
**Time / Date Printed:** 13:56:17 07/22/17

---

**ID Number:** 30505      **Type:** EVI      **Local ID:** FJG 2
**Item:** Miscellaneous      **Color:** /
**Brand:**      **Quantity:** 0
**Model:**      **Measure:**
**Serial #:**      **Description:** FJG-2 / MISC.
**Comments:**
FJG-2 / MISC. / DVD-R AND FLASHDRIVE / WORK PRODICT OF ADVICE ASSOCIATES

**Transaction:** INIT INITIAL ENTRY BY OFFICER      **Date:** 13:54:08 07/22/17
**Who to/from:** F GENDREAU      **Custodian:** F GENDREAU      **Location:** EVIDENCE LOCKER
**Reason:**

---

Officer Signature / Badge #: _____



# DES MOINES POLICE DEPARTMENT

Chain of Custody



## ID Number                    Description

F GENDREAU 15:06:16 07/18/17
INC#: 17-1559 LOC: RELEASED
30308
Magazine , CRE 30 DMPD

F GENDREAU 15:06:16 07/18/17
INC#: 17-1559 LOC: RELEASED
30306
Magazine , CRE 28 DMPD

F GENDREAU 15:06:16 07/18/17
INC#: 17-1559 LOC: RELEASED
30307
Magazine , CRE 29 DMPD

| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |
|---|---|---|
| 1401 | 07/18/17 1505 | F. GENDREAU #0002 |
| F. GENDREAU #0002 | 7-19-17 1103 | |
| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |
| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |
| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |
| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |
| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |
| Released By: (signature / badge #) | Date / Time: | Released To: (signature / badge #) |

KPD 011484



# DES MOINES POLICE DEPARTMENT
Chain of Custody



### ID Number                     Description

F GENDREAU 11:24:53 07/13/17
INC#: 17-1559 LOC: RELEASED

30304

Clothing , CRE 26 DMPD

| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
|---|---|---|
| #1401 | 07-14-17 1115 | F. GENDREAU  0002  BACK TO KPD |
| F. GENDREAU  #0002 | 7-17-17  1118 | X |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |



# DES MOINES POLICE DEPARTMENT

Chain of Custody



## ID Number          Description

F GENDREAU 07:28:02 07/17/17
INC#: 17-1559 LOC: RELEASED

30305

Gun , CRE 27 DMPD

| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
|---|---|---|
| Agnew # 1404 | 07/17/17  0729 | F. GENDREAU  #0002 |
| Released By: *(signature / badge #)*  F. GENDREAU  #0002 | Date / Time:  7-17-17  1118 | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |
| Released By: *(signature / badge #)* | Date / Time: | Released To: *(signature / badge #)* |

KPD 011486



## Advice Associates

Forensic / Investigation
Consulting & Training
AdviceAssociates@gmail.com

### Project Report

**Project: #** P17-07-001

**Date Received:** 07-12-17

**Client:** Valley Investigation Team

**Point of Contact:** Det. Fred Gendreau

**Scope:** Review and Analyze Video File and Create a Timeline and Presentation of Significant Events in the 30 second video

<u>**Exhibits Received:**</u>
Innovera 2GB flash drive containing the following files;

| | | | |
|---|---|---|---|
| ☑ PowerPoint | 7/12/2017 4:20 PM | File folder | |
| windshield | 7/12/2017 4:19 PM | File folder | |
| 19418302_1885810081657451_5326508553... | 7/13/2017 3:43 PM | G-Dimi Media file(.mp4) | 3,891 KB |
| APD 17-07841 warrant | 7/12/2017 12:08 PM | Adobe Acrobat Docu... | 1,113 KB |
| Original Information | 7/12/2017 4:25 PM | MD5 checksum cont... | 1 KB |

Within the folder labeled "PowerPoint" was a single PowerPoint file labeled, "Kent OIS." Within the folder labeled "windshield" were nine (9) .JPG images showing the subject vehicle. The files were labeled; RPD_4201, 4202, 4214, 4215, 4216, 4217, 4218, 4225 and 4226.
(The list also shows a MD5 Hash value labeled "Original Information" that was created prior to making a working copy of the files)

<u>**Project Workflow**</u>

On 07-12-17, I was contacted by Det. Fred Gendreau of the Des Moines Police Department, representing the Valley Investigation Team (South King County). Det. Gendreau asked if we could meet to discuss a project related to an Officer Involved Shooting (OIS) that occurred in the City of Kent and being investigated by the Valley Investigation Team.

Advice Associates #P17-07-001   

**KPD 011487**

I met with Det. Gendreau and he advised that he had a 30 second video clip of the time surrounding the OIS. The video was recorded by a Vivent brand outdoor camera mounted on the front of a residence in the cul-de-sac at 99th Ave. and S. 244th St. in the City of Kent. He requested that I examine the video file and create a timeline of significant events noted in the video. Det. Gendreau provided me with the flash drive listed above in the exhibits section.

I first created a MD5 hash value of the original data, then created a hash checksum verified working copy of the data files.

I examined the video file labeled,
"19418302_1885810081657451_5326508553760931840_n.mp4" using SG CODEC Information Appliance. The video was found to have avc1/H.264/MPEG-4 AVC CODEC and was recorded at 14.995 frames per second with 444 total frames. Additional data analysis is listed in the infographic below.



I then reviewed the other files on the flash drive for basic background information on the incident. I learned that the primary Kent PD Officers involved were Officer Rausch as the Precision Immobilization Technique (PIT) car and Officer Davis as the trail car. Officer Davis was reported to be the Officer who fired shots at the suspect.

I learned that the incident occurred on 06-24-17 at about 0016 hours and again, that the OIS occurred in a cul-de-sac located at 99th Ave S. and 244th St. in the City of Kent, King County, WA.

Advice Associates #P17-07-001   

KPD 011488

I first examined the video using the Adobe Production Premium CS5.5 suite and particularly Adobe Premier Pro CS5.5 and Adobe Audition CS5.5.   While examining the video, I noted several sections of video and audio as significant events.  There are parts and areas of the video where visibility of the involved vehicles is difficult or not possible due to extensive light wash from the emergency lights of the patrol vehicles but accompanying audio is clear.

I made still captures of the frames of video where noted significant events occurred. The still captures were placed into a video timeline editor in preparation of creating a timeline presentation video.  The significant events were noted with captions in the editor.

The events are listed in seconds, frames and total frames from the start of the video clip.

> 3 seconds & 13 frames (58 frames)
> Contact Between Patrol Vehicle and Subject Vehicle Separates

> 8 seconds & 8 frames (128 frames)
> Engine Rev / Loud Muffler

> 9 seconds & 11 frames (146 frames)
> Engine Rev / Loud Muffler

> 12 seconds & 4 frames (184 frames)
> Officer Heard Yelling Commands "Get Out of The Car"

> 13 seconds & 1 frame (196 frames)
> Engine Rev / Loud Muffler

> 14 seconds & 2 frames (212 frames)
> Officer Heard Yelling Commands a Second Time "Get Out of The Car"

> 16 seconds & 13 frames (253 frames)
> Subject Vehicle Moving Backwards / Away from Patrol Vehicle

> 18 seconds & 7 frames (277 frames)
> Subject Vehicle Moves Forward / Toward Patrol Vehicle as Engine Revs

> 19 seconds & 9 frames (294 frames)
> Vehicle Impact Sound (with audio clip)

> Starting @ 21 seconds & 6 frames (321 frames)
> Ending @ 21 seconds & 11 frames (326 frames)
> Two Gunshots Heard as Subject Vehicle Engine Revs

Advice Associates #P17-07-001

**KPD 011489**

> ➢ 22 seconds & 5 frames (335 frames)
> Subject Vehicle Travels Through and Exits Light Wash, Leaving View

> ➢ 29 seconds & 9 frames (444 frames)
> Video Ends

Using Adobe Premier Pro CS5.5, the full video clip was captured at ½ speed without sound and placed into the presentation video. The following title frame was placed to identify the ½ speed video.

The Following Video Is The
Full 30 second Clip
@ 1/2 Speed
(without Sound)

The full video file, as received was then placed in the presentation video to run real time with audio. The following title frame was placed to identify the full video.

Full 30 Second
Video As
Received
(With Sound)

The audio was then separated from the video and examined in Adobe Audition CS5.5.

Audio from the following four (4) significant events were isolated for further examination:

> ➢ 12 seconds & 4 frames (184 frames)
> Officer Heard Yelling Commands "Get Out of The Car"

> ➢ 14 seconds & 2 frames (212 frames)
> Officer Heard Yelling Commands a Second Time "Get Out of The Car"

> ➢ 19 seconds & 9 frames (294 frames)
> Vehicle Impact Sound

> ➢ Starting 21 seconds & 6 frames (321 frames)
> ➢ Ending 21 seconds & 11 frames (326 frames)
> Two Gunshots Heard as Subject Vehicle Engine Revs

These specific events were isolated as individual files and noise reduction was applied to the segments where the officer was giving commands in order to reduce the siren noise and more clearly hear the officer's commands of "Get out of the car."

Page **4** of **5**               Advice Associates #P17-07-001

These specific sound clips were placed into the presentation timeline video at the appropriate point in the timeline.

The vehicle impact sound and two gunshots, with engine heard revving, were also individually isolated, clipped ad placed into the timeline presentation video at the appropriate point in the timeline.

The presentation video timeline was then rendered and exported as an .MP4 video. The Timeline Presentation Video is 3 minutes, 16 seconds run time.

The project final along with work product, visual notes and original data received were exported to write once media (DVD-R) as well as a flash drive to be turned over to Det. Gendreau.  The original flash drive will be turned over to Det. Gendreau as well. No project files will be retained by Advice Associates.

Nothing further at this time.

*Any opinions or conclusions of the Analyst are based upon the data received and/or known at the time of this project.  Should the data change or new information be developed, the work product may have to be revised considering the new information.*

**Bryan Johnson**
Managing Partner

**Advice Associates**
Forensic Investigation
Consulting & Training

Advice Associates #P17-07-001

**KPD 011491**



**Advice Associates**
Forensic / Investigation
Consulting & Training

## TIMELINE EVENTS

The events are listed in seconds, frames and total frames from the start of the video clip.

➢ 3 seconds & 13 frames (58 frames)
Contact Between Patrol Vehicle and Subject Vehicle Separates

➢ 8 seconds & 8 frames (128 frames)
Engine Rev / Loud Muffler

➢ 9 seconds & 11 frames (146 frames)
Engine Rev / Loud Muffler

➢ 12 seconds & 4 frames (184 frames)
Officer Heard Yelling Commands "Get Out of The Car"

➢ 13 seconds & 1 frame (196 frames)
Engine Rev / Loud Muffler

➢ 14 seconds & 2 frames (212 frames)
Officer Heard Yelling Commands a Second Time "Get Out of The Car"

➢ 16 seconds & 13 frames (253 frames)
Subject Vehicle Moving Backwards / Away from Patrol Vehicle

➢ 18 seconds & 7 frames (277 frames)
Subject Vehicle Moves Forward / Toward Patrol Vehicle as Engine Revs

➢ 19 seconds & 9 frames (294 frames)
Vehicle Impact Sound (with audio clip)

➢ Starting @ 21 seconds & 6 frames (321 frames)
➢ Ending @ 21 seconds & 11 frames (326 frames)
Two Gunshots Heard as Subject Vehicle Engine Revs

➢ 22 seconds & 5 frames (335 frames)
Subject Vehicle Travels Through and Exits Light Wash, Leaving View

➢ 29 seconds & 9 frames (444 frames)
Video Ends

Advice Associates #P17-07-001

**KPD 011492**



**Advice Associates**
Forensic / Investigation
Consulting & Training

## NON-DISCLOSURE AGREEMENT

This Non-disclosure Agreement (this **"Agreement"**) is made effective as of July 12, 2017 (the **"Effective Date"**), by and between Fred Gendreau / Valley Investigations Team (the **"Owner"**), South King County, and Advice Associates (the **"Recipient"**), of PO Box 24925, Federal Way, Washington 98093.

Information of a confidential nature will be gained pursuant to a contract for professional consultant services or an initial consultation to determine scope of services. In order for the Recipient to accurately estimate the fee for services, it is necessary to receive some, or all, of the Confidential information to review prior to a formal Contract for Services being executed. The Owner has requested and the Recipient agrees that the Recipient will protect the confidential material and information which may be disclosed between the Owner and the Recipient. Therefore, the parties agree as follows.

**I. CONFIDENTIAL INFORMATION.** The term "Confidential Information" means any information or material which is proprietary to the Owner, whether or not owned or developed by the Owner, which is not generally known other than by the Owner, and which the Recipient may obtain through any direct or indirect contact with the Owner. Regardless of whether specifically identified as confidential or proprietary, Confidential Information shall include any information provided by the Owner concerning the business, technology and information of the Owner and any third party with which the Owner deals, including, without limitation, criminal or civil investigations,  business records and plans, trade secrets, technical data, product ideas, contracts, financial information, pricing structure, discounts, computer programs and listings, source code and/or object code, copyrights and intellectual property, inventions, sales leads, strategic alliances, partners, and customer and client lists. The nature of the information and the manner of disclosure are such that a reasonable person would understand it to be confidential.

**A. "Confidential Information"** does not include:

- matters of public knowledge that result from disclosure by the Owner;
- information rightfully received by the Recipient from a third party without a duty of confidentiality;
- information independently developed by the Recipient;
- information disclosed by operation of law;
- information disclosed by the Recipient with the prior written consent of the Owner;
  and any other information that both parties agree in writing is not confidential.

age **1** of **3**

Owner ___ Recipient ___

KPD 011493

**II. PROTECTION OF CONFIDENTIAL INFORMATION.** The Recipient understands and acknowledges that the Confidential Information has been developed or obtained by the Owner by the investment of significant time, effort and expense, and authority and that the Confidential Information is a valuable, special and unique asset of the Owner and needs to be protected from improper disclosure. In consideration for the receipt by the Recipient of the Confidential Information, the Recipient agrees as follows:

**A. No Disclosure.** The Recipient will hold the Confidential Information in confidence and will not disclose the Confidential Information to any person or entity without the prior written consent of the Owner.

**B. No Copying/Modifying.** The Recipient will not copy or modify any Confidential Information without the prior written consent of the Owner.

**C. Unauthorized Use.** The Recipient shall promptly advise the Owner if the Recipient becomes aware of any possible unauthorized disclosure or use of the Confidential Information.

**D. Application to Employees.** The Recipient shall not disclose any Confidential Information to any employees of the Recipient, except those employees who are required to have the Confidential Information in order to perform their job duties in connection with the limited purposes of this Agreement. Each permitted employee to whom Confidential Information is disclosed shall sign a non-disclosure agreement substantially the same as this Agreement at the request of the Owner.

**III. UNAUTHORIZED DISCLOSURE OF INFORMATION - INJUNCTION.** If it appears that the Recipient has disclosed (or has threatened to disclose) Confidential Information in violation of this Agreement, the Owner shall be entitled to an injunction to restrain the Recipient from disclosing the Confidential Information in whole or in part. The Owner shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**IV. RETURN OF CONFIDENTIAL INFORMATION.** Upon the written request of the Owner, the Recipient shall return to the Owner or properly destroy all written and electronic materials containing the Confidential Information. Upon request of the Owner, Recipient shall deliver to the Owner written statements signed by the Recipient certifying that all materials have been properly destroyed or returned within five (5) days of receipt of the request.

**V. RELATIONSHIP OF PARTIES.** Neither party has an obligation under this Agreement to purchase any service or item from the other party during the initial consultation of the scope of the services. This Agreement, in and of itself, does not create any agency, partnership, or joint venture.

**VI. LIMITED LICENSE TO USE.** The Recipient shall not acquire any intellectual property rights under this Agreement except the limited right to use as set forth above. The Recipient acknowledges that, as between the Owner and the Recipient, the Confidential Information and all related rights, copyrights and other intellectual property rights, are (and at all times will be) the property of the Owner.

**VII. INDEMNITY.** Each party agrees to defend, indemnify, and hold harmless the other party and its officers, directors, agents, affiliates, distributors, representatives, and employees from any and all third party claims, demands, liabilities, costs and expenses, including reasonable attorney's fees, costs and expenses resulting from the indemnifying party's material breach of any duty, representation, or warranty under this Agreement.

Page **2** of **3**                                        Owner _____ Recipient _____

**KPD 011494**

  
**IX. GENERAL PROVISIONS.** This Agreement sets forth the entire understanding of the parties regarding confidentiality. The obligations of confidentiality shall survive perpetuity from the date of disclosure of the Confidential Information. Any amendments must be in writing and signed by both parties. This Agreement shall be construed under the laws of the State of Washington. This Agreement shall not be assignable by either party. Neither party may delegate its duties under this Agreement without the prior written consent of the other party. The confidentiality provisions of this Agreement shall remain in full force and effect at all times after the effective date of this Agreement. If any provision of this Agreement is held to be invalid, illegal or unenforceable, the remaining portions of this Agreement shall remain in full force and effect and construed so as to best effectuate the original intent and purpose of this Agreement.

**XI. SIGNATORIES.** This Agreement shall be executed Fred Gendreau, on behalf of Fred Gendreau / Valley Investigations Team and Bryan Johnson, Managing Partner, on behalf of Advice Associates and delivered in the manner prescribed by law as of the date first written above.

**OWNER:**
Fred Gendreau / Valley Investigations Team

By: _____

**RECIPIENT:**
Advice Associates

By: _____

Owner _____ Recipient _____

**KPD 011495**



## *City of Des Moines*
**POLICE DEPARTMENT**
21900 11TH AVENUE SOUTH
DES MOINES, WASHINGTON 98198-6319
(206) 878-3301                    FAX: (206) 870-7638



## FAX TRANSMISSION
### Criminal Investigations Unit

Date:        07-03-2017

To:          Records staff

RE:          **Copy of KCME case 17-1240** (autopsy, investigators notes & toxicology).

Attention:    Records unit

I am requesting a copy of the autopsy report to include investigators notes, toxicology report, for **Giovonn M. Jospeh-McDade, date of birth 10-22-1996**. This is a death which occurred in the City of Kent 06-24-2017. The Des Moines Police Department case number is 2017-1559 and the Kent Police case number is 17-9738.

This information can be mailed to:

**Des Moines Police Department**
**21900 11th Avenue South**
**Des Moines, Washington 98198.**
**Attention: Detective Fred Gendreau.**

I can be reached at my desk at (206) 870-7615.

Thank you in advance,

Detective Fred Gendreau
Des Moines Police Department
Desk: 206-870-7615
Email: fgendreau@desmoineswa.gov

NUMBER OF PAGES (INCLUDING COVER SHEET)          1

KPD 011496